IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 05-80300-CIV  MARRA/SELTZER

LINEX TECHNOLOGIES, INC. §
§
Plaintiff, §
§
vs. §
§
MOTOROLA, INC., NORTEL NETWORKS, §
INC., TROPOS NETWORKS, INC., §
FIRETIDE, INC., STRIX SYSTEMS, INC., §
and BELAIR NETWORKS INC., §   JURY TRIAL DEMANDED
§
§
Defendants. §
_____/

**PLAINTIFF LINEX TECHNOLOGIES, INC.'S**
**OPENING CLAIM CONSTRUCTION BRIEF**

Pursuant to the Court's Order Setting Trial Date & Discovery Deadlines entered

November 30, 2005, Plaintiff Linex Technologies, Inc. ("Linex") submits the following

Opening Claim Construction Brief.

TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................. 1

     A. Linex's Contributions to the Wireless Telecommunications Industry. ............ 1

     B. An Overview of the Patented Technology and Its Relationship with Network
        Topology and Mesh Network Systems. ............................................... 2
        1.   Network topology. ........................................................... 2
        2.   Mesh network systems. ....................................................... 3
        3.   An overview of the '377 patent. ............................................. 5

     C. The Law of Claim Construction. ..................................................... 7
        1.   Claim terms should be given their ordinary meaning. ......................... 7
        2.   Focus should be on the intrinsic evidence. .................................. 8
        3.   Scope should not be limited by an example. ................................. 10

II.  CONSTRUCTION OF THE DISPUTED TERMS FOUND WITHIN
     CLAIMS 32 AND 33 OF THE '377 PATENT. ........................................... 11

     A. "spread-spectrum" ................................................................ 12

     B. "remote station" ................................................................. 13

     C. "node" ........................................................................... 15

     D. "packet" ......................................................................... 16

     E. "destination address" ........................................................... 18

     F. "flow-control means" ............................................................. 19

     G. "traffic information" ............................................................ 21

     H. "traffic density" ................................................................ 22

     I. "responsive to the traffic information" .......................................... 22

     J. Terms Not Requiring Construction Retain their Ordinary Meaning ................... 23
        1.   "respective node" .......................................................... 23
        2.   "first node" ............................................................... 24
        3.   "destination node" ......................................................... 24
        4.   "selecting a path of a multiplicity of nodes" .............................. 25

III. CONCLUSION ..................................................................... 25

ii

# TABLE OF AUTHORITIES

## Cases

*Bell Communications Research, Inc. v. Vitalink Communications Corp,*
  55 F.3d 615 (Fed. Cir. 1995).................................................................... 7, 8, 9, 10

*Chimie v. PPG Indus., Inc.*
  402 F.3d 1371 (Fed. Cir. 2005)................................................................. 10

*Comark Communications, Inc. v. Harris Corp.,*
  156 F.3d 1182 (Fed. Cir. 1998)................................................................. 10

*Cybor Corp v. FAS Techs.,*
  138 F.3d 1448 (Fed. Cir. 1998)................................................................. 8

*Eastman Kodak v. Goodyear Tire & Rubber Co.,*
  114 F.3d 1547 (Fed. Cir. 1997)................................................................. 8

*Ekchian v. Home Depot, Inc.,*
  104 F.3d 1299 (Fed. Cir. 1997)................................................................. 10, 19

*EMI Group N. Am., Inc. v. Intel Corp.,*
  157 F.3d 887 (Fed. Cir. 1998), *cert. denied*, 526 U.S. 1112 (1999) ............... 9

*Enercon GmbH v. Int'l Trade Comm'n,*
  151 F.3d 1376 (Fed. Cir. 1998), *cert. denied*, 526 U.S. 1130 (1999) ............ 7

*Generation II Orthotics, Inc. v. Medical Tech. Inc.,*
  263 F.3d 1356 (Fed. Cir. 2001)................................................................. 9

*Glaxo Inc. v. Noropharm Ltd.,*
  110 F.3d 1562 (Fed. Cir. 1997)................................................................. 9

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.,*
  222 F.3d 951 (Fed. Cir. 2000)................................................................... 7

*IMS Technology, Inc. v. Haas Automation, Inc.,*
  206 F.3d 1422 (Fed. Cir. 2000), *cert. dismissed*, 121 S. Ct. 24 USLW 3175 (Sept. 11,
  2000) ....................................................................................................... 10

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.,*
  175 F.3d 985 (Fed. Cir. 1999).................................................................. 7

*Karlin Tech. Inc. v. Surgical Dynamics, Inc.,*
  177 F.3d 968 (Fed. Cir. 1999).................................................................. 24

*Kegel Corp. v. AMF Bowling, Inc.,*
  127 F.3d 1420 (Fed. Cir. 1997)................................................................. 8

*Key Pharm. v. Hercon Labs. Corp.,*
  161 F.3d 709 (Fed. Cir. 1998).................................................................. 9

*Kraft Foods, Inc. v. Int'l Trading Co.,*
  203 F.3d 1362 (Fed. Cir. 2000)................................................................. 8

*Mantech Environmental Corp. v. Hudson Environmental Services, Inc.,*
  152 F.3d 1368 (Fed. Cir. 1998)................................................................. 11

*Markman v. Westview Instruments, Inc.,*
  52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996) ............... 7

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005)................................................... passim

*Pitney Bowes, Inc. v. Hewlett-Packard Co.,*
  182 F.3d 1298 (Fed. Cir. 1999)................................................................. 9

*Scriptgen Pharm. v. 3-Dimensional Pharm., Inc.,*
    79 F. Supp. 2d 409 (D. Del. 1999)...................................................................... 9

*Specialty Composites v. Cabot Corp.,*
    845 F.2d 981 (Fed. Cir. 1988)...................................................................... 11

*SRI Intern. v. Matsushita Elec. Corp. of America,*
    775 F.2d 1107 (Fed. Cir. 1985)...................................................................... 11

*Thermalloy, Inc. v. Aavid Eng'g, Inc.,*
    121 F.3d 691 (Fed. Cir. 1997)...................................................................... 8

*Transmatic, Inc. v. Gulton Industries, Inc.,*
    53 F.3d 1270 (Fed. Cir. 1995)...................................................................... 10

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996)...................................................................... 8

*White v. Dunbar,*
    119 U.S. 47, 7 S. Ct. 72 (1886)...................................................................... 8

*York Products, Inc. v. Cent. Tractor Farm and Family Ctr.,*
    99 F.3d 1568 (Fed. Cir. 1996)...................................................................... 8

*ZMI Corp. v. Cardiac Resuscilator Corp,*
    844 F.2d 1576 (Fed. Cir. 1998)...................................................................... 10

## I.      INTRODUCTION

### A.      Linex's Contributions to the Wireless Telecommunications Industry.

Linex is an innovator in the wireless telecommunications industry.  Linex focuses its research and development efforts on third and fourth generation wireless network technologies in order to solve longstanding needs in the industry.  Once these technologies are developed by Linex, they are then marketed to those service providers and equipment manufactures implementing next generation wireless equipment.

Currently, the Linex intellectual property portfolio contains seventeen issued United States patents, as well as nine patent applications pending before the United States Patent and Trademark Office (collectively referred to as the "Linex Patents").  The Linex Patents are directed to the next generation of wireless telecommunication systems and may be categorized in four separate fields: network topology; mobility and handoff; smart antenna; system capacity and performance improvements.[1]  While each of the technologies that fall within these categories provide unique benefits to the industry, they share at least one common goal, which is to increase the capacity of wireless transmissions over a network's architecture, which results in the reduction of costs for those companies implementing the technologies.

The Linex Patents originate primarily from the vision of two of the Linex principals, Donald L. Schilling and Joseph Garodnick.  Messrs. Schilling and Garodnick, co-inventors of the patent at issue, are internationally recognized and combined have over 75 years of experience in the telecommunications industry.  They have devoted their careers to the development and improvement of wireless communication systems.  Between the two of them, they are the named inventors on over 100 issued United States patents and have authored dozens of published articles in the field.

---

[1] The patent at issue is directed, in part, to a specific "network topology" and is discussed in greater detail in the following paragraphs.

1

**B.    An Overview of the Patented Technology and Its Relationship with Network Topology and Mesh Network Systems.**

Generally speaking, United States Patent No. 6,493,377 ("the '377 patent"), attached as Exhibit A, relates to the efficient transmission of wireless communications over a specific type of network topology.  In order to understand the technology of the '377 patent, it is important to consider various concepts in wireless communication systems, including network topologies, specifically mesh networks and their benefit over other typical networks, as well as the basic components in a wireless system and how they function.

**1.    Network topology.**

A network topology is commonly thought of as the pattern of communication links between multiple communication devices (*i.e.*, nodes) within a network.  Generally speaking, a network's topology is determined by the geometric configuration of the connections between the nodes.  The nodes are intermediate communication or computing devices that route data through the network.  The most common network topologies are characterized as bus, star, token ring, ring, tree and mesh networks.  Figure 1 shows these common network topologies, each of which has unique benefits, as well as limitations, depending upon the nature and intended purpose of the respective network.



**Figure 1.**

2

The network topology to which the invention claimed in the '377 patent is directed is a "mesh network."

### 2.      Mesh network systems.

A mesh network is typically a local area network that employs either a wired or wireless connection between nodes in order to transmit data through the network. The purpose of a mesh network is to provide reliable communication through redundancy. In other words, a mesh network provides multiple channels for communicating the signal to reach its intended destination. For example, if one node in the mesh network is incapable of receiving and/or transmitting a signal, the rest of the nodes in the mesh network are still capable of communicating with one another so that the signal can be dynamically rerouted through the network of nodes in order to reach its intended destination.

Remote stations, such as cellular telephones, personal computers, handheld computers, etc., may transmit data to or receive data from a node in the mesh network. When data is transmitted to a node by a remote station, that data is routed through the mesh network on a path to the intended destination. In many cases the intended destination is another computer outside of the mesh network. One or more of the nodes in the mesh network, called a hub node, may be connected to other networks, such as the Internet. The data would be routed on a path from the first node accessed by the remote station to the hub node. From the hub node, the data would be transmitted to an external network.

Common uses of mesh networks include providing internet access to university campuses or small cities. The nodes are typically small computing devices that may be mounted on telephone poles or rooftops. For example, a university campus may have 50 or 60 nodes mounted in various locations on the campus. A student with a laptop computer may access the Internet over the mesh network by connecting wirelessly to the nearest node.

In a basic mesh network system, each node is connected directly to each of the other nodes. In other mesh network configurations, the nodes are connected to all of the other nodes, but some nodes will connect and transmit data to nodes with which data is most frequently exchanged. Figure 2 is a general depiction of a basic mesh network system with five separate nodes and ten connections.



Mesh network

**Figure 2.**

A more complete depiction of an advanced mesh network system is seen in Figure 3, a drawing taken directly from the '377 patent, which typifies an actual wireless mesh network environment.



**Figure 3.**

4

As can be seen from Figure 3, a remote station communicates with a node such that the data can be dynamically routed throughout the network of nodes to reach its intended destination, whether that destination is another remote station inside the network, or one outside of the network.

### 3.      An overview of the '377 patent.

As indicated above, the '377 patent generally relates to the efficient transmission of wireless communications over a mesh network.  The inventions claimed in the '377 patent provides three specific benefits over existing networks, such as star networks and other prior mesh network systems: (1) increased capacity of data being transmitted over a network; (2) reduced power and power variations needed for the transmission of data over a network; and (3) a more flexible network capable of dynamically adapting to the communication environment. *See generally*, Ex. A, Col. 1, ll. 13- 45; Col. 2, ll. 11-18.

As described in the '377 patent, star network configurations are problematic in next generation wireless environments because data is routed through a fixed communication path and lacks the capability to route through dynamically changing paths depending upon network conditions and node availability.  *See* Ex. A, Co. 1, ll. 28-39.  Figure 4, taken from the '377 patent, shows the fixed routes from the remote stations to the respective base stations,[2] as well as from the three base stations to the central office in a typical star network.[3]

---

[2] Base stations are typically located on towers and are dispersed at various geographic locations.  The remote stations communicate directly to the base stations, which are the first point of access for the remote station into the star network.

[3] It is commonly understood that a "central office" refers to a physical location that maintains switching system hardware that routes calls (or other types of data).  In a mesh network system, the central office routes incoming calls/data originating from outside the network to destinations within the network as described herein.  Conversely, the central office in a mesh network system is capable of routing calls/data originating from inside the network to destinations both inside and outside of the network.



**Figure 4.**

An inherent result of a star network configuration in next generation wireless systems is that problems arise with respect to the power necessary to transmit signals between the base stations and the remote stations, and the network's ability to control that power. *See* Ex. A, Co. 1, ll. 39-45. Unlike fixed route star networks and prior mesh network systems, the technology described in the '377 patent allows for signals to be dynamically routed and transmitted to a central office by way of one or more nodes based upon existing network conditions and node availability. The practical effect of the technology claimed in the '377 is that a greater amount of data can be reliably transmitted from remote stations to other remote stations, nodes, and/or a central office, if necessary, and the power levels and power level variations needed to transmit the data are reduced. Importantly, the invention of the '377 patent also allows for network flexibility as a result of communication signals capable of dynamically adapting to the fluctuating data requirements between remote stations, nodes, and/or a central office, if necessary.

