IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA

CASE NO: 05-80300-CIV MARRA/SELTZER

LINEX TECHNOLOGIES, INC.

        Plaintiff,

vs.

MOTOROLA, INC., NORTEL NETWORKS,
INC., TROPOS NETWORKS, INC.,
FIRETIDE, INC., STRIX SYSTEMS, INC.,
and BELAIR NETWORKS INC.,

        Defendants.

_____/



## PLAINTIFF LINEX TECHNOLOGIES, INC.'S OPPOSITION TO DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF THEIR PROPOSED CLAIM CONSTRUCTION TERMS

        Plaintiff Linex Technologies, Inc. ("Linex") submits the following Opposition to Defendants' Joint Memorandum of Law In Support of Their Proposed Claim Construction Terms ("Defendants' Opening Brief"). For the reasons set forth herein, Linex respectfully requests that the Court reject the Defendants' proposed claim constructions and adopt each of Linex's proposed constructions.

**I.**    **ARGUMENTS AND AUTHORITIES REGARDING THE CONSTRUCTION OF MEANS-PLUS-FUNCTION LIMITATIONS AND THE CORRESPONDING ANALYSIS OF WHETHER THOSE CLAIMS FAIL FOR INDEFINITNESS.**

        Notwithstanding the arguments and authorities in the following paragraphs, Linex does not take issue with Defendants' recitation of the general claim construction principles set forth in their Opening Brief as the parties are generally in agreement over these concepts. However, Linex does take issue with the Defendants' arguments and authorities in support of their argument that the "flow control means" limitation recited in claim 32 should be viewed under their stated means-plus-function analysis. Linex also takes issue with the arguments and

authorities upon which Defendants rely in support of their contention that claim 32 of the '377 patent is indefinite.

### A.    The Court Must First Determine Whether The Limitation In Claim 32 Is A Means-Plus-Function Element.

Means-plus-function language is implicated when inventors use functional language in claims without recitation of any specific structure. *See* 35 U.S.C. § 112, ¶ 6 (2005). Patent drafters conventionally achieve this by using the words "means for" followed by recitation of the function performed. *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 531 (Fed. Cir. 1996), *cert. denied*, 522 U.S 812, 118 S. Ct. 56 (1997). Indeed, if a claim element contains the word "means" and recites a function, it is presumed that the element is a means-plus-function element. *Envirco Corp. v. Clestra Cleanroom, Inc.*, 209 F.3d 1360, 1364 (Fed. Cir. 2000). The inquiry must continue, however, because the presumption fails if the claim itself recites sufficient structure to perform the claimed function. *Cole*, 102 F.3d at 531; *Envirco*, 209 F.3d at 1364.

The Federal Circuit has declined to construe an element as a means-plus-function element even though it included the words "means" where the claim element included a word or words preceding the "means" phrase that described the structure to perform the function. *See, e.g., Cole*, 102 F.3d at 531 ("perforation means" was not a means-plus-function element); *Quantum Corp. v. Mountain Computer, Inc.*, 5 U.S.P.Q. 2d. 1103, 1108 (N.D. Calif. 1987), *aff'd.*, 818 F. 2d. 877 (Fed. Cir. 1987) ("correction signal generator means" was not a means-plus-function element). One such case, *Envirco Corp. v. Clestra Cleanroom*, held that the trial court improperly interpreted the "second baffle means" element as a means-plus-function element. *Envirco*, 209 F.3d at 1364. The court reasoned that the term "baffle," itself a structural term, imparts structure to the claims and, therefore, its use in the claim overcomes the presumption that §112, ¶6 applies. *Id.* at 1365.

### B.    The Analysis of Means-Plus-Function Elements is a Two-Step Process.

Once a court determines a claim limitation is in "means-plus-function" form, the court must then construe the limitation by identifying the function of the limitation and the structures disclosed in the specification for performing that function. *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1360 (Fed. Cir. 2000); *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194

F.3d 1250, 1258 (Fed. Cir. 1999). In other words, claim construction of a means-plus-function limitation is a two step process.

### 1.    Identify the function.

The first step of the means-plus-function analysis is to precisely identify the function. *Micro Chem.*, 194 F.3d at 1258. To identify the function, a court must construe the functional statement in the means-plus-function limitation by determining the meaning of the disputed phrases and terms in the recited function. *See Generation II Orthotics*, 263 F.3d at 1364. But in construing the functional statements, the Court should not adopt a function different from that explicitly recited in the claim. *Id.* at 1364-65; *Micro Chem*, 194 F.3d at 1258. This is important because an error in construing the disputed terms in the functional statements can improperly alter the identification of structure in the specification that performs to that function. *Micro Chem.*, 194 F.3d at 1258; *see also Kemco Sales*, 208 F.3d at 1361 ("After a court establishes that a means-plus-function limitation is at issue, it must then construe the function recited in that claim . . .").

### 2.    Identify the structure

After identifying the function, the second step for the court is to identify the structure described in the patent specification that performs or corresponds to the identified function. *Micro Chem.*, 194 F.3d at 1258. The corresponding structure includes the structure in the specification that corresponds to that claim element, and equivalents thereof. *Id.* In identifying the structure, a court must keep in mind that when multiple embodiments in the specification correspond to the identified function, proper application of section 112, ¶ 6 reads the limitation to embrace each of those embodiments (*i.e.*, alternative structures described in a patent specification should be included) and their equivalents. *Ishida Co. v. Taylor*, 221 F.3d 1310, 1316 (Fed. Cir. 2000); *Micro Chem.*, 194 F.3d at 1258.

### C.    The "Flow-Control Means" Element in Claim 32 Should Not Be Considered in Means-Plus-Function Form.

The Court must first determine if "flow-control means" limitation in claim 32 is in fact a "means-plus-function" element. Once the Court construes the claim terms disputed by the parties, a plain reading of the language of the claim makes clear that the flow-control means should not be considered in means-plus-function form.

**Colson Hicks Eidson**
255 Aragon Avenue, 2nd Floor, Coral Gables, Florida 33134-5008   Telephone: (305) 476-7400  Fax: (305) 476-7444

3

1.    **"Flow-control means" takes its name from the function it performs.**

Many devices, whose structure is well understood, take their names from the functions they perform. *Greenberg v. Ethicon Endo-surgery, Inc.*, 91 F.3d 1580, 1583-84 (Fed. Cir. 1996). The "flow-control means" recited in claim 32 is such a device.  In *Greenberg*, the court provides examples of common devices, such as a filter, brake, clamp, screwdriver and lock that are named for their respective functions.  In deciding *Greenberg*, the court reasoned that even if a term does not suggest a single, well-defined structure, the term is not in means-plus-function form if the term has a well-defined meaning in the art. *Id.*  Like the examples provided in *Greenberg*, the terms "flow-control means" takes its name from the function it performs.  Thus, using the word "means" does not prevent the term flow-control means from being understood as a definite structure to one of ordinary skill in the art. *See Cole*, 102 F.3d at 531.

