IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 05-80300 CIV-MARRA/SELTZER

LINEX TECHNOLOGIES, INC.,

        Plaintiff,

v.

MOTOROLA, INC., NORTEL NETWORKS
INC., TROPOS NETWORKS, INC., and
STRIX SYSTEMS, INC.,

        Defendants.

---

## DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF ADDITIONAL CLAIM CONSTRUCTION TERMS

Defendants Nortel Networks Inc., Tropos Networks, Inc., and Strix Systems, Inc. (collectively, "Defendants"), by and through their undersigned counsel, respectfully submit this memorandum of law in support of their proposed constructions of the additional disputed terms in the asserted claims of U.S. Patent Nos. 6,493,377 and 7,167,503. There are six additional terms presently at issue, as identified in the Notice of Filing Joint Claim Chart for Additional Claim Terms filed by the Plaintiff and the Defendants (DE 121), which sets forth the parties' respective constructions for each of the six terms. For the reasons set forth below, Defendants respectfully request that the Court adopt each of their proposed constructions.

## I.    Introduction

This case involves U.S. Patent Nos. 6,493,377 and 7,167,503 (the "'377 patent" and "'503 patent," respectively; collectively, the "patents-in-suit"), which are patents directed to a

distributed-network, spread-spectrum system.[1]  The '503 patent is a "continuation" of the '377

patent, and, as such, the specifications of the two patents are, in all relevant parts, virtually

identical.  *See* 35 U.S.C. § 120.  Thus, for ease of reference, citations herein will be made solely

to the '377 patent.  Plaintiff Linex Technologies, which neither manufactures nor sells any

products covered by the patents-in-suit, has accused Defendants of infringing these patents.

When the terms within the claims of the patents-in-suit are properly construed, not one of any of

the Defendants' products infringes either patent.

The parties previously submitted extensive briefing concerning claim constructions

related to the disputed terms in claims 32 and 33 in the '377 patent.[2]  The parties also presented

arguments in support of their respective constructions at a *Markman* hearing held on July 20,

2006.  Rather than repeat their overview of the patents-in-suit and discussion of the law on claim

construction, Defendants respectively refer the Court to Defendants' prior briefing on these

topics.  Where appropriate, of course, specific references to the teachings of the patents-in-suit

and to the law on claim construction are presented herein.

---

[1] Copies of the '377 and '503 patents are attached hereto as Exhibits 1 and 2, respectively.

[2] Defendants' claim construction briefs concerning these terms are found at DE 68 (Defendants' Joint Memorandum of Law in Support of Their Proposed Claim Construction Terms), DE 74 (Defendants' Joint Memorandum of Law in Response to Plaintiff's Opening Claim Construction Brief), and DE 81 (Defendants' Joint Reply Memorandum of Law in Support of Their Proposed Claim Construction).  Plaintiff's claim construction briefs concerning these terms are found at DE 70 (Plaintiff Linex Technologies, Inc.'s Opening Claim Construction Brief) and DE 76 (Plaintiff Linex Technologies, Inc.'s Opposition to Defendants' Joint Memorandum of Law in Support of Their Proposed Claim Construction Terms).  The parties also filed a joint stipulation concerning the construction of the word "packet."  *See* DE 80 (Joint Stipulation Concerning Claim Construction).

## II.     Additional Claim Terms to Be Construed in the Patents-in-Suit

### A.     Capable of Communicating – Claims 16 and 22 in the '377 Patent, And Claims 1, 2, 15, 18, and 30 in the '503 Patent

Defendants' proposed construction for the term "capable of communicating" is set forth below:[3]

> The ability of a *node* to transmit a *packet* directly to an adjacent *node* or to receive a *packet* directly from an adjacent *node*.[4]

Each of the new claims asserted by Plaintiff recites the term "capable of communicating." In particular, claims 1, 15, 18, and 30 in the '503 patent recite "the second node selected from two or more nodes capable of communicating with the first node," with claims 1 and 15 further reciting "the first node capable of communicating a packet to a second node."  Claims 16 and 22 in the '377 patent recite "the first node capable of communicating a respective packet to a node in the first multiplicity of neighboring nodes."

"Communicating" is described as a direct link between nodes.[5]  For example, with reference to Figures 2 and 3, the patents-in-suit specify a direct link between a hub node and a central office:

---

[3] To the extent constructions proposed in this brief refer to other terms for which the parties have previously asserted constructions, such previously addressed terms are shown in italics.