C.     **The Law of Claim Construction.**

As the Court is aware, determining the proper meaning of patent claims is a question of law, placing the task of claim construction on the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996)  In performing its claim construction duties, the Court has certain established principles or guidelines it should follow.   As background for the Court's consideration of these difficult and often case determinative issues, Linex first provides the Court with a summary of the applicable case law and then outlines its proposed claim constructions based on that case law.   Linex notes that the Federal Circuit has recently effectively settled the law of claim construction with the very thorough *Phillips* opinion, cited numerous times herein.   To the extent that certain portions of the prior law were not reinforced and/or adopted in the Federal Circuit's most recent analysis and explanation of the proper method of claim construction, they have been omitted from Linex's summary of the law contained below.

1.     **Claim terms should be given their ordinary meaning.**

The Court should first look at the claim language and ascribe the plain and ordinary meaning of a disputed term.   *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999); *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995); *Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1384 (Fed. Cir. 1998), *cert. denied*, 526 U.S. 1130 (1999); *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 955 (Fed. Cir. 2000).   It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).   While none of the intrinsic information should be ignored, the Federal Circuit has indicated that the claim language itself defines the scope of the claim, and a construing court does not accord the specification,

prosecution history and other relevant evidence the same weight as the claims themselves. *Eastman Kodak v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1552 (Fed. Cir. 1997), overruled on other grounds by *Cybor Corp v. FAS Techs.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998); *see also York Products, Inc. v. Cent. Tractor Farm and Family Ctr.*, 99 F.3d 1568, 1572 (Fed. Cir. 1996); *Thermalloy, Inc. v. Aavid Eng'g, Inc.,* 121 F.3d 691, 692-93 (Fed. Cir. 1997). Thus, the Court must presume that the terms in the claim mean what they say, and unless otherwise compelled, give full effect to the ordinary meaning of claim terms. *Johnson Worldwide*, 175 F.3d at 989. In fact, the Federal Circuit has gone as far as saying that there is a "***heavy presumption*** in favor of the ordinary meaning." *Id.* (emphasis added). "It is both unjust to the public and an evasion of the law to construe an invention in a manner different from the plain import of its terms." *Phillips*, 415 F.3d at 1312 (quoting *White v. Dunbar*, 119 U.S. 47, 52, 7 S. Ct. 72, 75 (1886), internal quotations omitted). The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of the ordinary skill in the art in question at the time of invention. *Phillips*, 415 F.3d at 1313.

## 2.    Focus should be on the intrinsic evidence.

To discharge its obligation in construing the claims of a patent, courts properly begin with the patent claim itself, the specification of the patent and the patent's prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362 (Fed. Cir. 2000); *Kegel Corp. v. AMF Bowling, Inc.*, 127 F.3d 1420, 1426 (Fed. Cir. 1997). This is typically referred to as intrinsic evidence. In most cases this intrinsic evidence should be sufficient to determine the meaning of a claim term. *Bell & Howell Doc. Mgmt. Prods. Co. v. Altek Sys.,* 132 F.3d 701, 705 (Fed. Cir. 1997). Other evidence, called extrinsic evidence, is typically not needed or used to properly construe the claims. In fact, when the intrinsic evidence is unambiguous, it is improper for the Court to rely

on extrinsic evidence for purposes of claim construction. *Id.* at 706.    In other words, "if the meaning of a disputed claim term is clear from the intrinsic evidence, that meaning and no other must prevail; it cannot be altered or superseded by expert witness testimony or other external sources simply because one of the parties wishes it were otherwise." *Scriptgen Pharm. v. 3-Dimensional Pharm., Inc.*, 79 F. Supp. 2d 409, 411 (D. Del. 1999) (quoting *Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)).

Extrinsic evidence may, however, be used by the court to enhance its understanding of the technology. *See EMI Group N. Am., Inc. v. Intel Corp.*, 157 F.3d 887, 892 (Fed. Cir. 1998), *cert. denied*, 526 U.S. 1112 (1999)).    Simply put, the use of extrinsic evidence may be appropriate to ensure that the court's understanding of the technical aspects of the patent is not entirely at variance with the understanding of one skilled in the art. *Generation II Orthotics, Inc. v. Med. Tech. Inc.*, 263 F.3d 1356, 1366 (Fed. Cir. 2001); *see also Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999).    But while extrinsic evidence (*e.g.*, expert testimony and/or industry treatises) may be admitted for this limited purpose (for the court to educate itself about the patent and the relevant technology), the claims and the written description remain the primary and more authoritative sources of claim construction.    *Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*, 152 F.3d 1368, 1373 (Fed. Cir. 1998); *Bell & Howell*, 132 F.3d at 705; *Glaxo Inc. v. Noropharm Ltd.*, 110 F.3d 1562, 1565 (Fed. Cir. 1997).

There are several reasons for the overall hesitation of the courts to rely upon extrinsic evidence.    These include the fact that extrinsic evidence is by definition not part of the patent, thus detracting from a patent's public notice function. *Phillips*, 415 F.3d at 1318.    Further, extrinsic evidence may not reflect the understanding of a skilled artisan in the art at the time of filing of the patent.    *Id.*    The fact that supporting extrinsic evidence is generated at the time of and for the purpose of litigation also makes it susceptible to bias; this is especially true as there is

a virtually unbounded universe of potential extrinsic evidence that a party can and most likely will selectively filter for the court in an attempt to advance its own case. *Id.*

Clearly, although the focus should be on the ordinary meaning, the specification and prosecution history cannot be ignored. *See Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1277 (Fed. Cir. 1995). However, as the prosecution history represents an ongoing negotiation between the PTO and the applicant, it often lacks the clarity of the end-product specification and, as such, is less useful for claim construction purposes. *Phillips*, 415 F.3d at 1317. Clearly, and as adhered to in Plaintiff's claim construction analysis, "[t]he purpose of consulting the prosecution history in construing a claim is to 'exclude any interpretation that was disclaimed during prosecution.'" *Phillips* at 1317 (citing *Chimie v. PPG Indus., Inc.* 402 F.3d 1371, 1384 (Fed. Cir. 2005) and quoting *ZMI Corp. v. Cardiac Resuscitator Corp*, 844 F.2d 1576, 1580 (Fed. Cir. 1998)); *Southwall*, 54 F.3d at 1576.

### 3.    Scope should not be limited by an example.

Reference to the specification and prosecution history must be balanced with the principle that it is impermissible to read a particular embodiment into the claim. *Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1186-87 (Fed. Cir. 1998); *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1433 (Fed. Cir. 2000), *cert. dismissed*, 530 U.S. 1299 (2000). The Federal Circuit has repeatedly warned against confining claims to the often very specific embodiments of the invention described in the specification. *Phillips* at 1323. Thus it is clear that while claims should be read in view of the specification, it is improper to limit the scope of a claim to the preferred embodiment or specific examples disclosed in the specification. *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1303 (Fed. Cir. 1997); *Bell Communications*, 55 F.3d at 620. Along these lines, if the written description supports the definition of the term that

is apparent from the claim language, then reading in a further limiting definition would be improper. *Mantech,* 152 F.3d at 1374.

The purpose of this prohibition is to preserve the function of the claims in a patent. If every claim were limited to the preferred embodiment, there would be no need for several claims. *See SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985). Consistent with this function of the claims, the Federal Circuit has routinely found that a patent is not restricted to the examples, but is defined by the words in the claims. "That is not just because section 112 of the Patent Act requires that the claims themselves set forth the limits of the patent grant, but also because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Phillips*, 415 F.3d at 1323. For instance, in *Specialty Composites v. Cabot Corp.*, the Federal Circuit found that just because the three examples described in the specification all refer to external plasticizers, the term "plasticizers" should not be limited to external plasticizers. *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988). Indeed, when the specification does not require such a limitation, no limitation should be read into the claims. *Id.* Likewise, in *SRI*, the Federal Circuit held that merely because "a specification describes only one embodiment does not require that each claim be limited to that one embodiment." *SRI Int'l*, 775 F.2d at 1121, n. 14. Thus, as a general rule, modifiers should not be added to broad terms standing alone, and mere inferences drawn from a description of an embodiment (or example) of the invention cannot require a narrower definition of a claim term. *Johnson Worldwide*, 175 F.3d at 989 and 991.

## II.   CONSTRUCTION OF THE DISPUTED TERMS FOUND WITHIN CLAIMS 32 AND 33 OF THE '377 PATENT.

Linex asserts that the Defendants infringe independent system claim 32 and independent method claim 33 of the '377 patent. From these two claims, there are thirteen disputed claim

11

terms or phrases that must be construed by the Court. With the exception of two terms, all of the disputed terms appear in both claims. Attached as Exhibit B is a chart that identifies the disputed terms, the claims in which they appear, and the parties' proposed constructions. For the Court's convenience, the asserted claims, with the disputed terms highlighted, are attached as Exhibit C.

### A.     "spread-spectrum"

Claims 32 and 33 are addressed to "spread spectrum" systems or methods. *See* Ex. A, Col. 16, ll. 4, 11, 28, 33. This term should be given its ordinary meaning as recognized by persons of ordinary skill in the art, namely "a form of communication in which a signal is spread over greater bandwidth than is necessary to transmit the signal." Clearly, the patentees used the term "spread spectrum" in the '377 patent in accordance with its ordinary meaning.[4]

With absolutely no support in the specification, Defendants attempt to limit this term to specific types of spread spectrum systems, namely direct sequence ("DSSS") and frequency hopping ("FHSS"). Defendants' proposed "definition," which is presumably based on some unknown dictionary definition, is more like an incomplete illustration and omits other types of spread spectrum systems that have emerged over the years, including ultra wideband ("UWB") and orthogonal frequency-division multiplexing ("OFDM"), among others. The two specific types of systems, DSSS and FHSS, to which the Defendants seek to limit this phrase are merely examples of the various spread spectrum systems that are in use.[5]

Accordingly, because there is no basis in the specification for the limitation proposed by Defendants in the specification, and because it is unduly restrictive, incomplete, and does not

---

[4] The Wiley Electrical and Electronics Engineering Dictionary defines spread spectrum as "Any modulation technique in which the bandwidth of the information-bearing signal is intentionally spread over a much wider bandwidth than would be otherwise be necessary." *See* Ex. D.

[5] "Examples include frequency-hopping spread spectrum, in which the frequency of the carrier hops among multiple frequencies at a rate determined by a specific code or algorithm, and direct-sequence spread spectrum, where the information-carrying bit stream is combined with a pseudorandom bit stream at a higher bit rate, and this combined signal modulates the carrier." *See* Ex. D.

consider all potential spread spectrum systems, Linex suggests that the Court adopt its proposed definition, which is clear, succinct and consistent with its ordinary meaning as it is understood by those skilled in the art.

**B.      "remote station"**

Claim 32 provides that the claimed spread spectrum system is comprised of "a plurality of *remote stations.*" Ex. A, Col. 16, l. 6. Claim 33 provides that the spread spectrum method comprise the steps of "communicating, to a respective node . . ., with one or more *remote stations* . . ." Ex. A, Col. 16, ll. 30-31.  In addition to these uses of this term, the claims also make additional references to communications between remote stations and nodes. Ex. A, Col. 16, ll. 9-10, 13, 34.

Linex proposes the following definition for the term "remote station":

A communication device capable of originating and transmitting packets to the distributed network via a node and capable of receiving packets from the distributed network via a node.

A remote station is a communication device.  Even the Defendants' proposed definition recognizes this and provides that a remote station is a "device . . . capable of communication. . ." *See* Ex. C.  Thus, the Court can easily conclude that the parties are essentially in agreement on this portion of Plaintiff's proposed definition.  To further support the proposition that remote stations are communication devices, the Court need only look to the language found in the claims-at-issue. Ex. A, Col. 16, ll. 8-9 (". . . nodes for *communicating, with one or more remote stations* . . ." (emphasis added); Col. 16, ll. 29-31 (". . . *communicating . . . with one or more remote stations* . . .") (emphasis added).

Similarly, the claims themselves, as well as the specification, also support that portion of Linex's proposed definition that a remote station is capable of originating, transmitting and receiving packets to and from the distributed network via a node. Ex. A, Col. 16, ll. 12-13, 33-

13

34 (". . . each packet *transmitted between a respective node and [the] remote station* . . .") (emphasis added); Col. 3, ll. 18-19 ("When an information packet(s) arrives from a remote station, the node routes the packet(s) . . ."); Col. 6, ll. 50-54 ("When sending a packet from a hub [which is a type of node] to a remote station . . . Typically, a packet is forwarded from the hub to a node, which is on the particular path to the remote user."); *see also* Col. 2, ll. 22-25 ("The plurality of nodes forms the distributed network. The distributed network plus the plurality of remote stations form the distributed system.").

Defendants' proposed definition provides that the device be "capable of communicating *only* with a node in *that* system." *See* Ex. B. There is no dispute between the parties that a remote station accesses the distributed network through a node. However, Defendants' definition requires that the remote station only be capable of communicating with a node. Further, Defendants' definition could be interpreted to require that the remote station only be capable of communicating with the distributed network, rather than any other type of device or network. This would exclude any type of remote station that is capable of communicating with any other type of network or communication device.

In addition, Defendants definition requires that the remote station be an "end-user device". In most cases the remote station would likely be an end-user device such as a cellular telephone or a laptop computer. However, other devices such as servers, which are not typically considered end-user devices, may still communicate with the nodes in the distributed network. The '377 patent does not limit the term remote station to end-user devices.

Accordingly, based upon the plain language found in the claims and in specification of the '377 patent, and in light of the fact that there is absolutely no support in the '377 patent for Defendants' proposed construction, the Court should adopt Linex's proposed definition of "remote station."