2.    **Claim 32 recites sufficient structure for the flow-control means.**

Claim 32 recites sufficient structure for the term "flow-control means" to render §112, ¶6 inapplicable.  This is particularly true considering that nine of the thirteen disputed claim terms appear in the "flow-control means" limitation and will be construed by the Court.  The relevant language of claim 32 reads as follows:

> *flow-control means* for communicating *traffic information* between the plurality of *nodes*, with the *traffic information* including *traffic density* at each of the plurality of *nodes*, said *flow-control means*, responsive to the *traffic information* and to a respective *packet*, from a *first node*, having a respective *destination address* of a respective *destination node* of the plurality of *nodes*, for *selecting a path of a multiplicity of nodes* through the plurality of *nodes* to the *destination node*, said *flow-control means* for routing, responsive to the *traffic information*, the respective *packet* through the path of the multiplicity of nodes to the respective *destination node*.

Claim 32, Col. 16, ll. 14-26 (disputed claim terms are emphasized).

The parties agree that the "flow control means" performs three functions: (i) communicating traffic information; (ii) selecting a path of a multiplicity of nodes; and (iii) routing packets through the multiplicity of nodes. The parties' depart over whether sufficient structures to perform these functions are disclosed in either the claim itself or the '377 patent's specification.

Once the disputed claim terms are construed by the Court, any uncertainty about the "flow-control means" limitation is resolved in that the structure performing these functions is

**Colson Hicks Eidson**
255 Aragon Avenue, 2nd Floor, Coral Gables, Florida 33134-5008   Telephone: (305) 476-7400  Fax: (305) 476-7444

4

sufficiently described in the claim itself. The "flow-control means" limitation clearly points out that traffic information, including traffic density, is communicated between the nodes, and the flow-control means is responsive to the traffic information and to a packet, which has a particular destination address of a particular destination node in the network. Based on this information, the flow-control means selects a path of two or more nodes to the destination node, in order to route a particular packet through the path of the multiplicity of nodes to a particular destination node. Claim 32, Col. 16, ll. 14-26. As a result of the plain language of this limitation, a traditional §112, ¶6 analysis should not applied to "flow-control means" limitation found in claim 32. *Cole,* 102 F.3d at 531.

> **D.** **Assuming that a §112, ¶6 Analysis Should Be Applied to the Flow-Control Means Limitation, Claim 32 Does Not Fail For Indefiniteness.**
>
> > **1.** **The '377 Patent Specification Discloses Sufficient Structures That Correspond to the Claimed "Flow-Control Means."**

Defendants argue that claim 32 of the '377 patent is invalid for indefiniteness pursuant to 35 U.S.C. § 112, ¶ 2, which states that "the specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." It is settled law that the claim in question will be held invalid for lack of definiteness if it fails to "reasonably apprise those of skill in the art of its scope." *In re Warmerdam,* 33 F.3d 1354, 1361 (Fed. Cir. 1994). However, indefiniteness is a very narrow concept applied to claim terms capable of no construction. Claims are not required to be plain on their face and immediately discernable; otherwise "all but the clearest claim construction issues could be regarded as giving rise to invalidating indefiniteness." *Exxon Research and Eng'g Co. v. United States,* 265 F.3d 1371, 1375 (Fed. Cir. 2001).

In *Exxon Research,* the Federal Circuit made clear that "[i]f the meaning is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds." *Id.* at 1375. The court continued, "[b]y finding claims indefinite *only if reasonable efforts at claim construction prove futile,* we accord respect to the statutory presumption of patent validity, and we protect the inventive contributions of patentees, even when the drafting of their patents has been less than ideal." *Exxon Research,* 265 F.3d at 1375 (emphasis added); *see also SmithKline Beecham Corp. v. Apotex Corp.,* 403 F.3d 1331, 1340 (Fed. Cir. 2006). In other words, a claim's meaning must be *entirely indiscernible* after all reasonable efforts at

construction before the claim can be held invalid for indefiniteness.[1]

Defendants go to great lengths to have this Court define the structure of the flow-control means-plus-function limitation to strictly comport with the Federal Circuit's holding of *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999). The Federal Circuit determined that the means-plus-function limitation in dispute was directed to the algorithm disclosed in a figure of the patent-at-issue and limited the means-plus-function limitation to not only the microprocessor that computed the algorithm, but also to the microprocessor programmed with the algorithm. *Id.* at 1348. However, Defendants' reliance upon *WMS Gaming* is misplaced and the standard for disclosing a structure corresponding to a means-plus-function limitation is not as onerous as Defendants suggest.

Judge James E. Whittemore from the Middle District of Florida, Tampa Division, recently rejected an argument that virtually mirrors that being proposed by the Defendants in this case. *See Billingnetwork Patent, Inc. v. Cerner Physician Practice, Inc.*, 2006 U.S. Dist. LEXIS 5995 (February 1, 2006). In *Billingnetwork*, the defendants argued that the limitation at issue was indefinite because there was no corresponding structure contained in the specification and plaintiff failed to specifically disclose an algorithm in connection with the claimed function. The defendants' arguments, predicated upon *WMS Gaming*, were summarily rejected after the court considered several provisions of the patent's specification together and determined that the plaintiff sufficiently described the "algorithm, or process, by which the computer performs" the claimed functions. *Id.* at 57-58; *see also CIVIX-DDI, LLC v. Microsoft Corporation*, 84 F. Supp.2d 1132, 1160 (D. Col. 2000) (Holding that *WMS Gaming* did not require that a specific algorithm for a logic processor and software be disclosed in the written description because the patentee's disclosure of "software, different types of computers and databases, and related communications means" recited sufficient structure for the claimed functions.).

> **a. The specification describes a flow-control means for (i) communicating traffic information; (ii) selecting a path of a multiplicity of nodes; and (iii) routing packets through the multiplicity of nodes.**

---

[1] The requirements of § 112, ¶ 2, also apply to those claims drafted in a means-plus-function format. *In re Donaldson Co.*, 16 F.3d 1189, 1195 (Fed. Cir. 1994) (en banc).