[4] Defendants note that, after further study, it has been determined that the original definition proposed for "capable of communicating" was incomplete, and, therefore, the definition has been modified.  Defendants note that its definition is now consistent with that of Plaintiff's, which states that this term means "having the ability to transmit and/or receive."  DE 121 at 2.

[5] The patents-in-suit clearly distinguish routing from communicating.  Routing is defined as determining a path for a packet through a series of nodes in the system.  *See, e.g.*, '377 Patent, col. 2, line 66 to col. 3, line 1 ("the flow-control subsystem routes the packet through appropriate nodes to the hub node or, in the case of a 'local call,' to the remote user directly; *id.* at col. 3, lines 10-11 ("Each packet in a message may traverse a different route."); *id.* at col. 6, lines 14-18 ("Using the traffic information and in response to a packet having the destination address to the hub node, the flow control subsystem 340 routes the packet through the appropriate nodes to the appropriate hub node.").

In the plurality of nodes 110, 120, 130, 140, 150, 160, 170[,] 180, 190, one node, the second node 120 is a hub node, which *communicates* to a central telephone office 50. . . .  In an alternative embodiment, as shown in FIG. 3, a set of the plurality of nodes (hubs) *communicates* to the central office 50."

'377 Patent, col. 4, lines 4-9 (emphases added).  Figures 2 and 3 are reproduced below.



FIG.2                    FIG.3

Similarly, with respect to Figures 2 and 3, the patents-in-suit describe nodes directly

connected to one another as being able to communicate:

- Thus, in the plurality of nodes 110, 120, 130, 140, 150, 160, 170[,] 180, 190, the first node 110 *communicates* with the second node 120, the fourth node 140 and the fifth node 150.

- The second node 120 *communicates* with the first node 110, the third node 130, the fourth node 140, the fifth node 150 and the sixth node 160.

- The third node *communicates* with the second node 120, the fifth node 150 and the sixth node 160.  The fourth node *communicates* with the first node 110, the second node 120, the fifth node 150, the seventh node 170 and the eighth node 180.

- 4 -

- The fifth node *communicates* with the first node 110, the second node 120, the third node 130, the fourth node 140, the sixth node 160, the seventh node 170, the eighth node 180 and the ninth node 190.

- The sixth node 160 *communicates* with the second node 120, the third node 130, the fifth node 150, the eighth node 180 and the ninth node 190.

- The seventh node 170 *communicates* with the fourth node 140, the fifth node 150 and the eighth node 180.

- The eighth node 180 *communicates* with the fourth node 140, the fifth node 150, the sixth node 160, the seventh node 170 and the ninth node 190.

- The ninth node *communicates* with the fifth node 150, the sixth node 160 and the eighth node 180.

'377 Patent, col. 4, lines 46-67 (emphases added); *see also* '503 Patent File History, Amendment of May 30, 2006 at 13 ("The first node is capable of communicating a packet to the second node within the plurality of nodes. . . . The second node is selected from two or more nodes capable of communicating with the first node.") (Exhibit 3).

Further, the patents-in-suit describe nodes communicating with remote stations that are directly connected to the respective nodes:

- FIGS. 2 and 3 show the first node 110 communicating with a first plurality of remote stations 111, 112, 113, 114.

- The second node 120 *communicates* with a second plurality of remote stations, with FIGS. 2 and 3 showing a first remote station 121 of the second plurality of remote stations.

- The third node 130 *communicates* with a third plurality of remote stations 131, 132 and the fourth node 140, the fifth node 150 and the sixth node 160 *communicate* with a fourth plurality of remote stations, a fifth plurality of remote stations, and a sixth plurality of remote stations, respectively.

- FIGS. 2 and 3 show the fourth node 140 *communicating* with a first remote station 141 of the fourth plurality of remote stations, the fifth node 150 *communicating* with a first remote station 151 of the fifth plurality of remote stations, and the sixth node 160 *communicating* with a first remote station 161 of the sixth plurality of remote stations.

- The seventh node 170 and the eighth node 180 are shown *communicating* with a seventh plurality of remote stations 171, 172, 173 and an eighth plurality of remote stations 181, 182, respectively.