C.     "node"

The term "node" is used throughout the claims in both the singular and plural and is modified in some instances with the terms "plurality of" or "multiplicity of."  Ex. A, Col. 16, ll. 7, 8 15, 16, 20, 21, 25, 28-29, 35-37, 41, 42.   The term is also used several other times throughout the claims and is modified by the adjectives: "respective," "first," or "destination."[6] Ex. A, Col. 16, ll. 12, 19, 20, 22, 25-26, 29, 34, 39, 41-42, 44, 47.  Regardless of these modifiers, the intrinsic evidence supports Plaintiff's proposed definition of "node" as:

> A communication device capable of transmitting and receiving packets to and from a remote station, as well as transmitting and receiving packets to and from another node in the distributed network.

The parties agree that a node is a communication device, and there is ample evidence throughout the '377 patent to support the remainder of Plaintiff's proposed construction.  The key feature that sets apart a node in the distributed network from other types of communication devices is that nodes are capable of communicating both with remote stations and other nodes in the distributed network.

For example, those portions of the claims and the patent's specification cited above with respect to the term "remote station," are also applicable for the proposition that a node is capable of transmitting and receiving and packets to and from a node.  Ex. A, Claims 32 and 33, Col. 16, ll. 12-13, 33-34 (". . . each packet transmitted between a respective node and [the] remote station . . ."); Col. 3, ll. 18-21 (describing a node receiving packets from a remote station); Col. 6, ll. 50-57 (describing a node transmitting packets to a remote station); Col. 2, ll. 45-57 ("Each node's spread-spectrum transceiver communicates, using packets . . ., with a plurality of remote stations.").  The specification also supports the concept that packets are transmitted and received

---

[6] These three terms are also disputed by the parties.  However, Linex believes that these terms should be afforded their ordinary meaning and will essentially define themselves once the Court construes the term "node."  Additional arguments and authorities with respect to these terms are set forth at Section II, J, 1-3, *infra*.

between nodes in the distributed network. *See* Ex. A, Col. 6, ll. 52-54 ("Typically, a packet is forwarded from the hub [a type of node] to a node . . ."); Col. 2, ll. 56-57 ("A node transmitter communicates with a node receiver located at a different node from the transmitting node."); Col. 4, ll. 18-20 ("For communicating between nodes . . . there is a node transceiver . . . , or equivalently, a node transmitter . . .and a node receiver . . ."); *see also* Col. 5, ll. 1-5, 56-60.

Defendants' proposed construction of this term is insufficient for at least two reasons. First, it unnecessarily limits the nodes to "having multiple transceivers for store-and-forward routing of packets to and from end-user devices." This goes against the teachings of the '377 patent, which provides that a node may have only a single transceiver, or alternatively a single transmitter and single receiver, for communicating with remote stations. Ex. A, Col. 2, ll. 45-57; *see also* Col. 5, ll. 56-60 ("Each node's spread-spectrum transceiver, or equivalently spread-spectrum transmitter and spread-spectrum receiver, communicates ... with the plurality of remote stations"). Furthermore, the specification teaches that multiple transceivers in a node are optional. Ex. A, Col. 5, ll. 1-2 ("Each node *may* include a plurality of spread-spectrum transceivers.") (emphasis added).

Secondly, Defendants' proposed definition is also deficient in that it is redundant and includes terms (*i.e.*, "geographic area" and "spread spectrum modulation") that are already found within the claims themselves. See Ex. A, Col. 16, ll. 7, 11, 33-34. It would be nonsensical to introduce other terms appearing in the claims into the construction of "node".

Based on the intrinsic evidence found in the claims and in specification of the '377 patent, the Court should adopt Linex's proposed definition of the term "node".

**D.      "packet"**

Linex requests the Court adopt the following definition for the term "packet," which is entirely consistent with the claim terms and the patent's specification:

A block of information for communicating in a distributed network, which includes a source address and a destination address.

In each of the asserted claims, the term "packet" is used to describe information communicated in a distributed network that contains a destination address. For example, the relevant portions of claim 32 and 33 recite that "each node . . . for communicating, with one or more remote stations . . ., using packets . . ." Ex. A, Col. 16, ll. 7-10, 33-34. The claim goes on to state that the packets have a "destination address." Col. 16, ll. 10, 19, 29-33 ("communicating, to a respective node . . ., with one or more remote stations . . ., using packets having a destination address."). This is in accord with the patent's specification. Ex. A, Col. 2, ll. 45-46 ("Each node's spread-spectrum transceiver communicates, using packets . . ."); Moreover, the specification provides that each packet also has a source address in addition to a destination address. Ex. A, Col. 2, ll. 47-49, Col. 5, ll. 60-61.

Linex would note that Defendants' proposed definition seeks to improperly limit this term to a "formatted" block of data that is transmitted over a "packet switching network." *See* Ex. C. These artificial limitations are not provided for in the claims or the specification and create confusion where none is needed.

**E.    "destination address"**

Linex proposes to define the term "destination address" as "[a] unique identifier for the intended recipient of a packet." This simple definition stems not only from the specification, but also from its ordinary meaning in the art. The patent claims and specification indicate that packets transmitted over the network include at least a destination address. Ex. A, Col. 16, ll. 10, 19, 30-31, 41; Col. 2, ll. 47-50; Col. 3, ll. 6-10; Col. 5, ll. 60-64. It can be determined from the specification that a destination address is an identifier for the intended recipient of a packet being transmitted in the network. Ex. A, Col. 3, ll. 18-22 ("When an information packet(s) arrives from a remote station, the node routes the packet(s) to an appropriate second recipient node on the way to an intended hub node and central office, *toward the destination address*.") (emphasis added). The implication from the specification is clear even to a layman, let alone one skilled in the art – the destination address is the intended recipient of the packet.

Defendants' proposed definition attempts to improperly limit the definition of a destination address to include a "unique *network* identifier for the *final* intended recipient of a packet in the *network*." See Ex. C (emphasis added). Plaintiff takes issue with these emphasized terms because they lack support. Specifically, there is no basis for the Defendants' contention that the identifier for the recipient be unique to the network or directed to the final intended recipient.

Defendants also intend to further limit this term by using a separate, disputed term also found within the claims. *See* Ex. C ("In the context of the asserted claims, the final intended recipient is the destination node."). There is no evidence to support Defendants' attempt to further limit "destination address." The specification clearly provides that the intended destination need not be the destination node because the destination node may be merely a

forwarding point to the intended recipient, and the intended recipient may be outside of the network. *See* Ex. A, Col. 3, ll. 18-21.

Moreover, the specification makes clear that a packet may have the destination address of either a node or a remote station. *See* Ex. A, Col. 6, ll. 18-20 ("Based on the traffic at each node, and each packet having a destination address to *either the hub or a remote station*") (emphasis added); *see also* Col. 7, ll. 7-11. The patent teaches that "[w]hen an information packet(s) arrives from a remote station, the node routes the packet(s) to an appropriate second recipient node on the way to an intended hub node and central office, toward the destination address." See Ex. A, Col. 3, ll. 18-22. The packet being routed through a hub node and central office (which transmits packets outside of a network) to a destination address necessarily indicates that the packet is being sent outside of the network.

**F.      "flow-control means"**

Plaintiff proposes a simple and concise definition for the term "flow-control means," which has ample support in the '377 patent:   "[a] subsystem that routes packets through the distributed network."   The specification provides that the "*flow-control subsystem routes the packet through appropriate nodes* to the hub node . . ."   Ex. A., Col. 2, l. 64 – Col. 3, l. 2 (emphasis added).   Further, a preferred embodiment described in the '377 patent indicates that the "flow-control subsystem 340 also is distributed *throughout the network*, with a flow-control subsystem 340 resident at each node." Col. 6, ll. 7-10 (emphasis added); *see also* Col. 6, ll. 20-22 (". . . the flow-control subsystem 340 transmits the packet from the hub node to an appropriate node, and routes the packet . . .").   These excerpts from the specification make clear that the patent provides for a flow-control subsystem that routes packets in a network.   Thus, the intrinsic evidence supports Plaintiff's proposed definition of "flow-control means."

Defendants go to great lengths in an attempt to narrow the scope of this term. Defendants assert that a "flow-control means" is limited to "a central computer or processor maintaining traffic information". By doing this, Defendants are improperly attempting to read in a particular embodiment from the specification. *Ekchian*, 104 F.3d at 1303 (holding that while claims should be read in view of the specification, it is improper to limit the scope of a claim to the preferred embodiment or specific example disclosed in the specification.). Defendants' attempt to read in this particular embodiment is misleading to the extent that they imply that it is the only embodiment of a "flow-control means" found in the '377 patent. The specification makes clear that there is at least one other embodiment for a "flow control means" – a flow-control subsystem distributed throughout the network with a subsystem found at each node (as opposed to a central computer maintaining the traffic):

> The flow-control subsystem 340 in the distributed network controls the store-and-forward subsystem, to store each packet arriving at the spread-spectrum transceiver. In a preferred embodiment. ***the flow-control subsystem 340 also is distributed throughout the network, with a flow-control subsystem 340 resident at each node***. It is possible, of course, to have a central flow-control system.

Ex. A, Col. 6, 4-10.

Defendants' proposed definition is also deficient in that it is redundant because it includes at least four disputed claim terms (*i.e.*, "traffic information," "node," "packet," "first node," "destination node"). A quick read of the claims-at-issue show that these terms are found within the claims. Assuming *arguendo* that the Defendants were to succeed on all of their proposed claim terms, their definition of "flow-control means" would contain definitions of definitions within the proposed definition of "flow-control means" and read as follows:

> A central computer or processor maintaining [information communicated between nodes in routing ***packets*** that indicates the capacity of a ***node*** to handle additional ***packets*** in view of, at least, the ***traffic density*** at that ***node***] about all of the [communication devices having multiple transceivers for store-and-forward routing of ***packets*** to and from end-user devices within a limited geographic area using ***spread-spectrum modulation***, and further including a at least one

transceiver for store-and-forward routing of *packets* to and from another node] in the distributed network which (a) communicates such [information communicated between *nodes* in routing *packets* that indicates the capacity of a *node* to handle additional *packets* in view of, at least, the *traffic density* at that *node*] between all of the [communication devices having multiple transceivers for store-and-forward routing of *packets* to and from end-user devices within a limited geographic area using *spread-spectrum modulation*, and further including a at least one transceiver for store-and-forward routing of *packets* to and from another *node* within the distributed network], (b) selects a path for routing a [formatted block of information for communicating in a packet switching network, including at least a source address and a *destination address*] from a [*first node* within the distributed network that receives a *packet* originated by a *remote station*, also called the "*respective node*"] to a [hub node capable of communicating with devices both within and outside of the distributed network] in view of the [information communicated between *nodes* in routing *packets* that indicates the capacity of a *node* to handle additional *packets* in view of, at least, the *traffic density* at that *node*], and (c) causes the [formatted block of information for communicating in a packet switching network, including at least a source address and a *destination address*] to be transmitted to the [hub node capable of communicating with devices both within and outside of the distributed network] through the selected path.

Defendants' propose definition of "flow-control means" is unwieldy, incoherent and has no basis in the intrinsic record.[7]  The Court should adopt Plaintiff's simple and supported definition of this term – a subsystem that routes packets through the distributed network.

### G.    "traffic information"

Linex contends that the term "traffic information" should be defined as that "information regarding conditions of the distributed network or the transmission of data in the distributed network."  The '377 patent specifies that traffic information could include a number of possible variables at any given time.  These variables include traffic density, traffic congestion, traffic flow, node memory availability, whether the intended recipient is inside or outside of the network, and the specific types of data being transmitted (*e.g.*, voice data).  *See* Ex. A, Col. 2, ll. 62-66; Col. 6, ll. 24-36, 45-47.

---

[7] Note that the hypothetical construction of this term would grow exponentially if the Defendants' proposed definitions of the disputed claim terms were at those highlighted portions of this hypothetical construction.

The Defendants definition for this term requires that it necessarily include, and is therefore limited to, traffic density. Linex does not dispute that traffic density is one particular type of traffic information. However, "traffic information" is a more general term describing the possible conditions of the network or the transmission of data in the network. Although the term "traffic information" certainly could include traffic density, it is not so limited. Indeed, the patent provides several examples of traffic information (listed above) which are not related to traffic density. The Defendants definition would effectively exclude the embodiments of the invention in which the other types of traffic information are utilized in routing packets through the network.

**H.     "traffic density"**

Linex contends that the term "traffic density" should be construed as "the amount of traffic in a given period of time". It is clear from the specification that "traffic density" is a particular type of traffic information and can be measured at the nodes, over a link between nodes or in the network as a whole. Ex. A, Col. 2, l. 62; Col. 6, ll. 24-30, 44-46.

Both sides' definitions constitute measurements in a period of time. However, Defendants' proposed definition is problematic for two reasons: (1) it unnecessarily limits the measurement of "traffic" to the "number of packets"; and (2) limits the location of the measurement to a single node. Accordingly, the Court should construe this term according to the Plaintiff's definition which is consistent with the term's ordinary meaning and the patent specification.

**I.     "responsive to the traffic information"**

In light of the fact that the parties are requesting the Court to define the disputed term "traffic information," Plaintiff believes that once this term is defined, the Court need only construe the term "responsive" as opposed to the phrase "responsive to the traffic information."

22

"Responsive," in the context of the claims, simply means "reacting" to the traffic information. *See The American Heritage Dictionary of the English Language,* Fourth Edition 2000. (Defining "responsive as "[r]eadily reacting to suggestions, influences, appeals, or efforts."); *see also WordNet,* 2.0 2003 (Defining "responsive" as "readily reacting to people or events."). Thus, the proper construction of this term is "reacting to the traffic information."

But for the last clause of Defendants' proposed definition, the parties' proposed definitions are identical. *See* Ex. C. Once again, however, Defendants' additional limitation on this term includes a disputed claim term that is already found within the claims (*i.e.*, "traffic density"). The additional limitation proposed by the Defendants is superfluous and unnecessary.