The specification of the '377 patent is replete with references, descriptions and algorithms that resemble the functional language of the limitations necessary to perform the three identified functions of the "flow-control means" found in claim 32 of the '377 patent. Accordingly, much like the plaintiff in *Billingnetwork*, the Linex patent "sufficiently disclosed an algorithm that 'resembles the functional language' of the limitation" as required by Federal Circuit precedent. *Id.* at 52-53 (citing *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241 (Fed. Cir. 2005).

The '377 patent discusses at great length the "flow-control subsystem," the corresponding structure associated with the "flow-control means." The "flow-control subsystem typically would include a processor or computer," (Col. 5, ll. 6-7), and . . . it may be distributed throughout the network in each node or centralized. Col. 6 ll. 4-10. The abstract provides a concise overview of the flow-control subsystem and structures.

> The flow-control subsystem communicates traffic information between each of the nodes in the plurality of nodes. The flow-control subsystem routes the packet through appropriate nodes to the hub node from a remote station. Based on the traffic at each node, the flow-control subsystem transmits the packet from the hub node to an appropriate node, and routes the packet to a recipient remote station. The flow-control subsystem routes the plurality of packets through a path in the plurality of nodes to ensure that the plurality of packets arrive sequentially for voice or video packets.

'377 patent, Abstract.

While a "particular flow-control subsystem . . . would be specified by a particular system requirements and design criteria" (Col. 5, ll. 14-18), a further description of the flow-control subsystem is set forth in Figures 4 and 5 and is described, in part, at Col. 6, ll. 4-28, and provides great detail as to how the flow-control subsystem performs each of the three functions recited in the limitation of claim 32, including the necessary algorithms:[2]

> The flow-control subsystem in the distributed network controls the store-and-forward subsystem, to store each packet arriving at the spread-spectrum transceiver. In a preferred embodiment, the flow-control subsystem also is distributed throughout the network, with a flow-control subsystem resident at each node. It is possible, of course, to have a central flow-control system. The flow-control subsystem communicates traffic information between each of the nodes in the plurality of nodes. The traffic information typically includes traffic density at each of the nodes and memory availability. Using the traffic

---

[2] The Federal Circuit has defined an "algorithm" to mean a "step-by-step process." *State Street bank & Trust Co. v. Signature Fin. Group*, 149 F.3d 1368, 1374 (Fed. Cir. 1998).

information and in response to a packet having the destination address to the hub node, the flow-control subsystem routes the packet through appropriate nodes to the appropriate hub node. Based on the traffic at each node, and each packet having a destination address to either the hub or a remote station, the flow-control subsystem transmits the packet from the hub node to an appropriate node, and routes the packet to the first recipient node. Each packet may traverse a different route en route to the remote station.

In response to the traffic congestion and to a plurality of packets having voice data, the flow-control subsystem routes the plurality of packets through a path in the plurality of nodes to ensure that the plurality of packets arrive sequentially.

While the necessary algorithms that "resemble the functional language" of the limitation in claim 32 are described in the above referenced passage from the specification, other portions of the specification, when coupled with this passage, resolve any doubts as to the identity of the algorithms:

The flow-control subsystem communicates traffic information between each of the nodes in the plurality of nodes . . . Using the traffic information, and in response to a packet having the destination address to the hub node, the flow-control subsystem routes the packet through appropriate nodes to the hub node or, in the case of a "local call", to the remote user directly.

\*       \*       \*

Based on the traffic at each node, and each packet having a destination address to a remote station, the flow-control subsystem transmits the packet from a central office to an appropriate hub node to an appropriate node, and routes the packet to the next recipient node. Each packet in a message may traverse a different route. In response to a plurality of packets having voice data, the flow-control subsystem routes the plurality of packets through the same path in the plurality of nodes to ensure that the plurality of packets arrive sequentially. The flow control procedure balances the activity in each node relative to other nodes in the distributed network.

Col. 2, l. 60 – Col. 3, ll. 17.

Importantly, the overriding concern of the flow-control subsystem for each of the three functions is that its procedures "balance the activity in each node relative to other nodes in the distributed network" (Col. 6, ll. 28 – 29) and the nodes chosen for a particular path are based on node available capacity and storage. Col. 6, ll. 54-55.

Contrary to Defendants' assertions, and in accordance with the holding in *Billingnetwork*, the '377 patent sufficiently discloses the necessary algorithms that "resemble the functional

**Colson Hicks Eidson**
255 Aragon Avenue, 2nd Floor, Coral Gables, Florida 33134-5008   Telephone: (305) 476-7400  Fax: (305) 476-7444

8

language" of the limitation in claim 32 such that one skilled in the art is reasonably apprised of its scope. *In re Warmerdam*, 33 F.3d at 1361.

## II. ARGUMENTS REBUTTING DEFENDANTS' PROPOSED CONSTRUCTION OF THE DISPUTED TERMS FOUND WITHIN CLAIMS 32 AND 33 OF THE '377 PATENT.

### A. "spread spectrum"

As pointed out in Linex's Opening Brief, the term "spread spectrum" term should be given its ordinary meaning as recognized by persons of ordinary skill in the art – "a form of communication in which a signal is spread over greater bandwidth than is necessary to transmit the signal." This definition is consistent with the specification and the relevant literature in the art prior to December 6, 2000, the date which the application leading to the '377 patent was filed. Rather than provide a definition of this term, Defendants attempt to limit this term to specific examples of spread spectrum systems. However, neither the specification nor the extrinsic evidence cited in Defendants' Opening Brief support their extremely narrow "definition" of "spread spectrum," which Defendants claim should be limited to only direct sequence ("DSSS") and frequency hopping ("FHSS") spread spectrum systems. On the contrary, the specification and the extrinsic evidence support Linex's proposed definition for this term.

As an initial matter, the Defendants have ignored the intrinsic evidence which clearly provides that the inventors contemplated the use of any spread spectrum system to practice the claimed invention, not just DSSS and FHSS. The specification states that the "[t]ransmission between the remote station and a node is through the use of CDMA modulation [a modification of a spread spectrum system designed to allow multiple simultaneous users], although *any other modulation technique may be employed.*" '377 patent, Col. 2, ll. 37-39 (emphasis added).