- The ninth node 190 *communicates* with a ninth plurality of remote stations, and FIGS. 2 and 3 show the ninth node 190 *communicating* with a first remote station 191 of the ninth plurality of remote stations.

'377 Patent, col. 5, lines 32-55 (emphases added).

Because the specifications of the patents-in-suit only use the word "communicating" when describing a direct packet exchange between two nodes, the term "capable of communicating" must be understood as the ability of a node to transmit a packet to or receive a packet from another node that is directly connected.

In contrast, Plaintiff has asserted that no definition is required for this term, but, if it needs to be defined, "capable of communicating" means "having the ability to transmit and/or receive." For the reasons stated above, Defendants believe that Plaintiff's proposed definition is inconsistent with the teachings of the patents-in-suit as "capable of communicating" is not limited to direct connections between nodes.

### B.  Flow-Control System – Claim 15 in the '503 Patent

Defendants' proposed construction for the term "flow-control system" is set forth below:

A central computer or processor maintaining *traffic information* about all of the *nodes* in the distributed network, which (a) communicates such *traffic information* between all of the *nodes*, (b) selects a path for routing a *packet* from a first node to a *destination node* in view of the *traffic information*, and (c) causes the *packet* to be transmitted to the *destination node* through the selected path.

Claim 15 of the '503 patent requires that the distributed-network, spread-spectrum system includes a "flow-control system" that, in response to traffic information, selects a path for routing a packet from a first node to a destination node, and causes the packet to be transmitted

to the destination node.[6]  In particular, the distributed system of claim 15 has a plurality of remote stations, a plurality of nodes, *and* a flow-control system.  A plain reading of this claim makes clear that the use of the word "and" indicates that the flow-control system is not – and cannot be – part of either the remote stations or the nodes.

Interpreting the flow-control system as being separate from the remote stations and the nodes is consistent with the specification of the '503 patent, which states that there can be "a *central* flow-control subsystem."  '377 Patent, col. 6, line 10 (emphasis added).  Although the specification of the '503 patent also indicates that the distributed network can have the "flow-control subsystem 340 resident at each node," '377 Patent, col. 6, lines 8-9, the plain language of claim 15 precludes any such interpretation.  If the patentee had wished to have the flow-control system reside at each node, the flow-control system would have been listed as a portion or sub-element of the plurality of nodes; the patentee, however, did no such thing.  Thus, the only proper interpretation of "flow-control system" is one that is central to the distributed system.

Furthermore, in order to perform the specified tasks (*i.e.*, communicate traffic information, select a path, and route the packets), the flow-control system must contain information about the traffic at all of the nodes, not just certain nodes.  Otherwise, the flow-control system would not be capable of "routing, responsive to the traffic information, the particular packet through the path of the multiplicity of nodes to the respective destination node."  This is an additional reason why the "flow-control system" of claim 15 should be interpreted as being central to the distributed system.

---

[6] Defendants note that claim 15 recites "the traffic information," although it does not contain an earlier reference to this term.  As a result, the Court may deem this claim indefinite under 35 U.S.C. § 112, ¶ 2.

In contrast, Plaintiff has asserted that "flow-control system" should be interpreted as follows: "A system that routes packets through a part of or the entire network." Plaintiff's proposed definition should be rejected, as routing a packet only through part of the network is inconsistent with the language of claim 15, in which the flow-control system routes a packet from a first node through a path of a multiplicity of nodes to a destination node.

### C.   Central Flow-Control Management System – Claim 30 in the '503 Patent

Defendants' proposed construction for the term "central flow-control management system" is the same as that for "flow-control system":

> A central computer or processor maintaining *traffic information* about all of the *nodes* in the distributed network, which (a) communicates such *traffic information* between all of the *nodes*, (b) selects a path for routing a *packet* from a first node to a *destination node* in view of the *traffic information*, and (c) causes the *packet* to be transmitted to the *destination node* through the selected path.

Claim 30 of the '503 patent requires that the distributed-network, spread-spectrum system includes a "central flow-control management system" that, in response to traffic information, selects a path for routing a packet from a first node to a destination node, and causes the packet to be transmitted to the destination node.[7]  The plain language of this claim requires that flow control in the distributed system must be centralized, *i.e.*, not part of the nodes.