## J.    Terms Not Requiring Construction Retain their Ordinary Meaning

Defendants attempt to artificially limit several terms and one phrase in dispute, which simply require no construction. These terms should retain their ordinary meaning and include the following: "respective node," "first node," "destination node," and the phrase "selecting a path of a multiplicity of nodes." Once the Court defines "node," these terms are clearly understandable and will essentially define themselves.

### 1.    "respective node"

The term "respective node" requires no additional construction once node is defined. The adjective "respective" merely indicates a particular node, and is not synonymous with the term "first node." There is no indication in the specification or in the claims that a "respective node" should be defined as anything other than a particular node in the network. There is no support for defendants' proposition that a respective node be defined as the first node within the distributed network that receives a packet originated by a remote station. On the contrary, the word "respective" is utilized throughout claims 32 and 33 and also modifies the terms "packet," "destination address," and "destination node." It is clear from the use of the word "respective"

throughout the claims, merely signifies a particular object, and does not provide for a specific construction for any of these terms, including "respective node."

### 2.      "first node"

The parties have essentially agreed to the definition of the term "first node." Plaintiff and defendants have agreed that "first node" means "[t]he first node within the distributed network that receives a packet originated by a remote station." However, Plaintiff disagrees with defendants' contention that the term "first node" is synonymous with the term "respective node." As indicated in the preceding paragraph, the use of the term "respective node" in claims 32 and 33 is not limited to the "first node" as the parties have defined that term.

### 3.      "destination node"

Defendants would like to add unnecessary limitations to the term "destination node" with no support in the specification for their proposed construction: "[a] hub node capable of communicating with devices both within and outside of the distributed network." Instead, the term should be given its ordinary meaning once the term "node" is defined. Plaintiff suggests that this term be simply defined as "[t]he last node in a path through the distributed network of nodes," which is consistent with the use of the term in the claims. There is no indication that a "destination node" be defined as a "hub node," which, according to the specification, is a node that connects to a central telephone office. Col. 2, ll. 25-26. Further, based upon a review of other claims of the '377 patent, it is clear that the inventors did not intend the term "destination node" be used synonymously with "hub node," which is its own unique term used in several claims of the '377 and absent from claims 32 and 33. *See, e.g.,* Claim 1, Col. 7, ll. 44, 66, 67,

Col. 8, ll. 3-4, 10; Claim 2, Col. 8, ll. 17, 39-41, 45, 52; Claim 3, Col. 8, ll. 58, Col. 9, ll. 8-9, and 14.[8]

### 4.    "selecting a path of a multiplicity of nodes"

The phrase "selecting a path of a multiplicity of nodes" is clearly understandable. However, defendants would like it to be construed so as to include "multiple nodes between the first (or respective) node and the destination node." There is no basis for this limitation. While such a subtle change may seem innocuous, adding an additional layer of complexity to the construction of the terms is not only unnecessary but against basic claim construction precedent.

## III.    CONCLUSION

Linex requests that any Order entered by the Court setting forth the meaning of any disputed claim terms be consistent with the definitions provided by Linex and/or the ordinary meaning of the terms in the '377 patent. To the extent that the Defendants attempt to vary the ordinary and plain meaning of the claims so as to read unnecessary and/or unsupported limitations into the claims, Linex asks this Court not to accept Defendants' proposed constructions.

---

[8] The doctrine of claim differentiation is a presumption "that separate claims do not have the same scope." *Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999). The presumption is at its strongest when a limitation from a dependent claim is sought to be read into an independent claim; however the presumption also exists to distinguish two independent claims containing different language. *Seachange Int'l, Inc. v. C-Cor Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005). The idea that claims using different terms have different scopes "stems from 'the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings.'" *Id.* (quoting *Karlin Tech.*, 177 F.3d at 971-72); *see also Comark Communications*, 156 F.3d at 1187.

Respectfully submitted,

Dated:   April 21, 2006

*[signature]*

Julie Braman Kane
Florida Bar No. 980277
**COLSON HICKS EIDSON**
255 Aragon Avenue, 2nd Floor
Coral Gables, FL  33134-5008
Tel:  (305) 476-7400
Fax:  (305) 476-7444
Email: Julie@colson.com

Edward W. Goldstein
Corby R. Vowell
**GOLDSTEIN, FAUCETT & PREBEG, LLP**
1177 West Loop South, Suite 400
Houston, TX  77027
Tel:  (713) 877-1515
Fax:  (713) 877-1737
Email: egoldstein@gfiplaw.com
Email: cvowell@gfiplaw.com

**ATTORNEYS FOR
LINEX TECHNOLOGIES, INC.**

26

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served by email and first class mail this 21st day of April 2006 to all counsel of record as set forth on the attached Service List.

BY: _Barbara B. Sloeman for_
Julie Braman Kane
Florida Bar No. 980277

## SERVICE LIST

Case No. 05-80300-CIV-MARRA/SELTZER

Linex Technologies, Inc. vs. Motorola, Inc. et al.

| **\* Counsel for Motorola, Inc.** | **\* Counsel for Nortel Networks, Inc.** |
|---|---|
| Michael E. Barry, Esq.<br>Joseph J. Buczynski, Esq.<br>David J.Moorhead, Esq.<br>**Gardner Carton & Douglas LLP**<br>191 North Wacker Drive, # 3700<br>Chicago, IL  60606-1698<br>Tel: (312) 569-1000/ Fax: (312) 569-3000<br>Email: mbarry@gcd.com<br>Email: jbuczynski@gcd.com<br>Email: dmoorhead@gcd.com<br><br>Darrell Payne, Esq.<br>Fla. Bar No. 773300<br>**Shook Hardy & Bacon, LLP**<br>Miami Center, Suite 2400<br>201 S. Biscayne Blvd.<br>Miami, Florida  33131-4332<br>Tel: (305) 358-5171/ Fax: (305) 358-7470<br>Email: dpayne@shb.com | Marissa D. Kelley, Esq.<br>Fla. Bar No. 379300<br>**Stearns, Weaver, Miller, Weissler,**<br>**Alhadeff & Sitterson, L.L.P.**<br>200 E. Broward Boulevard, Suite 1900<br>Fort Lauderdale, Florida  33301-1949<br>Tel: (954) 462-9500/ Fax: (954) 462-9567<br>Email: mkelley@swmwas.com<br><br>Mark M. Supko, Esq.<br>Michael H. Jacobs, Esq.<br>**Crowell & Moring, L.L.P.**<br>1001 Pennsylvania Avenue, N.W.<br>Washington, DC  20004-2595<br>Tel: (202) 624-2500/ Fax: (202) 628-5116<br>Email: msupko@crowell.com<br>Email: mjacobs@crowell.com |
| **\* Counsel for Strix Systems, Inc.** | **\* Counsel for Tropos Networks, Inc.** |
| Ramsey M. Al-Salem, Esq.<br>Jessica L. Rossman, Esq.<br>**Perkins Coie, L.L.P.**<br>1201 Third Avenue, Suite 4800<br>Seattle, WA  98101-3099<br>Tel: (206) 359-8000/ Fax: (206) 359-9000<br>Email: ralsalam@perkinscoie.com<br>Email: jrossman@perkinscoie.com<br><br>Charles H. Lichtman, Esq.<br>Fla. Bar No. 501050<br>**Berger Singerman**<br>Las Olas Centre II<br>350 E. Las Olas Boulevard, Suite 1000<br>Fort Lauderdale, Florida  33301<br>Tel: (954) 627-9913/ Fax: (954) 523-2872<br>Email: clichtman@bergersingerman.com | James A. Gale, Esq.<br>Fla. Bar No. 371726<br>Gregory L. Hillyer, Esq.<br>Fla. Bar No. 682489<br>**Feldman Gale, P.A.**<br>Miami Center, Suite 1920<br>201 South Biscayne Blvd.<br>Miami, FL  33131-4332<br>Tel: (305) 358-5001/ Fax: (305) 358-3309<br>Email: jgale@feldmangale.com<br>Email: ghillyer@feldmangale.com |

Exhibit A



US006493377B2

(12) **United States Patent**
Schilling et al.

(10) **Patent No.:** US 6,493,377 B2
(45) **Date of Patent:** Dec. 10, 2002

(54) **DISTRIBUTED NETWORK, SPREAD-SPECTRUM SYSTEM**

(75) Inventors: **Donald L. Schilling**, Palm Beach Gardens, FL (US); **Joseph Garodnick**, Centerville, MA (US)

(73) Assignee: **Linex Technologies, Inc.**, West Long Branch, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 62 days.

(21) Appl. No.: **09/729,911**

(22) Filed: **Dec. 6, 2000**

(65) **Prior Publication Data**

US 2002/0067756 A1 Jun. 6, 2002

(51) Int. Cl.7 ................................................. **H04B 1/69**

(52) U.S. Cl. ...................... **375/130**; 370/342; 370/353; 370/441

(58) Field of Search ........................... 375/130; 370/320, 370/335, 342, 441, 352, 353, 354, 355, 356

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,455,865 A | * | 10/1995 | Perlman | 370/445 |
| 5,604,869 A | * | 2/1997 | Mincher et al. | 370/280 |
| 5,742,593 A | * | 4/1998 | Sharony et al. | 370/280 |
| 6,301,239 B1 | * | 10/2001 | Chuprun et al. | 370/342 |

* cited by examiner

Primary Examiner—Don N. Vo
(74) Attorney, Agent, or Firm—David Newman Chartered

(57) **ABSTRACT**

A distributed network, spread-spectrum system comprising a plurality of remote stations and a plurality of nodes. One or more hub node(s) connect(s) to a central telephone office. A node's spread-spectrum transceiver communicates, using packets having spread-spectrum modulation, over radio waves, with the plurality of remote stations. Each packet has a source address and a destination address, and may have other information such as a header, start of message, end of message, flow-control information, forward error correction, and message data. A store-and-forward subsystem stores and forwards one or more packets to and from the remote station. The store-and-forward subsystem stores and forwards the one or more packets to and from another node in the plurality of nodes. A flow-control subsystem controls the store-and-forward subsystem, to store each packet arriving at the spread-spectrum transceiver. The flow-control subsystem communicates traffic information between each of the nodes in the plurality of nodes. The flow-control subsystem routes the packet through appropriate nodes to the hub node from a remote station. Based on the traffic at each node, the flow-control subsystem transmits the packet from the hub node to an appropriate node, and routes the packet to a recipient remote station. The flow-control subsystem routes the plurality of packets through a path in the plurality of nodes to ensure that the plurality of packets arrive sequentially for voice or video packets.

**37 Claims, 6 Drawing Sheets**





FIG.1  PRIOR ART



FIG.2



FIG.3



FIG.4



FIG.5

FIG.6

| HEADER | SOURCE ADDRESS | DESTINATION ADDRESS | TRAFFIC FROM PREVIOUS NODE(S) | START DATA | CODED DATA | END DATA |

US 6,493,377 B2

| 1 | 2 |

# DISTRIBUTED NETWORK, SPREAD-SPECTRUM SYSTEM

## BACKGROUND OF THE INVENTION

This invention relates to spread-spectrum communications, and more particularly to a wireless distributed network for reducing power and power variations, when transmitting packets having spread-spectrum modulation.

## DESCRIPTION OF THE RELEVANT ART

As the data rate increases, the power transmitted by a cellular "telephone" and by the cellular base station (BS) must also increase to ensure a low probability of error. As illustratively shown in FIG. 1, a star network, as is presently used for cellular networks, is used to communicate data between a central office 50 and a plurality of remote stations (RS). A plurality of base stations 20, 30, 40, communicate directly with the central office 50. A first base station 20 communicates data between a first plurality of remote stations 21, 22, 23, 24. A second base station 30 communicates data between a second plurality of remote stations 31, 32, 33, 34, 35, 36. A third base station 40 communicates data between a third plurality of remote stations 41, 42, 43, 44, 45.

In the star network of FIG. 1, data, in general, are not communicated directly between base stations, but through the central office 50. The routing of data is a fixed communication path, from a remote station through a base station to the central office, and vice versa. Data generally are not routed, with dynamically changing paths, between remote stations which communicate with a base station, and data are not routed between remote stations directly through base stations, without passing through the central office 50. Also, data are not routed to the central office 50, using communications paths which dynamically vary between base stations, depending upon availability.

The power transmitted by the base station and the remote stations, and the ability to properly control the power, are problems which are growing in importance with the start of third generation (3G) wireless systems, which stresses data transmission which requires low error rates and Internet access.

Previously, a user could transmit data at the rate of 9.6 kilobit per second (Kb/s). Now, with 3G wireless systems, this rate is increasing to 384 kb/s and higher. For the increased data rates, the power must increase by a factor of 40 or more to ensure no degradation of performance.

A proposed solution to this problem is to install additional base stations, or towers. This is a very costly solution since some base stations will be overloaded with traffic and other base stations underutilized. This solution, however, certainly will reduce the power transmitted. Users who are distant from the base station still will be required to transmit significantly larger power than users located near the base station, to alleviate the near-far power problem. This very significant difference in distance and therefore in transmitted power, requires very accurate power control, which is a limiting feature in the current, standardized, 3G system. For example, consider acquisition: One limitation is effective packet size; that is, it takes significant time for the base station to help the user adjust its transmit power to the correct level. As more time is required, the packet will, in effect, increase in length, using time which could be allocated for data transmission or the transmission of additional

data packets. This "ramp up" time could exceed the duration of the data portion of the packet itself. As another example, during power control adjustment, a user transmitting with too much power can increase the error rate of a user transmitting at the proper power level.