Defendants also fail to recognize the extensive amount of extrinsic evidence establishing that multiple spread spectrum systems were in existence prior to December 2000. To support their argument that "at the time the application that led to the '377 patent was filed, one skilled in the art would have understood 'spread-spectrum' to include only two communication methods: DSSS and FHSS," the Defendants only provide the Court a glimpse of what was known in the art as of 2000. In their brief, Defendants rely upon a Federal Communications Commission ("FCC") ruling that addressed the very narrow issue related to the non-licensed use of spread

spectrum systems over a specific bandwidth. *See* Ex. A.[3] Defendants' reliance upon the FCC decision is misplaced. Nowhere in the ruling does the FCC hold that "spread-spectrum operation was 'limited to frequency hopping and direct sequence spread spectrum systems'" as Defendants suggest to the Court. *See* Defendants' Opening Brief at 10. Further, Defendants state that the ruling was made in response to a "petition that the FCC consider alternate forms of communication as spread spectrum." *Id.* The FCC's ruling was in response to a petition much narrower in scope than what Defendants have represented to the Court:

> By this action, the Commission proposes to amend the Part 15 rules regarding the operation of non-licensed spread spectrum systems. Specifically, this *Notice* proposes to revise the rules for frequency hopping systems operating in the 2.4 GHz band (2400 - 2483.5 MHz) to allow for wider operational bandwidths. This *Notice* also proposes to refine the method for measuring the processing gain of direct sequence systems.

*See* Ex. A.

When one views a complete picture of the relevant art, it is apparent that a multitude of spread spectrum systems were in existence as of December 2000 in addition to DHSS and FHSS. In fact, and as Defendants have failed to point out, the FCC recognized additional spread spectrum systems prior to the referenced ruling. In 1996, almost four years prior to the filing of the application that led to the '377 patent, the FCC recognized and defined at least three other spread spectrum systems in addition to DSSS and FHSS: "Hybrid Spread Spectrum Systems," "Pulsed FM Systems," and "Time Hopping Systems." 47 C.F.R. § 2.1 (1996) (relevant excerpts attached as Ex. B). This was not the first time the FCC recognized the existence of these spread spectrum systems. In fact, the FCC recognized these systems as early as 1984. *See In re Authorization of spread spectrum and other wideband emissions not presently provided for in the FCC Rules and Regulations*, 98 F.C.C.2d 380, App. B (1984) (the opinion is referred to herein as "*In re Authorization of Spread Spectrum*"). Also absent from the Defendants' analysis is the FCC's 1996 definition of "spread spectrum systems" that does not limit spread spectrum systems to any specific form, let alone DSSS and FHSS, and is entirely consistent with the definition proposed by Linex in this case:

---

[3] Counsel for Linex was unsuccessful in its attempt to access the referenced FCC ruling at the web address cited by Defendants. Linex has attached what it believes to be the FCC ruling cited by Defendants.

**Colson Hicks Eidson**
255 Aragon Avenue, 2nd Floor, Coral Gables, Florida 33134-5008   Telephone: (305) 476-7400  Fax: (305) 476-7444

10

> Spread Spectrum Systems. A spread spectrum system is an information bearing communications system in which: (1) Information is conveyed by modulation of a carrier by some conventional means, (2) the bandwidth is deliberately widened by means of a spreading function over that which would be needed to transmit the information alone. (In some spread spectrum systems, a portion of the information being conveyed by the system may be contained in the spreading function).

*See* Ex. B; *see also In re Authorization of Spread Spectrum* at 380 ("Spread spectrum is a term applied to communications systems that spread radio frequency energy over a wide bandwidth by means of an auxiliary spreading code. *The spreading of the bandwidth can be accomplished in many different ways . . .*") Defendants completely ignore the FCC's recognition of the breadth of spread spectrum systems, the additional systems recognized by the FCC, as well as those systems that were well known to those skilled in the art.

In addition to the FCC's recognition of multiple spread spectrum systems as early as 1984 and consistent with its broad definition of "spread spectrum systems," the FCC also recognized emerging spread spectrum systems and the necessity for their continued development. In November 2000 an interim report was submitted to the FCC addressing third generation ("3G") mobile systems and noted several emerging spread spectrum systems and their potential use in 3G systems: CDMA-Direct Spread, CDMA Multi-Carrier, CDMA-TDD, and TDMA Single-Carrier. *See* Interim Report – *Spectrum Study of the 2500-2690 MHz Band: The Potential for Accommodating Third Generation Mobile Systems*, November 15, 2000, at pp. 7-8 (relevant excerpts attached as Ex. C).[4]

Defendants also ignore the other spread spectrum systems well known to those skilled in the art prior to December 2000, including Joint Tactical Information Distribution System ("JTIDS"), a military radio system, which employs a hybrid spread spectrum system consisting of frequency hopping, direct sequence and time hopping systems simultaneously, as well as Pulse-Position Modulation ("PPM"). *See* Ex. D, Scholtz, Robert A., *The Origins of Spread-Spectrum Communications*, IEEE Transactions on Communications, May 1982, at pp. 822, 824, 841. Similarly, Orthogonal Frequency-Division Multiplexing ("OFDM"), which can be considered a derivative of a multi-carrier spread spectrum technique, though not popularized in

---

[4] The report may be accessed in its entirety at the following web address:
http://www.fcc.gov/Bureaus/Engineering_Technology/Documents/cfr/1996/47cfr2.pdf

**Colson Hicks Eidson**
255 Aragon Avenue, 2nd Floor, Coral Gables, Florida 33134-5008   Telephone: (305) 476-7400  Fax: (305) 476-7444

11

2000, had been in existence for over thirty years prior to the time the application leading to the '377 patent was filed.   *See* Ex. E, United States Patent No. 3,488,445 entitled "Orthogonal Frequency Multiplex Data Transmission System."

As the references cited herein point out, multiple spread spectrum systems were known and were available long before Linex filed its application that led to the '377 patent.  There is no basis to limit the term "spread spectrum" to only those specific types of systems proposed by Defendants.  To do so would neglect the many spread spectrum technologies known by those skilled in art, as well as those emerging systems as of December 2000.   Linex's proposed definition is consistent with that recognized by the FCC in 1996 and encompassed in the specification of the '377 patent.  Accordingly, Linex requests that the Court adopt the following definition of "spread spectrum" – a form of communication in which a signal is spread over greater bandwidth than is necessary to transmit the signal."

**B.**      **"remote station"**

There is no dispute between the parties that a remote station accesses the distributed network through a node.  However, Defendants' proposed definition would unnecessarily limit this term contrary to the teachings of the patent.  In particular, Defendants' attempt to limit remote stations to "end user" devices is improper.  Defendants further attempt to limit "remote stations" such that they can *only* communicate with a node in the distributed network. Defendants' Opening Brief at 10-11.  However, as the specification points out, the limitations proposed by Defendants are not warranted.