As discussed in Section IV.B, above, with respect to the term "flow-control system," the specification of the '503 patent teaches the use of "a central flow-control subsystem." '377 Patent, col. 6, line 10.  Although the specification does state that the flow control function can alternatively be handled at the nodes, there is absolutely nothing in the specification or file

---

[7] As with claim 15 in the '503 patent, claim 30 recites "the traffic information," although it does not contain an earlier reference to this term.  As a result, the Court may also deem this claim indefinite under 35 U.S.C. § 112, ¶ 2.

history of the '503 patent to suggest that the word "central" in "central flow-control management system" should be interpreted contrary to its ordinary meaning.

Defendants' proposed definition for this term is further supported by the remainder of the discussion above concerning "flow-control system." First, claim 30 recites a plurality of remote stations, a plurality of nodes, *and* a flow-control system. Second, obtaining traffic information about all of the nodes requires that the management system be centrally located.

In contrast, Plaintiff has asserted that "central flow-control management system" should be interpreted as follows: "A system that routes packets through a part of or the entire network." Plaintiff's proposed definition should be rejected, as routing a packet only through part of the network is inconsistent with the language of claim 30, in which the central flow-control management system routes a packet from a first node through a path of a multiplicity of nodes to a destination node.

### D. First Multiplicity of Neighboring Nodes – Claims 16 and 22 in the '377 Patent

Defendants' proposed construction for the term "first multiplicity of neighboring nodes" is set forth below:

A group of *nodes*, each of which is adjacent to the *first node*.

Claims 16 and 22 of the '377 patent require "a first multiplicity of neighboring nodes of a first node of the plurality of nodes." Further, these claims require that the "first node [is] capable of communicating a respective packet to a node in the first multiplicity of neighboring nodes."

As stated in Section IV.A, above, a node capable of communicating with another node must be able to transmit a packet directly to or receive a packet directly from an adjacent node. Therefore, under this construction, a first multiplicity of neighboring nodes must be adjacent to the first node.

In contrast, Plaintiff's proposed definition of "first multiplicity of neighboring nodes" is as follows: "Nodes within the distributed network that are in communication range with the first node." This definition should be rejected as it fails to address what is meant by "neighboring"; furthermore, it introduces uncertainty into the term's meaning by using the phrase "communication range" to describe the relationship between certain nodes in the network.

### E.    First Traffic Information – Claim 22 in the '377 Patent

Defendants' proposed construction for the term "first traffic information" is set forth below:

> Information communicated between the first multiplicity of neighboring *nodes* in routing *packets* that indicates the capacity of each of the first multiplicity of neighboring *nodes* to handle additional *packets* in view of, at least, the *traffic density* at that *node*.

Claim 22 in the '377 patent requires communicating first traffic information between a first multiplicity of neighboring nodes and the first node. Defendants' proposed definition of "first traffic information" is based on their proposed definition of "traffic information," which was previously briefed and argued to the Court. *See* DE 68 at 18-19; DE 74 at 12-13; DE 81 at 11-12. Specifically, the definition of "first traffic information" has been modified to conform to the first node/second node structure of claim 22 in the '377 patent.

"Traffic information," as previously asserted by Defendants, must include the conditions existing at a node as described in the specification, namely, traffic density and memory availability. *See, e.g.*, '377 Patent, col. 6, lines 13-14 ("traffic information typically includes traffic density at each of the nodes and memory availability"). That "traffic information" is then used to determine an appropriate path for a packet. *See id.* at col. 6, lines 14-18. Thus, "first traffic information" should be interpreted as indicating the traffic density of the first multiplicity

of neighboring nodes and the capacity for each of these nodes to handle additional traffic for purposes of determining an appropriate path for a packet leaving the first node.

Plaintiff has proposed the following definition for "first traffic information": "Traffic information related to the first multiplicity of neighboring nodes." Although Plaintiff has correctly linked "first traffic information" with the "first multiplicity of neighboring nodes," it is unclear what is meant by "related to" in Plaintiff's proposed definition. Defendants' definition contains no such ambiguities.

### F.   Second Node – Claims 16 and 22 in the '377 Patent and Claims 1, 2, 15, 18, and 30 in the '503 Patent

Defendants' proposed construction for the term "second node" is set forth below:

A selected one of two or more neighboring *nodes* through which a *packet* is routed to the *destination node*.[8]

Each of the new claims asserted by Plaintiff recites the term "second node." In particular, claims 1, 15, 18, and 30 in the '503 patent recite "the second node selected from two or more nodes capable of communicating with the first node." Claims 16 and 22 in the '377 patent recite "a second node of the first multiplicity of neighboring nodes."