The present base station multi-access scheme currently in use is not a preferred system approach.

## SUMMARY OF THE INVENTION

A general object of the invention is to increase capacity of data from remote stations to a central office.

Another object of the invention is to reduce power levels and power level variations required for transmitting from remote stations and from the base stations.

An additional object of the invention is a more flexible network, which dynamically adapts to changing data requirements between remote stations and a central office.

According to the present invention, as embodied and broadly described herein, a distributed network, spread-spectrum system is provided, comprising a plurality of remote stations and a plurality of nodes. The plurality of nodes forms the distributed network. The distributed network plus the plurality of remote stations form the distributed system. In the plurality of nodes, one or more nodes are hub nodes, which connect to a central telephone office. The plurality of nodes covers a geographic area. Each node covers a micro-cell having a radius, which, typically, is less than one mile. Each node includes a plurality of spread-spectrum transceivers, or, equivalently, a plurality of spread-spectrum transmitters and a plurality of spread-spectrum receivers. Each node also includes a store-and-forward subsystem, and a flow-control subsystem, at least one node transmitter, and more typically a plurality of node transmitters, and at least one node receiver and more typically a plurality of node receivers.

Transmission between the remote station and a node is through the use of CDMA modulation, although any other modulation technique may be employed. Transmitting between nodes may be by cable, fiber optic cable, or microwave link, using any of a variety of modulation techniques. Steerable antennas may be employed. Such modulation and communications channels are well-known in the art.

Each node's spread-spectrum transceiver communicates, using packets having spread-spectrum modulation, over radio waves, with a plurality of remote stations. Each packet has a source address and a destination address, and may contain other information such as flow-control information, forward error correction, and message data. The store-and-forward subsystem stores and forwards one or more packets to and/or from the remote station. The store-and-forward subsystem stores and forwards the one or more packets to and from another node in the plurality of nodes.

A node transmitter communicates with a node receiver located at a different node from the transmitting node.

The flow-control subsystem in the distributed network controls the store-and-forward subsystem, to store each packet arriving at the spread-spectrum transceiver. The flow-control subsystem communicates traffic information between each of the nodes in the plurality of nodes. The traffic information typically includes traffic density at each of the nodes and node-memory availability. Using the traffic information, and in response to a packet having the destination address to the hub node, the flow-control subsystem routes the packet through appropriate nodes to the hub node

US 6,493,377 B2

3

or, in the case of a "local call", to the remote user directly. A "local call" is defined as a call between remote stations located within (i.e., accessing) the same distributed network. For the local call, the central office connection is not required.

Based on the traffic at each node, and each packet having a destination address to a remote station, the flow-control subsystem transmits the packet from a central office to an appropriate hub node to an appropriate node, and routes the packet to the next recipient node. Each packet in a message may traverse a different route. In response to a plurality of packets having voice data, the flow-control subsystem routes the plurality of packets through the same path in the plurality of nodes to ensure that the plurality of packets arrive sequentially. The flow control procedure balances the activity in each node relative to other nodes in the distributed network.

When an information packet(s) arrives from a remote station, the node routes the packet(s) to an appropriate second recipient node on the way to an intended hub node and central office, toward the destination address.

Additional objects and advantages of the invention are set forth in part in the description which follows, and in part are obvious from the description, or may be learned by practice of the invention. The objects and advantages of the invention also may be realized and attained by means of the instrumentalities and combinations particularly pointed out in the appended claims.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in and constitute a part of the specification, illustrate preferred embodiments of the invention, and together with the description serve to explain the principles of the invention.

FIG. 1 is a block diagram of a current cellular spread-spectrum system, showing all base stations communicating with a central office;

FIG. 2 is a block diagram of a distributed network, spread-spectrum system;

FIG. 3 is a block diagram of a distributed network, spread-spectrum system;

FIG. 4 is a block diagram illustrating key elements of a node with a central office communicating with a set of a plurality of nodes;

FIG. 5 is an alternative block diagram illustrating key elements of a node; and

FIG. 6 shows a representative example of a packet.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Reference now is made in detail to the present preferred embodiments of the invention, examples of which are illustrated in the accompanying drawings, wherein like reference numerals indicate like elements throughout the several views.

As illustratively shown in FIG. 2, a distributed network, spread-spectrum system is provided, comprising a plurality of remote stations and a plurality of nodes 110, 120, 130, 140, 150, 160, 170 180, 190. The plurality of nodes 110, 120, 130, 140, 150, 160, 170 180, 190 forms the distributed network. The distributed network plus the plurality of remote stations form the distributed system. The plurality of nodes 110, 120, 130, 140, 150, 160, 170 180, 190 of FIG. 2, depicts, by way of example, a first node 110, a second node,

4

120, a third node 130, a fourth node 140, a fifth node 150, a sixth node 160, a seventh node 170, an eighth node 180 and a ninth node 190.

In the plurality of nodes 110, 120, 130, 140, 150, 160, 170 180, 190, one node, the second node 120, is a hub node, which communicates to a central telephone office 50. Thus, there may be a plurality of hubs. In an alternative embodiment, as shown in FIG. 3, a set of the plurality of nodes (hubs) communicates to the central office 50. The set of the plurality of nodes (hubs), may include the entire plurality of nodes.

The plurality of nodes 110, 120, 130, 140, 150, 160, 170 180, 190 covers a geographic area. Each node in the plurality of nodes 110, 120, 130, 140, 150, 160, 170 180, 190 covers a micro-cell having a radius much less than one mile.

FIGS. 4 and 5 illustratively show an example of what might be at each node. For communicating between nodes, in FIG. 4, for example, there is a node transceiver 350, or equivalently, a node transmitter 351 and a node receiver 352. The node transmitter 351 and the node receiver 352 are coupled through a node isolator 353 to a node antenna 354. Transceiver 350 can be at microwave frequencies or connect to a fiber optic link or any other channel capable of handling the traffic between nodes.

FIG. 5 shows an example of a plurality of node transceivers 350, 360 and 370, or equivalently, a plurality of node transmitters 351, 361, 371 and a plurality of node receivers 352, 362, 372. In place of using a single antenna and an isolator, the first node transmitter 351 is coupled to a first node-transmitter antenna 356, and the first node receiver 352 is coupled to the first node-receiver antenna 357. Similarly, the second node transmitter 361 is coupled to a second node-transmitter antenna 366 and the second node receiver 362 is coupled to the second node-receiver antenna 367, and the third node transmitter 371 is coupled to the third node-transmitter antenna 376 and the third node receiver 372 is coupled to the third node-receiver antenna 377. The antennas could be omnidirectional, sectored, or steerable (smart) antennas.

With each node using the node transmitter 351 and the node receiver 352, of FIG. 4, or the plurality of node transmitters 351, 361, 371 and the plurality of node receivers, 352, 362, 372 of FIG. 5, a node communicates with a different node having a node transmitter and node receiver node receiver. Thus, in the plurality of nodes 110, 120, 130, 140, 150, 160, 170 180, 190, the first node 110 communicates with the second node 120, the fourth node 140 and the fifth node 150. The second node 120 communicates with the first node 110, the third node 130, the fourth node 140, the fifth node 150 and the sixth node 160. The third node communicates with the second node 120, the fifth node 150 and the sixth node 160. The fourth node communicates with the first node 110, the second node 120, the fifth node 150, the seventh node 170 and the eighth node 180. The fifth node communicates with the first node 110, the second node 120, the third node 130, the fourth node 140, the sixth node 160, the seventh node 170, the eighth node 180 and the ninth node 190. The sixth node 160 communicates with the second node 120, the third node 130, the fifth node 150, the eighth node 180 and the ninth node 190. The seventh node 170 communicates with the fourth node 140, the fifth node 150 and the eighth node 180. The eighth node 180 communicates with the fourth node 140, the fifth node 150, the sixth node 160, the seventh node 170 and the ninth node 190. The ninth node communicates with the fifth node 150, the sixth node 160 and the eighth node 180.

US 6,493,377 B2

5

Each node may include a plurality of spread-spectrum transceivers **310, 320, 330**, or, equivalently, a plurality of spread-spectrum transmitters **311, 321, 331** and a plurality of spread-spectrum receivers **312, 322, 332**, a store-and-forward subsystem **341**, and a flow-control subsystem **340**. The flow-control subsystem **340** typically would include a processor or computer. The store-and-forward subsystem **341** typically would include memory and the memory may be part of the computer embodying the processor for the flow-control subsystem **340**. The memory may be random access memory (RAM) or hard drive, or other volatile or non-volatile memory and memory storage device. Other devices are well-known in the art, and include hard drives, magnetic tapes, compact disk (CD), and other laser/optical memories and bubble memory devices. The particular flow-control subsystem **340** and the store-and-forward subsystem **341** would be specified by a particular system requirements and design criteria.

Each node in the plurality of nodes **110, 120, 130, 140, 150, 160, 170 180, 190** also includes at least one node transmitter **351**, and more typically a plurality of node transmitters **351, 361, 371** and at least one node receiver **352** and more typically a plurality of node receivers **352, 362, 372.**

The store-and-forward subsystem **341** is coupled to and controlled by the flow-control subsystem **340**. The plurality of spread-spectrum transmitters **311, 321, 331**, are coupled between a plurality of spread-spectrum antennas **316, 326, 336** and the flow-control subsystem **340**. The plurality of spread-spectrum receivers **312, 322, 332** are coupled between a plurality of receiver antennas **317, 327, 337** and the flow-control subsystem **340**. FIGS. 2 and 3 show the first node **110** communicating with a first plurality of remote stations **111, 112, 113, 114**. The second node **120** communicates with a second plurality of remote stations, with FIGS. 2 and 3 showing a first remote station **121** of the second plurality of remote stations. The third node **130** communicates with a third plurality of remote stations **131, 132** and the fourth node **140**, the fifth node **150** and the sixth node **160** communicate with a fourth plurality of remote stations, a fifth plurality of remote stations, and a sixth plurality of remote stations, respectively. FIGS. 2 and 3 show the fourth node **140** communicating with a first remote station **141** of the fourth plurality of remote stations, the fifth node **150** communicating with a first remote station **151** of the fifth plurality of remote stations, and the sixth node **160** communicating with a first remote station **161** of the sixth plurality of remote stations. The seventh node **170** and the eighth node **180** are shown communicating with a seventh plurality of remote stations **171, 172, 173** and an eighth plurality of remote stations **181, 182**, respectively. The ninth node **190** communicates with a ninth plurality of remote stations, and FIGS. 2 and 3 show the ninth node **190** communicating with a first remote station **191** of the ninth plurality of remote stations.

Each node's spread-spectrum transceiver, or equivalently spread-spectrum transmitter and spread-spectrum receiver, communicates, using packets having spread-spectrum modulation, over radio waves, with the plurality of remote stations. Each packet has a source address and a destination address, and may have header, start of data, end of data, and other information such as flow-control information, forward error correction, and message data. FIG. 6 shows, by way of example, one way a packet may be structured.

The store-and-forward subsystem **341** stores and forwards one or more packets to and from the remote station. The store-and-forward subsystem **341** stores and forwards the

6

one or more packets to and from another node in the plurality of nodes **110, 120, 130, 140, 150, 160, 170 180, 190**.

The flow-control subsystem **340** in the distributed network controls the store-and-forward subsystem, to store each packet arriving at the spread-spectrum transceiver. In a preferred embodiment, the flow-control subsystem **340** also is distributed throughout the network, with a flow-control subsystem **340** resident at each node. It is possible, of course, to have a central flow-control system. The flow-control subsystem **340** communicates traffic information between each of the nodes in the plurality of nodes. The traffic information typically includes traffic density at each of the nodes and memory availability. Using the traffic information and in response to a packet having the destination address to the hub node, the flow-control subsystem **340** routes the packet through appropriate nodes to the appropriate hub node. Based on the traffic at each node, and each packet having a destination address to either the hub or a remote station, the flow-control subsystem **340** transmits the packet from the hub node to an appropriate node, and routes the packet to the first recipient node. Each packet may traverse a different route en route to the remote station.

In response to the traffic congestion and to a plurality of packets having voice data, the flow-control subsystem routes the plurality of packets through a path in the plurality of nodes to ensure that the plurality of packets arrive sequentially. The flow control procedure balances the activity in each node relative to other nodes in the distributed network.

When an information packet arrives from a central office, the hub node routes the information packet to an appropriate second recipient node on the way to an intended remote station destination address.

Consider, by way of example, FIG. 3, with calls from the central office **50** to remote stations. There is a set of nodes (hubs) **110, 120 130** who tell the central office **50** of the availability of each hub node **110, 120, 130**. By having a set of hub nodes, the central office has redundancy, in case of hub node failure, for sending and receiving packets to and from remote stations. Based on availability of a hub node, a packet is sent to a particular hub node, which is available. If two or more hub nodes are available, any of the available hub nodes can be the recipient of the packet.

Each hub keeps track of the traffic flow, memory availability, of many nodes. The first nodes of which are kept track, include the closest surrounding nodes, as defined by design criteria. The next set of node(s) where the hub keeps information might be the next layer of closest nodes.

When sending a packet from a hub to a remote station, the path routing the packet through various nodes is not known, a priori, except maybe for voice. Typically, a packet is forwarded from the hub to a node, which is on the particular path to the remote user. Nodes chosen for a particular path have available capacity and storage, and can forward the packet to a subsequent node. This ability is called "look ahead".

The packet passes through various nodes, until the packet reaches the remote station. Since the path is not predefined, and not necessarily a direct part "as the crow flies", paths for several packet for the same remote station can be different.