Concededly, and as pointed out by Linex in its Opening Brief, in a practical application, a remote station would likely be an end-user device (*e.g.*, a cellular telephone or a laptop computer).  However, the '377 patent does not limit remote stations to end-user devices as Defendants suggest.  It is well understood by those skilled in the art that other devices exist in distributed networks (*e.g.*, servers), which are not typically considered end-user devices, that still communicate with the nodes in the distributed network by originating, transmitting and receiving packets to and from nodes in the network.  *See* '377 patent, Figs. 2 and 3 (Depicting computers 171, 172 and 182, which are not limited to end-user devices and could, for example, be a server). The concept that a remote station need not be an end-user device is taught by the specification of the '377 patent.

Defendants' definition is also too restrictive in that it attempts to limit the communication capabilities of the remote station to a node within the distributed network. While it is true that, according to the '377 patent, a remote station first communicates with a node in the distributed network, neither the claims nor the specification limit a remote station's communication to only those nodes within the distributed network. Defendants' proposed definition fails to recognize that the remote station can ultimately communicate with nodes and other remote stations and to other networks. *Cf.* Col. 3, ll. 18-21 ("When an information packet(s) arrives from a remote station, the node routes the packet(s) to an appropriate second recipient node on the way to an intended hub node and central office, toward the destination address."); Col. 3, ll. 2-5 ("A 'local call' is defined as a call between remote stations located within (i.e., accessing) the same distributed network. For the local call, the central office connection is not required."); Col. 7, ll. 1-2 ("For local calls within the distributed network, there is no need for packets going to a hub or central office.").

Therefore, based on the teachings of the '377 patent and the arguments herein, Linex respectfully requests the Court to adopt its proposed definition of "remote station."

**C.     "node"**

Defendants incorrectly argue that the term "node" should include "a plurality of spread spectrum transceivers, or equivalently, a plurality of spread-spectrum transmitters and a plurality of spread-spectrum receivers." Defendants' Opening Brief at 12. However, as pointed out in Linex's Opening Brief, this limitation is contrary to the express language found in the written description of the '377 patent. Col. 2, ll. 45-57; Col. 5, ll. 56-60 ("Each node's spread-spectrum transceiver, or equivalently spread-spectrum transmitter and spread-spectrum receiver, communicates … with the plurality of remote stations"). Furthermore, the specification teaches that multiple transceivers in a node are optional. Col. 5, ll. 1-2 ("Each node *may* include a plurality of spread-spectrum transceivers, or, equivalently, a plurality of spread-spectrum transmitter and a plurality of spread-spectrum receivers.") (emphasis added). This portion of Defendants' proposed limitation is clearly inconsistent with the teachings of the '377 patent.

Defendants' proposed construction is also incorrect in that it attempts to limit the definition of node to include: "at least one transceiver for store-and forward routing of packets to and from another node within the distributed network." Once again, to accept this portion of Defendants' proposed construction one would have to ignore the language of the specification

which provides that "[e]ach node *may* include . . . a store and forward subsystem (377 patent, Col. 5, ll. 1-5) and runs contrary to well settled law in that it attempts to limit this claim to an embodiment of the invention. *Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1186-87 (Fed. Cir. 1998) (holding that it is impermissible to read a particular embodiment into the claim).

Defendants' attempt to interject the requirement of a transceiver for store-and-forward routing also ignores the plain language of the claims at issue and runs afoul of the doctrine of claim differentiation. *Seachange Int'l, Inc. v. C-Cor Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005) (holding that the presumption that separate claims have different scopes extends to two independent claims containing different language). In particular, claims 1 and 2 of the '377 patent include limitations related to transceivers for store-and-forward routing that are not included in the claims at issue. *See, e.g.*, Claim 2, Col. 8, ll. 25-29 ("a store-and-forward subsystem, coupled to the spread-spectrum transceiver, for storing and forwarding one or more packets to and from the remote station, and for storing and forwarding the one or more packets to and from another node in the plurality of nodes"). Defendants' proposed definition is inconsistent with the plain language of the claims and the specification and should be rejected.

D.     "packet"

Linex agrees to that portion of Defendants' proposed definition of "packet" as: a "formatted" block of data that is transmitted over a distributed network. This is in accord with the patent's specification. *See, e.g.*, '377 patent at Col. 5, ll. 60-64. However, Linex disagrees with the inclusion of the phrase "packet switching network" in Defendant's proposed definition in that it is an unnecessary limitation on what has already been established as a distributed or mesh network.

Defendants attempt to interject the phrase "packet switching network," as part of the definition of this term. Importantly, the phrase "packet switching network" is not found anywhere in the claims at issue, nor is it found anywhere in the written description of the '377 patent. On the contrary, as the claims and the specification point out, the claimed invention is directed, in part, to distributed networks, which can include networks other than packet switching networks. Defendants want to provide a limited example of packet transmission, and ignore the simple fact that distributed networks can include networks other than packet switched networks

and that packets are capable of forming and passing through circuit switch networks, such as a cellular telephone network. Col. 1, l. 61 – Col. 2, l. 1.

### E. "destination address"

Defendants incorrectly argue that a packet *must have* a "single destination, and a single destination address – the address of the destination node." Defendants' Opening Brief at 13.   It should be noted that neither claim 32, claim 33, nor the patent's specification limit the packets being transmitted to contain only one destination address as Defendants propose.   Further, Defendants' proposed definition would ignore one of the main purposes behind the claimed invention – dynamic routing through the network. A destination address contained in a packet is not necessarily fixed.  The '377 teaches that as a packet is transmitted through the distributed network, it contains the destination address to the next node (*i.e.*, intended recipient) in the transmission. *See, e.g.*, Col. 6, ll. 50 – 54 ("When sending a packet from a hub to a remote station, the path routing the packet through various nodes is not known, a priori, except maybe for voice . . ."). Then, depending upon the information gleaned from the network, including traffic information, the packet is routed to the next node, which may have a separate destination address:

> The packet passes through various nodes, until the packet reaches the remote station. Since the path is not predefined, and not necessarily a direct part "as the crow flies", paths for several packet for the same remote station can be different.
>
> For packets passing from a remote station to the central office 50, the remote station accesses the nearest node. The packet is forwarded, node to node, until the packet arrives at the hub. Paths for packets are not predefined, and can be different for different packets from the remote station to the hub.

Col. 6, ll. 58 -66.

Another example from the specification to support this notion is the concept that the recipient remote station can be moving, which means that the destination node can change, thus requiring a "handoff" at any one of the multiple nodes nearest the remote station. Col. 7, ll. 5-10 ("The packet does not travel a predefined path, and different packets from the sending remote station can travel different paths to the recipient remote station."). Thus, a packet need not contain only one "fixed" destination address, which may change at each node as the packet is transmitted through the network depending upon the information present at that node. *See, e.g.,*

Col. 6, ll. 54-60) ("Nodes chosen for a particular path have available capacity and storage, and can forward the packet to a subsequent node.").