In both patents, the "second node" is the node selected from among the nodes adjacent to the first node. In other words, the second node is logically the node to which the first node directly transmits a packet. *See* '377 Patent, col. 4, lines 47-48 ("the first node 110 communicates with the second node").

Plaintiff's proposed construction – "A node within the distributed network that receives a packet from a first node" – completely ignores the meaning of the "capable of communicating"

---

[8] Defendants note that the original definition proposed for "second node" referred to the term "the first multiplicity of neighboring nodes," which does not appear in any of claims 1, 15, 18, and 30 of the '503 patent. The proposed change is meant merely to simplify the definition.

language of claims 1, 15, 18, and 30 of the '503 patent, and the "first multiplicity of neighboring nodes" language of claims 16 and 22 in the '377 patent.  In particular, under Plaintiff's construction, any node in the network that eventually receives a packet on its path to the destination node could be interpreted as the "second node."  In contrast, Defendants' proposed construction is consistent with the specification of the patent as well as Defendants' previously presented definition of "first node."  *See* DE 68 at 21; DE 74 at 15; DE 81 at 13-14 ("The first node within the distributed network that receives a packet originated by a remote station, also called the 'respective node.'").

III.     **Conclusion**

Defendants respectfully request that the Court adopt each of the proposed constructions set forth above, as those constructions are fully consistent with the controlling intrinsic evidence and are supported by pertinent extrinsic evidence.  By contrast, Plaintiff's proposed constructions seek to unduly broaden the scope of the alleged invention beyond what is actually described and claimed in the patents-in-suit.[9]

Dated: March 28, 2008

/s/Michael H. Jacobs
Mark M. Supko
msupko@crowell.com
Michael H. Jacobs
mjacobs@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel:  (202) 624-2500
Fax:  (202) 628-5116

Marissa D. Kelley (Bar No. 379300)
mkelley@swmwas.com
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
200 East Las Olas Boulevard
21st Floor (PH A)
Fort Lauderdale, Florida 33301
Tel:  (954) 462-9500
Fax:  (954) 462-9567

ATTORNEYS FOR NORTEL NETWORKS INC.

---

[9] The undersigned has been authorized by Tropos Networks, Inc. and Strix Systems, Inc. to file this joint memorandum of law on behalf of Defendants.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 28, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the parties of record on the attached Service List.

<u>/s/Michael H. Jacobs</u>
Michael H. Jacobs

**SERVICE LIST**

| | |
|---|---|
| Edward Goldstein, Esq.<br>GOLDSTEIN & FACCETT, LLP<br>1177 West Loop South, Suite 400<br>Houston, TX  77027<br>Tel:  (713) 877-1515<br>Fax: (713) 877-1737<br>Email: egoldstein@gfiplaw.com<br><br>Julie B. Kane<br>COLSON HICKS EIDSON<br>255 Aragon Avenue, 2nd Floor<br>Coral Gables, FL  33134-5008<br>Tel:  (305) 476-7400<br>Fax: (305) 476-7444<br>Email: Julie@colson.com<br><br>ATTORNEYS FOR LINEX TECHNOLOGIES, INC. | Ramsey M. Al-Salam, Esq.<br>PERKINS COIE, LLP<br>1201 Third Avenue, Suite 4800<br>Seattle, WA  98101-3099<br>Tel:  (206) 359-6385<br>Fax: (206) 359-9000<br>Email: RAlsalam@perkinscoie.com<br><br>Charles H. Lichtman, Esq.<br>BERGER SINGERMAN<br>350 East Las Olas Blvd.<br>Ft. Lauderdale, FL  33301<br>Tel:  (954) 525-9000<br>Fax: (954) 523-2874<br>Email: clichtman@bergersingerman.com<br><br>ATTORNEYS FOR STRIX SYSTEMS, INC. |
| James A. Gale, Esq.<br>FELDMAN GALE, P.A.<br>Miami Center, Suite 1920<br>201 South Biscayne Boulevard<br>Miami, FL  33131<br>Tel:  (305) 358-5001<br>Fax: (305) 358-3309<br>Email: jgale@feldmangale.com<br><br>ATTORNEY FOR TROPOS NETWORKS, INC. | |