For packets passing from a remote station to the central office **50**, the remote station accesses the nearest node. The packet is forwarded, node to node, until the packet arrives at the hub. Paths for packets are not predefined, and can be different for different packets from the remote station to the hub.

US 6,493,377 B2

7

For local calls within the distributed network, there is no need for packets going to a hub or central office. Instead, if the data are sent to another remote station located within the distributed network, the packet enters the distributed network through a node near the remote station sending the packet, and exits the distributed network from a node near the recipient remote station. The packet does not travel a predefined path, and different packets from the sending remote station can travel different paths to the recipient remote station. This depends on the destination address as in a phone system.

An advantage of the present invention is that the nodes and the connected remote stations form micro-cells. Thus, low power can be used by the remote stations, and by nodes (base stations), reducing the potential of radio frequency effects on the user of the remote station, such as RF burns, brain tumors, etc. Handoff for a remote station traveling between nodes can be done in any of the standard ways available for packet communications and base stations. One such technique is for the remote station to monitor the control signals from several of the strongest nodes (base stations). When the signal strength from the node (base station) being used by the remote station falls below a threshold, then the remote station transmits the next packet to a node having the largest signal strength being monitored by the remote station.

Each node is small and can be mounted on telephone poles, building, etc. The nodes require little space and low amounts of power.

It will be apparent to those skilled in the art that various modifications can be made to the distributed network, spread-spectrum system of the instant invention without departing from the scope or spirit of the invention, and it is intended that the present invention cover modifications and variations of the distributed network, spread-spectrum system provided they come within the scope of the appended claims and their equivalents.

We claim:

1. A distributed network, spread-spectrum system, comprising:

a plurality of remote stations;

a plurality of nodes for covering a geographic area, the plurality of nodes including a hub node, each node covering a micro-cell having a radius less than one mile, each node including,

a spread-spectrum transceiver for communicating, using packets having spread-spectrum modulation, over radio waves, with the plurality of remote stations, each packet having a source address and a destination address;

a store-and-forward subsystem, coupled to the spread-spectrum transceiver, for storing and forwarding one or more packets to and from the remote station, and for storing and forwarding the one or more packets to and from another node in the plurality of nodes;

a flow-control subsystem, coupled to the store-and-forward subsystem, for controlling the store-and-forward subsystem, to store each packet arriving at the spread-spectrum transceiver, said flow-control subsystem communicating traffic information between each of the nodes in the plurality of nodes, with the traffic information including traffic density at each of the nodes, said flow-control subsystem, responsive to the traffic information and to a packet having the destination address to the hub node, for routing the packet through appropriate nodes to the hub node, said

8

flow-control subsystem, responsive to the traffic at each node, each packet having a destination address to a first recipient node, for transmitting the packet from the hub node to an appropriate node, routing the packet to the first recipient node, said flow-control subsystem, responsive to the traffic congestion and to a plurality of packets having voice data, for routing the plurality of packets through a path in the plurality of nodes to ensure that the plurality of packets arrive sequentially; and

said hub node, responsive to an information packet arriving from a central office, for routing the information packet to a second recipient node.

2. A distributed network, spread-spectrum system, comprising:

a plurality of remote stations;

a plurality of nodes for covering a geographic area, the plurality of nodes including a set of hub nodes, each node covering a micro-cell having a radius less than one mile, each node including,

a spread-spectrum transceiver for communicating, using packets having spread-spectrum modulation, over radio waves, with the plurality of remote stations, each packet having a source address and a destination address;

a store-and-forward subsystem, coupled to the spread-spectrum transceiver, for storing and forwarding one or more packets to and from the remote station, and for storing and forwarding the one or more packets to and from another node in the plurality of nodes;

a flow-control subsystem, coupled to the store-and-forward subsystem, for controlling the store-and-forward subsystem, to store each packet arriving at the spread-spectrum transceiver, said flow-control subsystem communicating traffic information between each of the nodes in the plurality of nodes, with the traffic information including traffic density at each of the nodes, said flow-control subsystem, responsive to the traffic information and to a packet having the destination address to a particular hub node, for routing the packet through appropriate nodes to the particular hub node, said flow-control subsystem, responsive to the traffic at each node, each packet having a destination address to a first recipient node, for transmitting the packet from the particular hub node to an appropriate node, routing the packet to the first recipient node, said flow-control subsystem, responsive to the traffic congestion and to a plurality of packets having voice data, for routing the plurality of packets through a path in the plurality of nodes to ensure that the plurality of packets arrive sequentially; and

said particular hub node, responsive to an information packet arriving from a central office, for routing the information packet to a second recipient node.

3. A distributed network, spread-spectrum method, for a plurality of remote stations and a plurality of nodes for covering a geographic area, the plurality of nodes including a hub node, each node covering a micro-cell having a radius less than one mile, comprising the steps of:

communicating, using packets having spread-spectrum modulation, over radio waves, with the plurality of remote stations, each packet having a source address and a destination address;

storing and forwarding one or more packets to and from the remote station;

storing and forwarding the one or more packets to and from another node in the plurality of nodes;

US 6,493,377 B2

9

controlling the steps of storing and forwarding, to store each packet arriving at the spread-spectrum transceiver;

communicating traffic information between each of the nodes in the plurality of nodes, with the traffic information including traffic density at each of the nodes;

routing, in response to the traffic information and to a packet having the destination address to the hub node, the packet through appropriate nodes to the hub node;

transmitting, in response to the traffic at each node, each packet having a destination address to a first recipient node;

transmitting the packet from the hub node to an appropriate node;

routing the packet to the first recipient node;

routing, in response to the traffic congestion and to a plurality of packets having voice data, the plurality of packets through a path in the plurality of nodes to ensure that the plurality of packets arrive sequentially; and

routing, in response to an information packet arriving from a central office, the information packet to a second recipient node.

4. A distributed network, spread-spectrum system, comprising:

a plurality of remote stations;

a plurality of nodes for covering a geographic area, each node in the plurality of nodes for communicating, with one or more remote stations of the plurality of remote stations, using packets having a destination address and modulated with spread-spectrum modulation, with each packet transmitted between a respective node and remote station using radio waves; and

flow-control means for communicating traffic information between a first multiplicity of neighboring nodes of a first node of the plurality of nodes, with the first node capable of communicating a respective packet to a node in the first multiplicity of neighboring nodes, with the traffic information including traffic density at each of the first multiplicity of neighboring nodes, said flow-control means, responsive to the traffic information and to the respective packet, from the first node, having a respective destination address of a respective destination node of the plurality of nodes, for selecting a second node of the first multiplicity of neighboring nodes, said flow-control means for routing, responsive to the traffic information, the respective packet through the second node to the respective destination node.

5. The distributed network, as set forth in claim 4, with said flow-control means for communicating traffic information between a second multiplicity of neighboring nodes of the second node, with the second node capable of communication the respective packet to a node in the second multiplicity of neighboring nodes, with the traffic information including traffic density at each of the second multiplicity of neighboring nodes, said flow-control means, responsive to the traffic information and to the respective packet, from the second node, having the respective destination address of the respective destination node, for selecting a third node of the second multiplicity of neighboring nodes, said flow-control means, responsive to the traffic information, for routing the respective packet through the third node to the respective destination node.

6. The distributed network, as set forth in claim 5, with said flow-control means for communicating traffic informa-

10

tion between a third multiplicity of neighboring nodes of the third node, with the third node capable of communicating the respective packet to a node in the third multiplicity of neighboring nodes, with the traffic information including traffic density at each of the third multiplicity of neighboring nodes, said flow-control means, responsive to the traffic information and to the respective packet, from the third node, having the respective destination address of the respective destination node, for selecting a fourth node of the third multiplicity of neighboring nodes, said flow-control means, responsive to the traffic information, for routing the respective packet through the fourth node to the respective destination node.

7. The distributed network, as set forth in claim 6, with said flow-control means for communicating traffic information between a fourth multiplicity of neighboring nodes of the fourth node, with the fourth node capable of communicating the respective packet to a node in the fourth multiplicity of neighboring nodes, with the traffic information including traffic density at each of the fourth multiplicity of neighboring nodes, said flow-control means, responsive to the traffic information and to the respective packet, from the fourth node, having the respective destination address of the respective destination node, for selecting a fifth node of the fourth multiplicity of neighboring nodes, said flow-control means, responsive to the traffic information, for routing the respective packet through the fifth node to the respective destination node.

8. The distributed network, as set forth in claim 7, with said flow-control means for communicating traffic information between a fifth multiplicity of neighboring nodes of the fifth node, with the fifth node capable of communicating the respective packet to a node in the fifth multiplicity of neighboring nodes, with the traffic information including traffic density at each of the fifth multiplicity of neighboring nodes, said flow-control means, responsive to the traffic information and to the respective packet, from the fifth node, having the respective destination address of the respective destination node, for selecting a sixth node of the fifth multiplicity of neighboring nodes, said flow-control means, responsive to the traffic information, for routing the respective packet through the sixth node to the respective destination node.

9. The distributed network, as set forth in claim 8, with said flow-control means for communicating traffic information between a sixth multiplicity of neighboring nodes of the sixth node, with the sixth node capable of communicating a respective packet to a node in the sixth multiplicity of neighboring nodes, with the traffic information including traffic density at each of the sixth multiplicity of neighboring nodes, said flow-control means, responsive to the traffic information and to the respective packet, from the sixth node, having the respective destination address of the respective destination node, for selecting a seventh node of the sixth multiplicity of neighboring nodes, said flow-control means, responsive to the traffic information, for routing the respective packet through the seventh node to the respective destination node.

10. A distributed network, spread-spectrum system, comprising:

a plurality of remote stations;

a plurality of nodes for covering a geographic area, each node in the plurality of nodes for communicating, with one or more remote stations of the plurality of remote stations, using packets having a destination address and modulated with spread-spectrum modulation, with each packet transmitted between a respective node and remote station using radio waves; and

US 6,493,377 B2

11

flow-control means for communicating first traffic information between a first multiplicity of neighboring nodes of a first node of the plurality of nodes, with the first node capable of communicating a respective packet to a node in the first multiplicity of neighboring nodes, with the first traffic information including traffic density at each of the first multiplicity of neighboring nodes, said flow-control means, responsive to the first traffic information and to the respective packet, from the first node, having a respective destination address of a respective destination node of the plurality of nodes, for selecting a second node of the first multiplicity of neighboring nodes, said flow-control means for responsive to the first traffic information, the respective packet through the second node to the respective destination node.

11. The distributed network, as set forth in claim 10, with said flow-control means for communicating second traffic information between a second multiplicity of neighboring nodes of the second node, with the second node capable of communicating a respective packet to a node in the second multiplicity of neighboring nodes, with the second traffic information including traffic density at each of the second multiplicity of neighboring nodes, said flow-control means, responsive to the second traffic information and to the respective packet, from the second node, having the respective destination address of the respective destination node, for selecting a third node of the second multiplicity of neighboring nodes, said flow-control means, responsive to the second traffic information, for routing the respective packet through the third node to the respective destination node.

12. The distributed network, as set forth in claim 11, with said flow-control means for communicating third traffic information between a third multiplicity of neighboring nodes of the third node, with the third node capable of communicating a respective packet to a node in the third multiplicity of neighboring nodes, with the third traffic information including traffic density at each of the third multiplicity of neighboring nodes, said flow-control means, responsive to the third traffic information and to the respective packet, from the third node, having the respective destination address of the respective destination node, for selecting a fourth node of the third multiplicity of neighboring nodes, said flow-control means, responsive to the third traffic information, for routing the respective packet through the fourth node to the respective destination node.

13. The distributed network, as set forth in claim 12, with said flow-control means for communicating fourth traffic information between a fourth multiplicity of neighboring nodes of the fourth node, with the fourth node capable of communicating a respective packet to a node in the fourth multiplicity of neighboring nodes, with the fourth traffic information including traffic density at each of the fourth multiplicity of neighboring nodes, said flow-control means, responsive to the fourth traffic information and to the respective packet, from the fourth node, having the respective destination address of the respective destination node, for selecting a fifth node of the fourth multiplicity of neighboring nodes, said flow-control means, responsive to the fourth traffic information, for routing the respective packet through the fifth node to the respective destination node.

14. The distributed network, as set forth in claim 13, with said flow-control means for communicating fifth traffic information between a fifth multiplicity of neighboring nodes of the fifth node, with the fifth node capable of communicating a respective packet to a node in the fifth

12

multiplicity of neighboring nodes, with the fifth traffic information including traffic density at each of the fifth multiplicity of neighboring nodes, said flow-control means, responsive to the fifth traffic information and to the respective packet, from the fifth node, having the respective destination address of the respective destination node, for selecting a sixth node of the fifth multiplicity of neighboring nodes, said flow-control means, responsive to the fifth traffic information, for routing the respective packet through the sixth node to the respective destination node.

15. The distributed network, as set forth in claim 14, with said flow-control means for communicating sixth traffic information between a sixth multiplicity of neighboring nodes of the sixth node, with the sixth node capable of communicating a respective packet to a node in the sixth multiplicity of neighboring nodes, with the sixth traffic information including traffic density at each of the sixth multiplicity of neighboring nodes, said flow-control means, responsive to the sixth traffic information and to the respective packet, from the sixth node, having the respective destination address of the respective destination node, for selecting a seventh node of the sixth multiplicity of neighboring nodes, said flow-control means, responsive to the sixth traffic information, for routing the respective packet through the seventh node to the respective destination node.