The specification provides that the destination address of a respective destination node, in the context of the patent, is not necessarily a "final" intended recipient of a transmission, but instead signifies that it may mean a forwarding point to a remote station, the next node in path of the transmission, or to a separate network via a hub node to reach the intended recipient. Col. 6, ll. 18-20 (". . . and each packet having a destination address to *either the hub or a remote station*") (emphasis added); Col. 3, ll. 18-22 ("When an information packet(s) arrives from a remote station, the node routes the packet(s) to an appropriate second recipient node on the way to an intended hub node and central office, toward the destination address.").

Further, Defendants' definition limiting the intended recipient of a packet as the "destination node" implies that a remote station cannot be the intended recipient of a packet. This is inconsistent with the teachings of the '377 patent. Col. 7, ll. 7-11 ("The packet does not travel a predefined path, and different packets from the sending remote station can travel different paths to the *recipient remote station*.") (emphasis added); Col. 3, ll. 6-7 (". . . each packet having a destination address to a *remote station . . .*"); Col. 6, ll. 18-20.

For the reasons cited herein, the Court should reject Defendants' attempt to improperly limit this term and adopt the construction proposed by Linex.

### F.   "respective node"

Defendants propose to limit the term "respective node" to the "first node within the distributed network that receives a packet originated by a remote station." The purpose for this proposal is to improperly limit the respective node "as the node in which a path is determined to the destination node." Defendants' Opening Brief at 15.   To accept this limitation would undermine the concept and the teachings of the '377 patent – *i.e.*, the packets can be dynamically routed throughout the network based upon network conditions – and, in essence, hold that the routing of the packets is static and predetermined upon receipt by the first node. Clearly, this is not the case.

When distinguishing the inventions of the '377 patent over the prior art, the specification notes that prior art networks lack the dynamic routing capabilities of the claimed inventions:

> In the star network . . . data, in general, are not communicated directly between base stations, but through the central office 50. The routing of data is a *fixed communication path*, from a remote station through a base station to the central

office, and vice versa. *Data generally are not routed, with dynamically changing paths,* . . . Also, *data are not routed to the central office 50, using communications paths which dynamically vary between base stations, depending upon availability.*

Col. 1, 28 – 39. Further, one of the objects of the invention is to provide a "more flexible network, which dynamically adapts to changing data requirements between remote stations and a central office." Col. 2, ll. 16-18; Col. 2, ll. 64 – 66. ("Using the traffic information, and in response to a packet having the destination address to the hub node, the flow-control subsystem routes the packet through appropriate nodes . . ."); Col. 3, ll. 6-11 ("Based on the traffic at each node, and each packet having a destination address to a remote station, the flow-control subsystem transmits the packet from a central office to an appropriate hub node to an appropriate node, and routes the packet to the next recipient node. Each packet in a message may traverse a different route."); Col. 7, ll. 4-11 (". . . the packet enters the distributed network through a node near the remote station sending the packet, and exits the distributed network from a node near the recipient remote station. The packet does not travel a predefined path . . .").

The aforementioned references to the '377 patent provides for dynamic routing at each "respective" node and establishes that the path is not fixed at the node with which the packets are transmitted at the first instance. Col. 6, 58-60 ("The packet passes through various nodes, until the packet reaches the remote station. Since the path is not predefined, and not necessarily a direct path "as the crow flies", paths for several packet for the same remote station can be different."); *see also* Col. 6, ll. 50 – 66. These references also establish that a respective node could also be a node from which (1) traffic information is obtained, and/or (2) a node that is determined to be one suitable to receive a packet.

Once again, and as indicated in Linex's Opening Brief, there is no indication in the specification or in the claims that a "respective node," which is used in claims 32 and 33, should be defined as anything other than a particular node in the network. It is clear from a fair reading of the claims and the specification that the modification of the word node by the adjective "respective" merely signifies a particular node, and provides absolutely no indication – contextually or otherwise – that it is synonymous with a "first node." Defendants' proposed definition is inconsistent with the plain language of the claims and the specification and should be rejected.

**G.    "flow-control means"**

As indicated in Section II above, claim 32 recites sufficient structure to perform the claimed "flow control" function such that an analysis under § 112, ¶ 6 is not applicable. Moreover, even if § 112, ¶ 6 were to apply, claim 32 is not indefinite because sufficient structure corresponding to the "flow-control means" is disclosed in the written description of the '377 patent.  With respect to the construction of this term, the following paragraphs show that the patent's specification supports Linex's proposed construction that a "flow-control means" is a "subsystem that routes packets through the distributed network."

As stated above, the invention claimed in '377 patent provides a "more flexible network, which dynamically adapts to changing data requirements between remote stations and a central office," Col. 2, ll. 16-18, and are distinguished from the prior art based, in part, upon a dynamic routing capability relative to other nodes in the network.  Col. 1, 28 – 39; Col. 2, ll. 64 – 66. ("Using the traffic information, and in response to a packet having the destination address to the hub node, the flow-control subsystem routes the packet through appropriate nodes . . ."); Col. 3, ll. 6-11 ("Based on the traffic at each node, and each packet having a destination address to a remote station, the flow-control subsystem transmits the packet from a central office to an appropriate hub node to an appropriate node, and routes the packet to the next recipient node. Each packet in a message may traverse a different route."); Col. 3, ll. 15-17; Col. 6, ll. 4 – 29.

Contrary to Defendants' arguments, there is absolutely no indication in claim 32 that the flow control means *must* be centrally located in the distributed system and maintain traffic information about all of the nodes (although it could be).  Defendants' Opening Brief at 17.  As pointed out in Linex's Opening Brief and throughout this opposition, Defendants are attempting to improperly read in a particular embodiment from the patent's specification to limit claim 32. *Ekchian*, 104 F.3d at 1303 (holding that while claims should be read in view of the specification, it is improper to limit the scope of a claim to the preferred embodiment or specific example disclosed in the specification.).

Accordingly, because the '377 patent clearly identifies two separate embodiments for a "flow control means" – one that is distributed throughout the network with a flow-control subsystem distributed at each node (which means that the nodes themselves have the intelligence to route), as well as a "central flow-control system" – claim 32 should not be restricted as the Defendants suggest. Col. 6, ll. 4-10.

## H.    "traffic information"

As indicated in its Opening Brief, Linex contends that the term "traffic information" should be defined as that "information regarding conditions of the distributed network or the transmission of data in the distributed network." The '377 patent specifies that traffic information could include a number of possible variables at any given time. Examples of these variables include traffic density, traffic congestion, traffic flow, node memory availability, whether the intended recipient is inside or outside of the network, and the specific types of data being transmitted (*e.g.*, voice data), as well as capacity buffer size and delay. Col. 2, ll. 62-66; Col. 6, ll. 24-36, 45-47.