16. A distributed network, spread-spectrum method, having a plurality of remote stations and a plurality of nodes for covering a geographic area, comprising the steps of:

communicating, between a node of the plurality of nodes and one or more remote stations of the plurality of remote stations, using packets having a destination address and modulated with spread-spectrum modulation, with each packet transmitted between a respective node and remote station using radio waves;

communicating traffic information between a first multiplicity of neighboring nodes of a first node of the plurality of nodes, with the first node capable of communicating a respective packet to a node in the first multiplicity of neighboring nodes, with the traffic information including traffic density at each of the first multiplicity of neighboring nodes;

selecting, responsive to the traffic information and to the respective packet, from the first node, having a respective destination address of a respective destination node of the plurality of nodes, a second node of the first multiplicity of neighboring nodes; and

routing, responsive to the traffic information, the respective packet through the second node to the respective destination node.

17. The distributed network, spread-spectrum method, as set forth in claim 16, further comprising the steps:

communicating traffic information between a second multiplicity of neighboring nodes of the second node, with the second node capable of communication the respective packet to a node in the second multiplicity of neighboring nodes, with the traffic information including traffic density at each of the second multiplicity of neighboring nodes;

selecting, responsive to the traffic information and to the respective packet, from the second node, having the respective destination address of the respective destination node, a third node of the second multiplicity of neighboring nodes; and

routing, responsive to the traffic information, the respective packet through the third node to the respective destination node.

US 6,493,377 B2

13

14

**18.** The distributed network, spread-spectrum method, as set forth in claim 17, further comprising the steps:

communicating traffic information between a third multiplicity of neighboring nodes of the third node, with the third node capable of communicating the respective packet to a node in the third multiplicity of neighboring nodes, with the traffic information including traffic density at each of the third multiplicity of neighboring nodes;

selecting, responsive to the traffic information and to the respective packet, from the third node, having the respective destination address of the respective destination node, a fourth node of the third multiplicity of neighboring nodes; and

routing, responsive to the traffic information, the respective packet through the fourth node to the respective destination node.

**19.** The distributed network, spread-spectrum method, as set forth in claim 18, further comprising the steps:

communicating traffic information between a fourth multiplicity of neighboring nodes of the fourth node, with the fourth node capable of communicating the respective packet to a node in the fourth multiplicity of neighboring nodes, with the traffic information including traffic density at each of the fourth multiplicity of neighboring nodes;

selecting, responsive to the traffic information and to the respective packet, from the fourth node, having the respective destination address of the respective destination node, a fifth node of the fourth multiplicity of neighboring nodes; and

routing, responsive to the traffic information, the respective packet through the fifth node to the respective destination node.

**20.** The distributed network, spread-spectrum method, as set forth in claim 19, further comprising the steps:

communicating traffic information between a fifth multiplicity of neighboring nodes of the fifth node, with the fifth node capable of communicating the respective packet to a node in the fifth multiplicity of neighboring nodes, with the traffic information including traffic density at each of the fifth multiplicity of neighboring nodes;

selecting, responsive to the traffic information and to the respective packet, from the fifth node, having the respective destination address of the respective destination node, a sixth node of the fifth multiplicity of neighboring nodes; and

routing, responsive to the traffic information, the respective packet through the sixth node to the respective destination node.

**21.** The distributed network, spread-spectrum method, as set forth in claim 20, further comprising the steps:

communicating traffic information between a sixth multiplicity of neighboring nodes of the sixth node, with the sixth node capable of communicating a respective packet to a node in the sixth multiplicity of neighboring nodes, with the traffic information including traffic density at each of the sixth multiplicity of neighboring nodes;

selecting, responsive to the traffic information and to the respective packet, from the sixth node, having the respective destination address of the respective destination node, for selecting a seventh node of the sixth multiplicity of neighboring nodes; and

routing, responsive to the traffic information, the respective packet through the seventh node to the respective destination node.

**22.** A distributed network, spread-spectrum method, having a plurality of remote stations and a plurality of nodes for covering a geographic area, comprising the steps of:

communicating, between a node of the plurality of nodes and one or more remote stations of the plurality of remote stations, using packets having a destination address and modulated with spread-spectrum modulation, with each packet transmitted between a respective node and remote station using radio waves;

communicating first traffic information between a first multiplicity of neighboring nodes of a first node of the plurality of nodes, with the first node capable of communicating a respective packet to a node in the first multiplicity of neighboring nodes, with the first traffic information including traffic density at each of the first multiplicity of neighboring nodes;

selecting, responsive to the first traffic information and to the respective packet, from the first node, having a respective destination address of a respective destination node of the plurality of nodes, a second node of the first multiplicity of neighboring nodes; and

routing, responsive to the first traffic information, the respective packet through the second node to the respective destination node.

**23.** The distributed network, spread-spectrum method, as set forth in claim 22, further comprising the steps:,

communicating second traffic information between a second multiplicity of neighboring nodes of the second node, with the second node capable of communicating a respective packet to a node in the second multiplicity of neighboring nodes, with the second traffic information including traffic density at each of the second multiplicity of neighboring nodes;

selecting, responsive to the second traffic information and to the respective packet, from the second node, having the respective destination address of the respective destination node, a third node of the second multiplicity of neighboring nodes; and

routing, responsive to the second traffic information, the respective packet through the third node to the respective destination node.

**24.** The distributed network, spread-spectrum method, as set forth in claim 23, further comprising the steps:

communicating third traffic information between a third multiplicity of neighboring nodes of the third node, with the third node capable of communicating a respective packet to a node in the third multiplicity of neighboring nodes, with the third traffic information including traffic density at each of the third multiplicity of neighboring nodes;

selecting, responsive to the third traffic information and to the respective packet, from the third node, having the respective destination address of the respective destination node, a fourth node of the third multiplicity of neighboring nodes; and

routing, responsive to the third traffic information, the respective packet through the fourth node to the respective destination node.

**25.** The distributed network, spread-spectrum method, as set forth in claim 24, further comprising the steps:

communicating fourth traffic information between a fourth multiplicity of neighboring nodes of the fourth

US 6,493,377 B2

15

node, with the fourth node capable of communicating a respective packet to a node in the fourth multiplicity of neighboring nodes, with the fourth traffic information including traffic density at each of the fourth multiplicity of neighboring nodes;

selecting, responsive to the fourth traffic information and to the respective packet, from the fourth node, having the respective destination address of the respective destination node, a fifth node of the fourth multiplicity of neighboring nodes; and

routing, responsive to the fourth traffic information, the respective packet through the fifth node to the respective destination node.

26. The distributed network, spread-spectrum method, as set forth in claim 25, further comprising the steps:

communicating fifth traffic information between a fifth multiplicity of neighboring nodes of the fifth node, with the fifth node capable of communicating a respective packet to a node in the fifth multiplicity of neighboring nodes, with the fifth traffic information including traffic density at each of the fifth multiplicity of neighboring nodes;l

selecting, responsive to the fifth traffic information and to the respective packet, from the fifth node, having the respective destination address of the respective destination node, a sixth node of the fifth multiplicity of neighboring nodes; and

routing, responsive to the fifth traffic information, the respective packet through the sixth node to the respective destination node.

27. The distributed network, spread-spectrum method, as set forth in claim 26, further comprising the steps:

communicating sixth traffic information between a sixth multiplicity of neighboring nodes of the sixth node, with the sixth node capable of communicating a respective packet to a node in the sixth multiplicity of neighboring nodes, with the sixth traffic information including traffic density at each of the sixth multiplicity of neighboring nodes;

selecting, responsive to the sixth traffic information and to the respective packet, from the sixth node, having the respective destination address of the respective destination node, a seventh node of the sixth multiplicity of neighboring nodes; and

routing, responsive to the sixth traffic information, the respective packet through the seventh node to the respective destination node.

28. The distributed network as set for in claim 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14 or 15, with said flow-control means including means for communicating with radio waves.

29. The distributed network as set for in claim 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14 or 15, with said flow-control means including means for communicating with spread-spectrum modulation using radio waves.

30. The distributed-network, spread-spectrum method as set forth in claim 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26 or 27, with the routing step including the step of modulating the packet with spread-spectrum modulation.

31. The distributed-network, spread-spectrum method as set forth in claim 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26

16

or 27, with the routing step including the step of transmitting, using radio waves, the packet with spread-spectrum modulation.

32. A distributed network, spread-spectrum system, comprising:

a plurality of remote stations;

a plurality of nodes for covering a geographic area, each node in the plurality of nodes for communicating, with one or more remote stations of the plurality of remote stations, using packets having a destination address and modulated with spread-spectrum modulation, with each packet transmitted between a respective node and remote station using radio waves; and

flow-control means for communicating traffic information between the plurality of nodes, with the traffic information including traffic density at each of the plurality of nodes, said flow-control means, responsive to the traffic information and to a respective packet, from a first node, having a respective destination address of a respective destination node of the plurality of nodes, for selecting a path of a multiplicity of nodes through the plurality of nodes to the destination node, said flow-control means for routing, responsive to the traffic information, the respective packet through the path of the multiplicity of nodes to the respective destination node.

33. A distributed network, spread-spectrum method, having a plurality of nodes, comprising the steps of:

communicating, to a respective node of the plurality of nodes, with one or more remote stations of a plurality of remote stations, using packets having a destination address and modulated with spread-spectrum modulation, with each packet transmitted between the respective node and remote station using radio waves;

communicating traffic information between the plurality of nodes, with the traffic information including traffic density at each of the plurality of nodes;

selecting, responsive to the traffic information and to a respective packet, from the respective node, having a respective destination address of a respective destination node of the plurality of nodes, a path of a multiplicity of nodes through the plurality of nodes to the destination node; and

routing, responsive to the traffic information, the respective packet through the path of the multiplicity of nodes to the respective destination node.

34. The distributed network as set for in claim 32, with said flow-control means including means for communicating with radio waves.

35. The distributed network as set for in claim 32, with said flow-control means including means for communicating with spread-spectrum modulation using radio waves.

36. The distributed-network, spread-spectrum method as set forth in claim 33, with the routing step including the step of modulating the packet with spread-spectrum modulation.

37. The distributed-network, spread-spectrum method as set forth in claim 33, with the routing step including the step of transmitting, using radio waves, the packet with spread-spectrum modulation.

*   *   *   *   *

Exhibit B

FILED by _____ *EG* _____ D.C.
ELECTRONIC

**Apr 5 2006**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Case No.: 05-80300-CIV-MARRA/SELTZER

LINEX TECHNOLOGIES, INC.,

                Plaintiff,

vs.

MOTOROLA, INC., NORTEL NETWORKS,
INC., TROPOS NETWORKS, INC., STRIX
SYSTEMS, INC., and BELAIR NETWORKS,
INC.,

                Defendants.

_____ /

## <u>NOTICE OF FILING JOINT CLAIM CHART</u>

Motorola hereby serves notice of filing the parties' Joint Claim Chart, setting forth the

parties proposals regarding disputed claim construction.

SHOOK, HARDY & BACON L.L.P.
MIAMI CENTER, SUITE 2400, 201 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131-4332 •TELEPHONE (305) 358-5171

511034v1

Case No.: 05-80300-CIV-MARRA/SELTZER

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.
Attorneys for Defendant, Motorola, Inc.
Miami Center, Suite 2400
201 South Biscayne Boulevard
Miami, Florida 33131-4332
Telephone: 305.358.5171
Facsimile:  305.358.7470


By___s/._____
        DARRELL PAYNE
        Fla. Bar No.:  773300

Of Counsel:

GARDNER CARTON & DOUGLAS, L.L.P.
Michael E. Barry, Esq.
David Moorhead, Esq.
Nicole M. Bulman, Esq.
(Admitted Pro Hac Vice)
191 North Wacker Drive, Suite 3700
Chicago, Illinois  60606-1698
Tel.  (312) 569-1000

GARDNER CARTON & DOUGLAS, L.L.P.
Joseph J. Buczynski, Esq.
(Admitted Pro Hac Vice)
1301 K. Street, NW, Suite 900, East Tower
Washington, D.C.  2005-3317
Tel.  (202) 230-5000

Case No.: 05-80300-CIV-MARRA/SELTZER

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by

U.S. Mail on this 5th day of April, 2005, upon the following:

**Counsel for Plaintiff**
Edward W. Goldstein, Esq.
egoldstein@gfiplaw.com
Corby R. Vowell, Esq.
cvowell@gfiplaw.com
**Goldstein & Faucett, L.L.P.**
1177 West Loop South, Suite 400
Houston, Texas  77027
Tel.:   713/877-1515
Fax:   713/877-1145


**Counsel for Tropos Networks**
James A. Gale, Esq.
jgale@feldmangale.com
Fla. Bar No.: 371726
Gregory L. Hillyer, Esq.
ghillyer@feldmangale.com
Fla. Bar No.: 682489
**Feldman Gale, P.A.**
Miami Center, Suite 1920
201 S. Biscayne Boulevard
Miami, Florida  33131-4332
Tel.:   305/358-5001
Fax:   305-358-3309

**Co-Counsel for Strix Systems, Inc.**
Ramsey M. Al-Salem, Esq.
ralsalam@perkinscoie.com
Jessica L. Rossman, Esq.
jrossman@perkinscoie.com
**Perkins Coie, L.L.P.**
1201 Third Avenue, Suite 4800
Seattle, Washington  98101-3099
Tel:   206/359-8000
Fax:   206/359-9000


Charles H. Lichtman, sq.
clichtman@bergersingerman.com
Fla. Bar No.: 501050
**Berger Singerman**
Las Olas Centre II
350 E. Las Olas Boulevard, Suite 1000
Fort Lauderdale, Florida  33301
Tel.:   954/627-9913
Fax:   954/523-2872