The Defendants definition for this term requires that it necessarily include, and is therefore limited to, traffic density. Linex does not dispute that traffic density is one particular type of traffic information. However, "traffic information" is a more general term describing the possible conditions of the network or the transmission of data in the network. Although the term "traffic information" certainly could include traffic density, it is not so limited. *See* Col. 6, ll. 12-13 (The traffic information typically includes traffic density . . ."). Indeed, the patent provides several examples of traffic information (listed above) which are not related to traffic density and the state of congestion at a node within the network, but also the state of the link between the nodes. Col. 2, ll. 62-66; Col. 6, ll. 24-36, 45-47.

The Defendants definition would effectively exclude other embodiments of the invention in which all traffic information – other than only traffic density – are utilized in order to transmit packets through the network. Rather than accept Defendants' proposed *example* for the term "traffic information," Linex request that the Court accept its *definition* of the term – Information regarding conditions of the distributed network or the transmission of data in the distributed network.

## I.    "traffic density"

Defendants propose the following definition for the term "traffic density" – The number of packets presently traversing a node per unit of time. Upon further review of the '377 patent, Linex accepts Defendants' proposed definition of the term "traffic density," with the exception of the phrase "presently traversing a node per unit of time." Neither the claims, specification nor the file history provide any guidance as to what the phrase "presently traversing a node per unit of time" means in the context of the patent. There is simply no guidance in the intrinsic evidence

to establish what this phrase means or how it is used in the context of the claims. Furthermore, if the Court were to include this phrase in the definition of "traffic density," additional claim construction would be required.

Therefore, based upon Linex's willingness to accept portions of Defendants' proposed definitions consistent with the patent's specification, Linex proposes the following definition for the term "traffic density": The number of packets at a node at a given time.

**J.      "responsive to the traffic information"**

Each claim at issue includes the phrase "responsive to the traffic information." Contrary, to Defendants' arguments, however, the term "traffic information," as used in this phrase, need not necessarily include "traffic density." *See* Col. 6, ll. 12-13 (The traffic information typically includes traffic density . . ."). In fact, as the specification points out, traffic information could include a number of variables other than traffic density to select a path for packet routing through the network. In particular, the specification points out that traffic information can also include traffic congestion, traffic flow, node memory availability, the location of the intended recipient (*i.e.*, inside or outside of the network), and can also take into consideration the specific types of data being transmitted (*e.g.*, voice data). Col. 2, ll. 62-66; Col. 6, ll. 24-36, 45-47.

Defendants' argument to limit this phrase to "traffic density at each of the plurality of nodes" is also inappropriate in that Defendants are attempting to improperly limit the term by reading in a preferred embodiment – a central flow control system.   As indicated above, this is only one of two separate embodiments for flow control subsystem that are clearly set forth in the specification. Col. 6, ll. 4-10. Defendants' proposed definition ignores the fact that a flow control subsystem can also be distributed throughout the network with the node being able to react to the traffic information at its neighboring nodes, and not necessarily to the traffic information throughout the entire network. To construe this phrase to include "traffic density at each of the plurality of nodes" would ignore the intrinsic evidence and unnecessarily limit the claims in contravention of well settled precedent.

**K.      "first node"**

The parties have agreed that "first node" means "[t]he first node within the distributed network that receives a packet originated by a remote station." In order to be perfectly clear, Linex would also show, consistent with the patent's claims, written description, and Linex's proposed claim terms, a "first node" could also be any type of node in the network, including a

hub node, destination node, intermediate node and/or remote station. The function of the first node, according to claim 32, is to transmit traffic information and a respective packet as a part of the "flow-control means." Further, as explained in Section III.F, above, Linex disagrees with Defendants' contention that the term "first node" is synonymous with the term "respective node." Defendants' proposed definition is inconsistent with the plain language of the claims and the specification and should be rejected.

### L.    "destination node"

Defendants' definition of this term has no connection with the intrinsic evidence and the Court should reject their efforts to connect a "destination node" to a "hub node". Moreover, Defendants ignore the fact that the term "hub node," a unique term which is absent from claims 32 and 33, appears in several other claims of the '377 patent. Claim 1, Col. 7, ll. 44, 66, 67, Col. 8, ll. 3-4, 10; Claim 2, Col. 8, ll. 17, 39-41, 45, 52; Claim 3, Col. 8, ll. 58, Col. 9, ll. 8-9, and 14. Had the inventors of the '377 patent intended that the term "destination node" mean *only* a hub node, this limitation would have been written into claims 32 and 33.

Linex contends that the term "destination node" be simply defined as "[t]he last node in a path through the distributed network of nodes," and contrary to Defendants' arguments, nodes other than hub nodes can serve as destination nodes, and can include a remote station, a node in another network, or even a remote station in another network. Col. 6, ll. 18-20 (". . . and each packet having a destination address to *either the hub or a remote station*") (emphasis added); Col. 3, ll. 18-22 ("When an information packet(s) arrives from a remote station, the node routes the packet(s) to an appropriate second recipient node on the way to an intended hub node and central office, toward the destination address."). Moreover, as pointed out above, the patent indicates that a destination node is not necessarily "fixed," but can change throughout the course of a transmission. *See, e.g.,* Col. 6, ll. 50 – 66.

While a hub node for a particular service or connection may also be a destination node, the same hub node may also act as a regular node in the network for receiving and transmitting packets to other destinations. Col. 3, ll. 6-10; Col. 6, ll. 31-35. This is entirely consistent with Defendants' acknowledgement that the "destination address" identifies the "final intended recipient" of the transmission. *See* Defendants Opening Brief at 14. The specification clearly provides that the intended destination need not be the destination node because the destination node, in the context of the patent, may be merely a forwarding point to the next node in path of

**Colson Hicks Eidson**
255 Aragon Avenue, 2nd Floor, Coral Gables, Florida 33134-5008   Telephone: (305) 476-7400  Fax: (305) 476-7444

21

the transmission (and not necessarily a hub node) and may include a remote station. Col. 6, ll. 18-20 ("Based on the traffic at each node, and each packet having a destination address to *either the hub or a remote station*") (emphasis added); Col. 7, ll. 7-11 ("The packet does not travel a predefined path, and different packets from the sending remote station can travel different paths to the *recipient remote station*.") (emphasis added).