**SHOOK, HARDY & BACON** LLP
MIAMI CENTER, SUITE 2400, 201 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131-4332 •TELEPHONE (305) 358-5171

Case No.: 05-80300-CIV-MARRA/SELTZER

**Co-Counsel for Nortel Networks, Inc.**
Mark M. Supko, Esq.
msupko@crowell.com
Michael H. Jacobs, Esq.
mjacobs@crowell.com
**Crowell & Moring, L.L.P.**
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
Tel:    202/624-2500
Fax:    202/628-5116

Marissa D. Kelley, Esq.
mkelley@swmwas.com
Fla. Bar No. 379300
**Stearns, Weaver, Miller, Weissler,
  Alhadeff & Sitterson, L.L.P.**
200 E. Broward Boulevard, Suite 1900
Fort Lauderdale, Florida  33301-1949
Tel: 954/462-9500
Fax: 954/462-9567

_____s/._____
Darrell Payne

| | | | |
|---|---|---|---|
| 1 | spread-spectrum [modulation/system] (claims 32 and 33) | A form of communication in which a signal is spread over greater bandwidth than is necessary to transmit the signal | Either of two communication methods, known as direct sequence spread spectrum (DSSS) and frequency hopping spread spectrum (FHSS), in which the bandwidth for transmitting information is deliberately widened by means of a spreading function over that which otherwise would be needed to transmit the information. |
| 2 | remote station (claims 32 and 33) | A communication device capable of originating and transmitting packets to the distributed network via a node and capable of receiving packets from the distributed network via a node. | An end-user device in a wireless system which is capable of communicating only with a node in that system. |
| 3 | node (claims 32 and 33) | A communication device capable of transmitting and receiving packets to and from a remote station, as well as transmitting and receiving packets to and from another node in the distributed network. | A communication device having multiple transceivers for store-and-forward routing of packets to and from end-user devices within a limited geographic area using spread-spectrum modulation, and further including at least one transceiver for store-and-forward routing of packets to and from another node within the distributed network. |
| 4 | packet (claims 32 and 33) | A block of information for communicating in a distributed network, which includes a source address and a destination address. | A formatted block of information for communicating in a packet switching network, including at least a source address and a destination address. |

| | | | |
|---|---|---|---|
| 5 | destination address (claims 32 and 33) | A unique identifier for the intended recipient of a packet. | A unique network identifier for the final intended recipient of a packet in the network. In the context of the asserted claims, the final intended recipient is the destination node. |
| 6 | respective node (claims 32 and 33) | Plaintiff believes that no construction is necessary for this term. | The first node within the distributed network that receives a packet originated by a remote station, also called the "first node." |
| 7 | flow-control means (claim 32) | A subsystem that routes packets through the distributed network. | A central computer or processor maintaining traffic information about all of the nodes in the distributed network which (a) communicates such traffic information between all of the nodes, (b) selects a path for routing a packet from a first node to a destination node in view of the traffic information, and (c) causes the packet to be transmitted to the destination node through the selected path. |
| 8 | traffic information (claims 32 and 33) | Information regarding conditions of the distributed network or the transmission of data in the distributed network. | Information communicated between nodes in routing packets that indicates the capacity of a node to handle additional packets in view of, at least, the traffic density at that node. |
| 9 | traffic density (claims 32 and 33) | The amount of traffic in a given period of time. | The number of packets presently traversing a node per unit of time. |
| 10 | responsive to the traffic information (claims 32 and 33) | Reacting to the traffic information. | Reacting to the traffic information, including the traffic density at each of the plurality of nodes. |

| | | | |
|---|---|---|---|
| 11 | first node (claim 32) | The first node within the distributed network that receives a packet originated by a remote station. | The first node within the distributed network that receives a packet originated by a remote station, also called the "respective node." |
| 12 | destination node (claims 32 and 33) | The last node in a path through the distributed network of nodes. | A hub node capable of communicating with devices both within and outside of the distributed network. |
| 13 | selecting a path of a multiplicity of nodes (claim 32)  selecting . . . a path of a multiplicity of nodes (claim 33) | Plaintiff believes that no construction is necessary for this term. | Selecting a path including multiple nodes between the first (or respective) node and the destination node. |

Exhibit C

**United States Patent No. 6,493,377**
**Claims 32 and 33**

32. A distributed network, spread-spectrum system, comprising:

a plurality of remote stations;

a plurality of nodes for covering a geographic area, each node in the plurality of nodes for communicating, with one or more remote stations of the plurality of remote stations, using packets having a destination address and modulated with spread-spectrum modulation, with each packet transmitted between a respective node and remote station using radio waves; and

flow-control means for communicating traffic information between the plurality of nodes, with the traffic information including traffic density at each of the plurality of nodes, said flow-control means, responsive to the traffic information and to a respective packet, from a first node, having a respective destination address of a respective destination node of the plurality of nodes, for selecting a path of a multiplicity of nodes through the plurality of nodes to the destination node, said flow-control means for routing, responsive to the traffic information, the respective packet through the path of the multiplicity of nodes to the respective destination node.

33. A distributed network, spread-spectrum method, having a plurality of nodes, comprising the steps of:

communicating, to a respective node of the plurality of nodes, with one or more remote stations of a plurality of remote stations, using packets having a destination address and modulated with spread-spectrum modulation, with each packet transmitted between the respective node and remote station using radio waves;

communicating traffic information between the plurality of nodes, with the traffic information including traffic density at each of the plurality of nodes;

selecting, responsive to the traffic information and to a respective packet, from the respective node, having a respective destination address of a respective destination node of the plurality of nodes, a path of a multiplicity of nodes through the plurality of nodes to the destination node; and

routing, responsive to the traffic information, the respective packet through the path of the multiplicity of nodes to the respective destination node.

Exhibit D

# WILEY ELECTRICAL AND ELECTRONICS ENGINEERING DICTIONARY

**Steven M. Kaplan**
Lexicographer



IEEE PRESS



A JOHN WILEY & SONS, INC., PUBLICATION

Copyright © 2004 by John Wiley & Sons, Inc. All rights reserved.

Published by John Wiley & Sons, Inc., Hoboken, New Jersey.
Published simultaneously in Canada.

No part of this publication may be reproduced, stored in a retrieval system or transmitted in any form or by
any means, electronic, mechanical, photocopying, recording, scanning or otherwise, except as permitted
under Section 107 or 108 of the 1976 United States Copyright Act, without either the prior written
permission of the Publisher, or authorization through payment of the appropriate per-copy fee to the
Copyright Clearance Center, Inc., 222 Rosewood Drive, Danvers, MA 01923, 978-750-8400, fax 978-646-
8600, or on the web at www.copyright.com. Requests to the Publisher for permission should be addressed
to the Permissions Department, John Wiley & Sons, Inc., 111 River Street, Hoboken, NJ 07030, (201) 748-
6011, fax (201) 748-6008.

Limit of Liability/Disclaimer of Warranty: While the publisher and author have used their best efforts in
preparing this book, they make no representation or warranties with respect to the accuracy or
completeness of the contents of this book and specifically disclaim any implied warranties of |
merchantability or fitness for a particular purpose. No warranty may be created or extended by sales
representatives or written sales materials. The advice and strategies contained herein may not be suitable
for your situation. You should consult with a professional where appropriate. Neither the publisher nor
author shall be liable for any loss of profit or any other commercial damages, including but not limited to
special, incidental, consequential, or other damages.

For general information on our other products and services please contact our Customer Care Department
within the U.S. at 877-762-2974, outside the U.S. at 317-572-3993 or fax 317-572-4002.

Wiley also publishes its books in a variety of electronic formats. Some content that appears in print, however,
may not be available in electronic format.

*Library of Congress Cataloging-in-Publication Data is available.*

Kaplan, Steven M.

Wiley Electrical and Electronics Engineering Dictionary

ISBN 0-471-40224-9

Printed in the United States of America.

10  9  8  7  6  5  4  3  2  1



ing. For instance, to join wires by twisting their ends together. Also, the act of so joining, and the place where such a joint occurs.

**splice tray** A container or location utilized to organize and protect spliced optical fibers.

**splicer** That which serves to effect a splice.

**splicing block** A device which facilitates tape splicing by holding the ends in place.

**splicing tape** A non-magnetic, flexible, and durable adhesive tape specially designed for performing tape splices.

**split pair** The use of one wire from each of two wire pairs to make a pair. This may be done accidentally or intentionally. Such an arrangement is usually beset by interference.

**split-phase motor** A motor which has an auxiliary winding connected with the main winding when starting, and which after reaching a specified speed runs utilizing only the main winding. Used, for instance, where neither high cycle rates nor high torques are required, as in the case of small blowers.

**split screen** The division of the display screen of a computer into two or more parts or windows. Used, for instance, when keeping track of one program while simultaneously working on another.

**splitter** 1. That which serves to divide or separate something. For example, a beam splitter or a phase splitter. 2. A device which divides the signals received, or those to be sent, of an antenna, so as to provide multiple paths. Used, for instance, to enable multiple TVs to access the signal of a single satellite. Also called **antenna splitter.** 3. A filter which separates the voice and data signals of a telephone line via which DSL service is accessed. The voice frequencies are in the lower frequency range, and the data is in the higher interval. Not all DSL services require a splitter. Also called **POTS splitter,** or **DSL splitter.**

**splitterless ADSL** An ADSL service in which the splitter is located at the central office, or another location other than the premises of the customer.

**splitterless DSL** A DSL service in which the splitter is located at the central office, or another location other than the premises of the customer.

**SPM** 1. Abbreviation of **scanning probe microscopy.** 2. Abbreviation of **scanning probe microscope.**

**SPMD** Abbreviation of **single program-multiple data.**

**spontaneous emission** The natural emission particles or waves by a substance, such as that which is radioactive.

**spoof** To create and use false email return address, IP address, or the like.

**spoofing** The creation and use of a false email return address, IP address, or the like. Used, for instance, by spammers which wish to hide their identity, elicit confidence, or otherwise deceive a recipient. Spoofing may also be used by individuals, programs, or entities wishing to extract confidential information from unwary users.

**spool** 1. An object, usually with a circular cross-section, around which something is rolled or wound. For example, a reel upon which a magnetic tape, film, wire, cable, or other flexible material is wound. Also called **reel** (1). 2. That which is wound around a **spool** (1). Also called **reel** (2). 3. A spool (1) including that which is wrapped around it. Also called **reel** (3). 4. To place a document or data in a **spooler** (2).

**spooler** 1. That which serves to wind or roll something around a spool (1). 2. A program which manages printing tasks. Such a program can add, remove, change the order of, or cancel print jobs, in addition to placing documents in a memory or storage location to await printing at the printer's pace. Also called **print spooler.**

**sporadic E** Same as **sporadic E-layer.**

**sporadic E-layer** An ionospheric layer, within the E-region, which occasionally forms during periods of increased ionization. Also called **sporadic E.**

**sporadic-E propagation** The propagation of radio waves with the assistance of one or more reflections off a sporadic E-layer.

**sporadic-E reflections** Sharply defined reflections of radio waves at frequencies above the critical frequency in sporadic-E layers of the ionosphere. Also called **sporadic reflections.**

**sporadic reflections** Same as **sporadic-E reflections.**

**spot** 1. A specified point or comparatively small location or region. For example, a cathode spot, a dead spot, a hot spot, a focal spot, or a recording spot. 2. On a display, such as a CRT, the luminous area created at any given instant by an electron beam. 3. Same as **scanning spot** (1). 4. Same as **scanning spot** (2).

**spot beam** 1. A satellite signal that is sent to a limited geographic area. 2. An antenna signal that is sent to a limited area.

**spot check** An occasional and/or random check, inspection, or test which is usually limited in scope.

**spot frequency** 1. A single frequency, as opposed to a frequency band. 2. A frequency which serves a reference for others.

**spot size** The dimensions of the region illuminated by an electron beam in a CRT.

**spot speed** The speed at which a scanning spot moves. Also called **scanning speed** (2).

**spot welding** Welding, especially resistance welding, performed on small areas. The size and shape of the electrodes determine the size and shape of the weld.

**SPP** Abbreviation of **scalable parallel processing.**

**SPQ** Abbreviation of **statistical quality control.**

**spray coating** The application of a layer by spraying a solution onto a substrate, which is then allowed to dry. Used, for instance, to apply a liquid photoresist.

**spread** 1. To extend, or to extend from a given point or location. Also, to have extended, or to be extended from a given point or location. 2. To distribute over a surface, or within a volume. Also, to have distributed over a surface, or within a volume. 3. To increase the size of a gap. Also, to have the size of a gap increased. 4. The limits within which a value fluctuation may occur. Also, the limits within which a value fluctuation actually occurs.

**spread spectrum** 1. Any modulation technique in which the bandwidth of the information-bearing signal is intentionally spread over a much wider bandwidth than would otherwise be necessary. This may be done, for instance, for added security or for the ability to recover the data without retransmission. Examples include frequency-hopping spread spectrum, in which the frequency of the carrier hops among multiple frequencies at a rate determined by a specific code or algorithm, and direct-sequence spread spectrum, where the information-carrying bit stream is combined with a pseudorandom bit stream at a higher bit rate, and this combined signal modulates the carrier. Also, the technology utilized to implement any such technique. Also called **spread-spectrum modulation,** or **spread-spectrum technique.** 2. A transmission utilizing a spread spectrum (1) technique or technology.

**spread-spectrum modulation** Same as **spread spectrum** (1).

**spread-spectrum technique** Same as **spread spectrum** (1).

**spread-spectrum transmission** A data transmission utilizing a spread-spectrum technique.

**spreader** An object or material, such as a bar or insulator, which helps keep wires or other conductors apart. Used, for