The intrinsic evidence provides that in addition to hub nodes, remote stations and nodes, both of which may be found inside and outside the network, as well as hub nodes for particular services, can serve as destination nodes. Linex's simple definition should be adopted by the Court.

**M.    "selecting a path of a multiplicity of nodes"**

Defendants' proposed construction of this phrase suffers from the Defendants' wrongful importation of a preferred embodiment into the claims – *i.e.*, a central flow system and assumption path selection is "between the first node and the destination." Defendants' arguments are flawed.

In a distributed system the path, from node to node through the network, is not constant and the selection may be from one intermediary node to another. The phrase "selecting a path of a multiplicity of nodes" simply means selecting a path of two or more nodes – the choice to route is made between the multiplicity of nodes, not the network as a whole, or only those intermediate nodes falling in between the first node and the destination node. The specification undoubtedly supports this notion. Col. 6, ll. 58 -66.

## III.    CONCLUSION

Linex respectfully requests that the Court reject the Defendants' proposed claim constructions and adopt each of Linex's proposed claim constructions for the thirteen disputed terms at issue.

Dated: May 19, 2006

                Respectfully submitted,

                **COLSON HICKS EIDSON**
                255 Aragon Avenue, 2nd Floor
                Coral Gables, FL  33134-5008
                Tel:  (305) 476-7400
                Fax:  (305) 476-7444
                Email: Julie@colson.com

By_____
                Julie Braman Kane
                Florida Bar No. 980277

                Edward W. Goldstein
                Corby R. Vowell
                GOLDSTEIN, FAUCETT & PREBEG, LLP
                1177 West Loop South, Suite 400
                Houston, TX  77027
                Tel:  (713) 877-1515
                Fax:  (713) 877-1737
                Email: egoldstein@gfiplaw.com
                Email: cvowell@gfiplaw.com

                **ATTORNEYS FOR**
                **LINEX TECHNOLOGIES, INC.**

<u>**CERTIFICATE OF SERVICE**</u>

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been served by email and first class mail this 19th day of May 2006 to: All counsel of record as set forth on the attached Service List.

By_____
           Julie Braman Kane

**Colson Hicks Eidson**
255 Aragon Avenue, 2nd Floor, Coral Gables, Florida 33134-5008   Telephone: (305) 476-7400  Fax: (305) 476-7444

23

## SERVICE LIST

Case No. 05-80300-CIV-MARRA/SELTZER

Linex Technologies, Inc. vs. Motorola, Inc. et al.

| * **Counsel for Motorola, Inc.** | * **Counsel for Nortel Networks, Inc.** |
|---|---|
| Michael E. Barry, Esq.<br>Joseph J. Buczynski, Esq.<br>David J.Moorhead, Esq.<br>**Gardner Carton & Douglas LLP**<br>191 North Wacker Drive, # 3700<br>Chicago, IL  60606-1698<br>Tel: (312) 569-1000/ Fax: (312) 569-3000<br>Email: mbarry@gcd.com<br>Email: jbuczynski@gcd.com<br>Email: dmoorhead@gcd.com<br><br>Darrell Payne, Esq.<br>Fla. Bar No. 773300<br>**Shook Hardy & Bacon, LLP**<br>Miami Center, Suite 2400<br>201 S. Biscayne Blvd.<br>Miami, Florida  33131-4332<br>Tel: (305) 358-5171/ Fax: (305) 358-7470<br>Email: dpayne@shb.com | Marissa D. Kelley, Esq.<br>Fla. Bar No. 379300<br>**Stearns, Weaver, Miller, Weissler,**<br>**Alhadeff & Sitterson, L.L.P.**<br>200 E. Broward Boulevard, Suite 1900<br>Fort Lauderdale, Florida  33301-1949<br>Tel: (954) 462-9500/ Fax: (954) 462-9567<br>Email: mkelley@swmwas.com<br><br>Mark M. Supko, Esq.<br>Michael H. Jacobs, Esq.<br>**Crowell & Moring, L.L.P.**<br>1001 Pennsylvania Avenue, N.W.<br>Washington, DC  20004-2595<br>Tel: (202) 624-2500/ Fax: (202) 628-5116<br>Email: msupko@crowell.com<br>Email: mjacobs@crowell.com |
| * **Counsel for Strix Systems, Inc.** | * **Counsel for Tropos Networks, Inc.** |
| Ramsey M. Al-Salem, Esq.<br>Jessica L. Rossman, Esq.<br>**Perkins Coie, L.L.P.**<br>1201 Third Avenue, Suite 4800<br>Seattle, WA  98101-3099<br>Tel: (206) 359-8000/ Fax: (206) 359-9000<br>Email: ralsalam@perkinscoie.com<br>Email: jrossman@perkinscoie.com<br><br>Charles H. Lichtman, Esq.<br>Fla. Bar No. 501050<br>**Berger Singerman**<br>Las Olas Centre II<br>350 E. Las Olas Boulevard, Suite 1000<br>Fort Lauderdale, Florida  33301<br>Tel: (954) 627-9913/ Fax: (954) 523-2872<br>Email: clichtman@bergersingerman.com | James A. Gale, Esq.<br>Fla. Bar No. 371726<br>Gregory L. Hillyer, Esq.<br>Fla. Bar No. 682489<br>**Feldman Gale, P.A.**<br>Miami Center, Suite 1920<br>201 South Biscayne Blvd.<br>Miami, FL  33131-4332<br>Tel: (305) 358-5001/ Fax: (305) 358-3309<br>Email: jgale@feldmangale.com<br>Email: ghillyer@feldmangale.com |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

# ATTACHMENT(S) NOT SCANNED

# PLEASE REFER TO COURT FILE MAINTAINED IN THE OFFICE WHERE THE JUDGE IS CHAMBERED

## CASE NO. 05-80300-CV-Marra
## DE#76

☐ **DUE TO POOR QUALITY, THE ATTACHED DOCUMENT IS NOT SCANNED**

---

☐ VOLUMINOUS (exceeds 999 pages = 4 inches) consisting of (boxes, notebooks, etc.)_____

☐ BOUND EXTRADITION PAPERS

☐ ADMINISTRATIVE RECORD (Social Security)

☐ ORIGINAL BANKRUPTCY TRANSCRIPT

☐ STATE COURT RECORD (Habeas Cases)

☐ SOUTHERN DISTRICT TRANSCRIPTS

☐ LEGAL SIZE

☐ DOUBLE SIDED

☒ PHOTOGRAPHS

☒ POOR QUALITY (e.g. light print, dark print, etc.)

☐ SURETY BOND (original or letter of undertaking)

☐ CD's, DVD's, VHS Tapes, Cassette Tapes

☐ OTHER = _____