IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-80300-CIV-MARRA/JOHNSON

LINEX TECHNOLOGIES, INC.,

Plaintiff,

v.

MOTOROLA, INC.; NORTEL NETWORKS,
INC.; TROPOS NETWORKS, INC.; and
STRIX SYSTEMS, INC.,

Defendants.

---

## PLAINTIFF LINEX TECHNOLOGIES, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ADDITIONAL AND REVISED CLAIM CONSTRUCTION TERMS

Pursuant to the Court's Order granting the Parties' Joint Motion for Entry of Proposed Briefing Schedule entered December 6, 2007 [DE 112], Plaintiff Linex Technologies, Inc. ("Linex") submits the following Memorandum of Law In Support of Additional and Revised Claim Construction Terms.

## I.      INTRODUCTION

### A.      Purpose for Additional Claim Construction Briefing.

On November 27, 2007, the Court granted Linex leave of Court to amend its Complaint, which allowed Linex to assert two additional claims of United States Patent No. 6,493,377 ("the '377 patent"), and to assert additional claims from a separate and newly issued Linex patent, United States Patent No. 7,167,503, entitled "Distributed Spread-Spectrum Network" ("the '503 patent"). The '503 patent was issued by the United States Patent and Trademark Office after this lawsuit was filed and almost six months after the July 2006 claim construction hearing. [DE 110]. The '377 and the '503 patents are attached hereto as Exhibits A and B, respectively.

The newly asserted claims from both the '377 and the '503 patents introduce several new claim terms that were not previously addressed by the parties in their claim construction briefs or

at the *Markman* hearing held on July 20, 2006. As a result, the parties jointly requested additional briefing for the claim construction issues raised by Linex's First Amended Complaint.

Linex would also point out that in addition to addressing the disputed terms found within the newly asserted claims of the '377 and the '503 patents, this Memorandum also sets forth Linex's clarification of three terms that were previously briefed and argued by the Parties. These clarifications relate to the terms "node", "destination address" and "traffic density."

### A.    Overview of the '377 patent and the '503 patent.

Linex previously provided the Court with a comprehensive discussion and overview of the patented technology and mesh network systems as they relate to the '377 patent in its Opening Claim Constriction Brief. *See* Opening Claim Construction Brief, DE 70, at 2-6. Linex respectfully requests that the Court take note that the discussion and overview is equally applicable to the '503 patent. This is due to the fact that the '503 patent is a continuation of the application which ultimately issued as the '377 patent. Because the '503 patent is a continuation of the application resulting in the '377 patent, the specification of the '503 patent is virtually identical to the specification of the '377 patent. Rather than set forth again the comprehensive discussion and overview herein, for the benefit of the Court, Linex incorporates by reference those portions of its Opening Claim Construction Brief.

## II.    ARGUMENTS AND AUTHORITIES

### B.    The Law of Claim Construction.

There have been no major substantive changes to the law of patent claim construction since Linex filed its Opening Claim Construction Brief. Therefore, for the convenience of the Court and the sake of brevity, rather than set forth all of the legal arguments and authorities herein, except where noted, Linex incorporates those arguments and authorities recited in its Opening Claim Construction Brief, as well as its Opposition to Defendants' Joint Memorandum of Law in Support of Their Proposed Claim Construction Terms [DE 76].

## III.    CONSTRUCTION OF THE DISPUTED TERMS FOUND WITHIN THE NEWLY ASSERTED CLAIMS OF THE '377 AND '503 PATENTS.

Linex originally asserted that the Defendants infringed independent system claim 32 and independent method claim 33 of the '377 patent. From these two claims, there were thirteen disputed claim terms or phrases that parties requested that the Court construe in accordance with *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S.

370 (1996), and other relevant authorities. Now that Linex has added additional claims from the '377 patent (independent method claims 16 and 22) and the '503 patent (claims 1, 2, 15, 18 and 30), the parties are requesting that the Court construe an additional 6 terms unique to these claims.

### A. Disputed Terms Found Within the Newly Asserted Claims of the '377 Patent.

#### 1. "first multiplicity of neighboring nodes"

The phrase "first multiplicity of neighboring nodes" is unique to the '377 patent and is found in newly asserted claims 16 and 22. Based upon the plain language of these claims (particularly when read in conjunction with the corresponding dependent claims) and the patent's specification, Linex proposes the following construction for this phrase:

**Linex's Proposed Construction:**

**Nodes within the distributed network that
are in communication range with the first node.**

**Defendants' Proposed Construction:**

**A group of nodes, each of which is adjacent to the first node.**

The relevant language of claims 16 and 22 reads as follows:

> . . . communicating traffic information between a *first multiplicity of neighboring nodes* of a first node of the plurality of nodes, with the first node capable of communicating a respective packet to a node in the *first multiplicity of neighboring nodes*;
>
> selecting . . . a second node of the *first multiplicity of neighboring nodes*

Ex. A, the '377 patent at claim 16.

> . . . communicating first traffic information between a *first multiplicity of neighboring nodes* of a first node of the plurality of nodes, with the first node capable of communicating a respective packet to a node in the *first multiplicity of neighboring nodes*, with the first traffic information including traffic density at each of the *first multiplicity of neighboring nodes*;
>
> selecting . . . a second node of the *first multiplicity of neighboring nodes*; and

Id. at claim 22.

While the phrase "first multiplicity of neighboring nodes" does not specifically appear in the specification of the '377 patent, the specification does discuss that in one embodiment the "plurality of nodes . . . covers a geographic area," and that "[e]ach node covers a micro-cell having a radius, which, typically, is less than one mile." Ex. A, the '377 patent at col. 2, ll. 26-

29; col. 4, ll. 12-16; claims 1-3. While this is just one example of a mesh network configuration, it demonstrates that the nodes are designed to communicate with other nodes within a particular range and is not limited to communications with only "adjacent" nodes, as proposed by Defendants.[1]

Additionally, the claim language makes clear that the "first multiplicity of neighboring nodes" is the nodes in communication range with the "first node." The teachings of the patents make clear that this relates to the first layer of packet transmission to those nodes in communication range of the "first node." The claims that depend on claims 16 and 22 establish this "layered" approach to selective packet transmission in the mesh network (i.e., dynamic routing) by referring to a second, third, fourth and fifth multiplicity of neighboring nodes, which correspond to packet transmissions from second, third, fourth and fifth nodes. Ex. A, the '377 patent at claims 17-21 ("communicating traffic information between a [second, third, fourth, fifth] multiplicity of neighboring nodes of the [second, third, fourth, fifth] node . . ."); see also Ex. A, the '377 patent at claims 23-27 "communicating [second, third, fourth, fifth, sixth] traffic information between a [second, third, fourth, fifth, sixth] multiplicity of neighboring nodes of the [second, third, fourth, fifth, sixth] node . . .").

The concept of dynamic routing is reflected in the file history of the '377 patent and is entirely consistent with those arguments made to the Patent and Trademark Office when traversing prior art raised by the examiner. Specifically, it was noted that:

> The present [invention] allows a user [with a remote station] to access a closest node [i.e., the "first node"], *with a packet moving from node to node within the distributed system dependent on traffic information at the node from which the packet will leave*. Because the next node to which a packet is sent is *dependent on traffic information about a multiplicity of neighboring nodes*, an entire path of the packet through the distributed network is not determined *a priori*. *Chau* does not teach or suggest a packet passing through a distributed network, *with the path of the packet dependent on traffic information regarding neighboring nodes*.

See Ex. C, Amendment B at 22.

A representative example of a "first multiplicity of neighboring nodes" can be seen in the following figure taken from the '377 patent:

---

[1] Linex assumes for the purposes of this Memorandum that Defendants' proposed construction for this term, which purports to restrict the term to include only those nodes "adjacent to the first node," is presumably an attempt to restrict the term to only those nodes in closest physical proximity to the first node.

CASE NO. 05-80300-CIV-MARRA/JOHNSON



It is important to note that this figure is a "block diagram" and merely a representative example of only one embodiment of a mesh network generally described in the '377 patent.[2] As indicated in the preceding paragraph, and in the context of the asserted claims, the "first multiplicity of neighboring nodes" is the series of nodes in communication range with the first node.[3] Assume, for purposes of discussion, that the node in the center of the mesh network, (which is identified as node 150) is the "first node." Because every other node in the mesh network, illustrated by the figure, is in communication range with node 150, the "first multiplicity of neighboring nodes" would comprise every node in the mesh network (*i.e.*, nodes 110, 120, 130, 140, 160, 170, 180 and 190).

Assuming that Defendants' intended construction which purports to restrict the term to include only those nodes "adjacent to the first node," is intended to restrict the term to only those nodes in closest physical proximity to the first node, Linex respectfully shows that Defendants' proposed

---

[2] The claims of the patents-in-suit are not limited to this embodiment. The law of claim construction is clear that reference to the specification and prosecution history must be balanced with the principle that it is impermissible to read a particular embodiment into the claim. *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 -87 (Fed. Cir. 1998); *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1433 (Fed. Cir. 2000), *cert. dismissed*, 530 U.S. 1299 (2000); *see also* Linex's Opening Claim Construction Brief, DE 70, at 10-11.

[3] Linex has proposed that the term "first node" be construed as follows: "the first node within the distributed network that receives a packet originated by a remote station."

construction is an attempt to improperly limit this term. Neither the claims nor the specification support such a construction.

Linex anticipates that Defendants will likely point to the referenced drawing set forth above in an attempt to improperly limit the construction of this term to a particular embodiment of the described mesh network. However, the figure is only one representative example – a simplified version for illustrative purposes – of a mesh network. There is absolutely no support in the specification for the proposition that a mesh network must be configured in a linear or grid-like fashion. On the contrary, the '377 patent actually teaches away from the concept of nodes communicating only with those "adjacent" nodes, the specification discusses a preferred embodiment in which the "plurality of nodes . . . covers a geographic area," and that "[e]ach node covers a micro-cell having a radius, which, typically, is less than one mile." Ex. A, the '377 patent at col. 2, ll. 26-29; col. 4, ll. 12-16; claims 1-3.

Based on the foregoing, the asserted claims and the specification make clear that the "first multiplicity of neighboring nodes" are those "nodes within the distributed network that are in communication range with the first node."

### 2.    "first traffic information"

This term "first traffic information" is unique to the '377 patent and is found only in newly asserted claim 22. This term is not specifically referenced in the specification of the '377 patent, but is readily defined in the context of the claims. As a result, Linex proposes the following construction for this term:

<u>**Linex's Proposed Construction:**</u>

**Traffic information related to the first multiplicity of neighboring nodes.**

<u>**Defendants' Proposed Construction:**</u>

**Information communicated between the first multiplicity of neighboring nodes in routing packets that indicates the capacity of each of the first multiplicity of neighboring nodes to handle additional packets in view of, at least, the traffic density at that node.**

To ascertain the definition of "first traffic information," Linex would first direct the Court to the term "traffic information." Linex has proposed that "traffic information" be construed to mean: "information regarding conditions of the distributed network or the transmission of data in the distributed network." *See* Opening Claim Construction Brief, DE 70, at 21-22. In the context of newly asserted claim 22, traffic information is: (1) communicated between a first

multiplicity of neighboring nodes of a first node, (2) used to select a second node of the first multiplicity of neighboring nodes, and (3) used route a packet to a second node. Ex. A, the '377 patent at claim 22 (. . . ***communicating first traffic information between a first multiplicity of neighboring nodes of a first node*** of the plurality of nodes . . . ***selecting, responsive to the first traffic information***. . . a second node of the ***first multiplicity of neighboring nodes***, and ***routing, responsive to the first traffic information*** . . .) (emphasis added).

It is clear from the context of claim 22 that the referenced "traffic information" relates to that traffic information exchanged between the first multiplicity of neighboring nodes and the first node. It is in this context that the term "traffic information" is referred to as "***first*** traffic information." This proposed construction is entirely consistent with those claims depending on claim 22, claims 23-27. As pointed out above with respect to the term "first multiplicity of neighboring nodes", these claims establish a "layered" approach to selective packet transmission in the mesh network by referring to second, third, fourth, fifth and sixth traffic information, which correspond to the traffic information exchanged between the second, third, fourth, fifth and sixth nodes and the second, third, forth, fifth and sixth multiplicity of neighboring nodes, respectively. Ex. A, the '377 patent at claims 23-27 ("communicating [second, third, fourth, fifth, sixth] traffic information between a [second, third, fourth, fifth, sixth] multiplicity of neighboring nodes of the [second, third, fourth, fifth, sixth] node . . .").[4]

When claim 22 is read in the context of dependent claims 23-27, it is absolutely clear that the claim defines the term "first traffic information" as the "traffic information related to the first multiplicity of neighboring nodes."

**B.     Disputed Terms Found Within the Asserted Claims of the '503 Patent: "flow-control system" and "central flow-control management system".**

**1.     An overview of the flow-control subsystems described in the '503 patent.**

The terms "flow-control system" and "central flow-control management system" are unique to the '503 patent and are found in newly asserted claims 15 and 30, respectively.[5]

---

[4] For the reasons set forth in the preceding section, Defendants' attempt to limit the construction of this term to "adjacent nodes" (by virtue of its proposed definition of "first multiplicity of neighboring nodes") is improper.

[5] Concepts related to these terms have been addressed by the parties to some degree with respect to their arguments related to the term "flow-control means".

Generally speaking, these terms are related to flow-control systems that route packets through the mesh network. The abstract of the '503 patent provides a concise overview of a flow-control subsystem:

> The flow-control subsystem communicates traffic information between each of the nodes. The flow-control subsystem routes the packet through appropriate nodes to the hub node from a remote station. Based on the traffic at each node, the flow-control subsystem transmits the packet from the hub node to an appropriate node, and routes the packet to a recipient remote station.

Ex. B, the '503 patent, Abstract.

The specifications of the patents-in-suit are replete with descriptions relative to flow-control subsystems that route packets through a mesh network. While neither patent sets forth a particular design criteria for a flow control subsystem (a "particular flow-control subsystem . . . would be specified by a particular system requirements and design criteria" Ex. B, the '503 patent at col. 5, ll. 21-24), both patents discuss and make absolutely clear that there are two fundamental types of flow-control subsystems subject to the teachings of the patent – distributed systems and centralized systems:

> The flow-control subsystem in the distributed network controls the store-and-forward subsystem, to store each packet arriving at the spread-spectrum transceiver. ***In a preferred embodiment, the flow-control subsystem also is distributed throughout the network, with a flow-control subsystem resident at each node. It is possible, of course, to have a central flow-control system.***

Ex. B, the '503 patent at col. 6, ll. 9-15 (emphasis added).

The specification generally describes these flow-control subsystems – whether distributed or centralized – by explaining the concept of dynamic packet routing:

> The flow-control subsystem communicates traffic information between each of the nodes in the plurality of nodes. The traffic information typically includes traffic density at each of the nodes and memory availability. Using the traffic information and in response to a packet having the destination address to the hub node, the flow-control subsystem routes the packet through appropriate nodes to the appropriate hub node. Based on the traffic at each node, and each packet having a destination address to either the hub or a remote station, the flow-control subsystem transmits the packet from the hub node to an appropriate node, and routes the packet to the first recipient node. Each packet may traverse a different route en route to the remote station.
>
> In response to the traffic congestion and to a plurality of packets having voice

> data, the flow-control subsystem routes the plurality of packets through a path in the plurality of nodes to ensure that the plurality of packets arrive sequentially. The flow control procedure balances the activity in each node relative to other nodes in the distributed network.

Ex. B, the '503 patent at col. 6, ll. 4-29; *see also* col. 3, ll. 1-25.

The specification further provides that the routing of a packet through the mesh is not known "*a priori*" and the path a packet travels is not "predefined." Ex. B, the '377 patent at col. 6, ll. 54-52, 63-65. Moreover, in order to accomplish the routing of a packet in this fashion, "nodes chosen for a particular path have available capacity and storage, and can forward the packet to a subsequent node." *Id.* at col. 6, ll. 58-60.

When read in the context of the asserted claims, these descriptions of flow-control subsystems provide the necessary intrinsic evidence to construe the terms "flow-control system" and "central flow-control management system"

### a.    "flow control system".

For the reasons stated above, Linex proposes the following construction for the term "flow control system," which appears in claim 15 of the '503 patent:

<u>**Linex's Proposed Construction:**</u>

**A system that routes packets through a part of, or the entire, distributed network.**

<u>**Defendants' Proposed Construction:**</u>

**A central computer or processor maintaining traffic information about all of the nodes in the distributed network, which (a) communicates such traffic information between all of the nodes, (b) selects a path for routing a packet from a first node to a destination node in view of the traffic information, and (c) causes the packet to be transmitted to the destination node through the selected path.**

The relevant portion of claim 15 of the '503 patent provides as follows:

> a *flow-control system*, responsive to the traffic information and to a particular packet, from the first node, with the first node capable of communicating a packet to a second node within the plurality of nodes, with the second node selected from two or more nodes capable of communicating with the first node, the particular packet having a particular destination address of a respective destination node of the plurality of nodes, for selecting a path, including the second node, of a multiplicity of nodes through the plurality of nodes to the destination node, said *flow-control system* for routing, responsive to the traffic information, the particular packet through the path of the multiplicity of nodes to the respective destination node.

In contrast to Defendants' unworkable and unwieldy proposed definition for this term, which reads in limitations not supported by the claims or the specification, Linex's proposed construction for this term is not limited to any particular type of system and could include either a distributed system or a centralized system.

        **b.**     **"central flow-control management system".**

For the reasons set forth in the preceding paragraphs, Linex proposes the following construction for the term "central flow-control management system," which appears in claim 30 of the '503 patent:

<u>**Linex's Proposed Construction:**</u>

**A system that routes packets through the distributed network.**

<u>**Defendants' Proposed Construction:**</u>

**A central computer or processor maintaining traffic information about all of the nodes in the distributed network, which (a) communicates such traffic information between all of the nodes, (b) selects a path for routing a packet from a first node to a destination node in view of the traffic information, and (c) causes the packet to be transmitted to the destination node through the selected path.**

The relevant portion of claim 15 of the '503 patent provides as follows:

> a *central flow-control management system*, responsive to the traffic information and to a particular packet, from the first node, having a respective destination address of a respective destination node of the plurality of nodes, for selecting a path, including a second node, within the plurality of nodes, with the second node selected from two or more nodes capable of communicating with the first node, of a multiplicity of nodes through the plurality of nodes to the destination node, said *central flow-control management system for routing*, responsive to the traffic information, the particular packet through the path of the multiplicity of nodes to the respective destination node

Linex's proposed construction for this term is limited to a centralized system.

     **C.**     **Disputed Terms Found Within the Asserted Claims of the '377 and the '503 Patents.**

     **1.**     **"second node"**

The term "second node" is found in both the '377 patent and the '503 patent – specifically, newly asserted claims 16 and 22 of the '377 patent and newly asserted claims 1, 2, 15, 18 and 30 of the '503 patent. While Linex does not believe that this term needs to be

CASE NO. 05-80300-CIV-MARRA/JOHNSON

construed, to the extent the Court determines that a construction is required, Linex proposes the term should retain its ordinary meaning as follows:

### Linex's Proposed Construction:

**A node within the distributed network that receives a packet from a first node.**

### Defendants' Proposed Construction:

**A selected one of the first multiplicity of neighboring nodes through which a packet is routed to the destination node.**

The term "second node" simply means "a node within the distributed network that receives a packet from a first node." *See, e.g.*, Ex. A, the '377 patent at claim 16 ("*. . . selecting . . . from the first node . . . a second node* of the first multiplicity of neighboring nodes . . .") (emphasis added); *see also* Ex. B, the '503 patent at claim 1 (. . . the *first node capable of communicating a packet to a second node* within the plurality of nodes, with the *second node selected from two or more nodes capable of communicating with the first node*.") (emphasis added).[6]

### 2.     "capable of communicating"

This term is found in both the '377 patent and the '503 patent – specifically, newly asserted claims 16 and 22 of the '377 patent and newly asserted claims 1, 2, 15, 18 and 30 of the '503 patent. Linex does not believe that this term needs to be construed; however, to the extent the Court determines that a construction is required, Linex proposes the term should retain its ordinary meaning as follows:

### Linex's Proposed Construction:

**Having the ability to transmit and/or receive (depending upon the context of the term).**

### Defendants' Proposed Construction:

**The ability of a node to transmit a packet directly to an adjacent node.**

The phrase "capable of communicating" is clearly understandable and, depending upon the context of how the term is used in the claims, simply means a node designed as "having the ability to transmit [and/or receive]" a packet. *See, e.g.*, Ex. A, the '377 patent at claim 16 (". . . the first node *capable of communicating* a respective packet to a node . . ."); *see also* Ex. B, the '503 patent at claim 1 (. . . the first node *capable of communicating* a packet to a second node

---

[6] For the reasons set forth above, Defendants' attempt to limit the construction of this term to "adjacent nodes" (by virtue of its proposed definition of "first multiplicity of neighboring nodes") is improper.

within the plurality of nodes, with the second node selected from two or more nodes *capable of communicating* with the first node.").[7]

**III.   ALTERNATIVE PROPOSED CONSTRUCTION OF THREE DISPUTED TERMS FOUND WITHIN THE CLAIMS OF THE '377 AND '503 PATENTS, WHICH WERE PREVIOUSLY BRIEFED AND ARGUED.**

In view of the newly asserted claims, Linex has reexamined its prior proposed claim constructions for several terms that were previously briefed and argued by the parties as part of the original claim construction proceedings.  For the benefit of the Court – and in an effort to further refine and clarify those terms – Linex sets forth its alternative constructions for the following terms: "node," "destination address" and "traffic density."

**A.    Linex's Alternative Constructions for Disputed Terms Previously Briefed and Argued.**

**1.    "node"**

For the purposes of clarification, Linex proposes the following revised construction for the term "node," which is found in all asserted claims of the '377 and the '503 patents:

### Linex's Proposed Construction:

**A communication device capable of transmitting and receiving packets to and from remote stations, as well as transmitting and receiving packets to and from other nodes in the distributed network.[8]**

### Defendants' Proposed Construction:

**A communication device having multiple transceivers for store-and-forward routing of packets to and from end-user devices within a limited geographic area using spread-spectrum modulation, and further including a at least one transceiver for store-and-forward routing of packets to and from another node within the distributed network.**

Linex's alternative construction merely clarifies its former proposal by simply changing aspects of the originally proposed construction from the singular to the plural.  Specifically, Linex's alternative construction provides clarity by specifying that a node is capable of transmitting and receiving packets to and from *more than one* remote station.  Similarly, the

---

[7] For the reasons set forth above, Defendants' attempt to limit the construction of this term to "adjacent nodes" is improper.

[8] Linex originally proposed that this term be construed as: "A communication device capable of transmitting and receiving packets to and from a remote station, as well as transmitting and receiving packets to and from another node in the distributed network."

alternative construction clarifies Linex's initial proposal for this term by specifying that a node is capable of transmitting and receiving packets to and from *more than one* node in the network.

Linex's alternative construction is entirely consistent with the intrinsic record. First and foremost, the asserted claims make clear that a node in the distributed network is capable of communicating with more than one remote station and more than one node. Claims 16 and 22 of the '377 patent provide that the claimed methods comprise the steps of "communicating, between a node . . . and one or more remote stations . . ." and "communicating [first] traffic information between a first multiplicity of neighboring nodes of a first node . . ." Ex. A, the '377 patent at claim 16, Col. 12, ll. 29-31, 35-37 and claim 22, Col. 14, ll. 7-8, 14-16; *see also* Ex. A, the '377 patent at claim 32 (". . . each node in the plurality of nodes for communicating, with one or more remote stations. . ."). This is equally true for the '503 patent. *See* Ex. B, the '503 patent at claim 1 (". . . each node in the plurality of nodes for communicating, with one or more remote stations. . .") (as to more than one remote station); *Id.* (". . . with the second node selected from two or more nodes capable of communicating with the first node") (as to more than one node); *see also* Ex. B, the '503 patent at claims 15, 18 and 30.

Accordingly, based upon the plain language found in the asserted claims and in specification of the patents-in-suit, the Court should adopt Linex's proposed revised construction of "node."

### 2.    "destination address"

For the purpose of clarification, Linex proposes the following revised construction for the term "destination address," which is found in all asserted claims of both the '377 patent and the '503 patent:

<u>Linex's Proposed Construction:</u>

**A unique identifier for the intended recipient of a packet, whether the recipient is within or outside of the distributed network.**[9]

<u>Defendants' Proposed Construction:</u>

**Additionally, the Defendants have proposed the following construction: A unique network identifier for the final intended recipient of a packet in the network. In the context of the asserted claims, the final intended recipient is the destination node.**

---

[9] Linex originally proposed that this term be construed as: "A unique identifier for the intended recipient of a packet."

Linex's alternative construction for this term clarifies its former proposal by indicating that the intended recipient of a packet may be located within or outside of the distributed network. This alternative construction leaves little doubt as to the spirit and intent of the claims and the teachings of the patent, which include both intra-network and inter-network communications.

###### a.   Intra-network and Inter-network communications.

The specification undoubtedly provides for both intra-network and inter-network communications. With respect to intra-network communications, the patents generally refer to them as "local calls," which are defined as "*call[s] between remote stations located within (i.e., accessing) the same distributed network*." Ex. A, the '377 patent at Col. 3, ll. 2-5 (emphasis added). The specifications further point out an important distinction between "local calls" and inter-network communications, which requires that inter-network communications must access a "hub node" and/or a "central office." *Id.* at Col. 7, ll. 1-4 ("For local calls within the distributed network, there is no need for packets going to a hub or central office."); *see also* Col. 3, ll. 4-5 ("For the local call, the central office connection is not required.").

As pointed out in Linex's Opening Claim Construction Brief, it is commonly understood that a "central office" refers to a physical location that maintains switching system hardware that routes calls (or other types of data). *See* Opening Claim Construction Brief, DE 70, at 5, n3. The central office routes incoming communications originating from outside the network to destinations within the network, which is described in the asserted patents. *See, e.g.*, Ex. A, the '377 patent at Col. 3, ll. 6-10 (". . . the flow-control subsystem transmits the packet from a central office to an appropriate hub node to an appropriate node, and routes the packet to the next recipient node."). Conversely, the central office in a mesh network system is capable of routing communications originating from inside the network to destinations outside of the network. Ex. A, the '377 patent at Col. 6, ll. 62 – 65 ("For packets passing from a remote station to the central office . . ."); *see also Id.* at Col. 3, ll. 18-22. ("When an information packet(s) arrives from a remote station, the node routes the packet(s) . . . on the way to an intended hub node and central office, toward the destination address.).

  b. **The term "destination address" is a unique identifier for the intended recipient of a packet, whether the recipient is within or outside of the distributed network.**

With respect to the term "destination address," the specification makes clear that the intended recipient of a packet could be found within the distributed network (when making a "local call") or outside the distributed network (when accessing either a "hub node" and/or "central office"). As pointed out above, the key distinction is whether the destination address is directed to a "hub node" and/or "central office" or a "remote user" (*i.e.*, remote station):

> Using the traffic information, and in response to *a packet having the destination address to the hub node* . . . or, in the case of a "local call", to the *remote user* directly.

Ex. A, the '377 patent at col. 2, l. 64 – col. 3, l. 1 (emphasis added). This portion of the specification establishes that a packet can have a "destination address" to either a "hub node" (for inter-network communications) or, in the case of intra-network communications, a "remote user" (*i.e.*, remote station). *Id.*, at col. 6, ll. 18-20 (". . . and each packet having a destination address to *either the hub or a remote station*") (emphasis added).

For communications intended for recipients within the network, the specification also provides that destination address is directed to a remote station. *see also* Ex. A, the '377 patent at col. 7, ll. 7-11 ("The packet does not travel a predefined path, and different packets from the sending remote station can travel different paths to the recipient remote station. This depends on the destination address as in a phone system."); Ex. A, the '377 patent at col. 3, ll. 6-7 (". . . each packet having a destination address to a remote station . . ."). For communications intended for recipients outside the network, the specification further provides that "[w]hen an information packet(s) arrives from a remote station, the node routes the packet(s) to an appropriate second recipient node *on the way to an intended hub node and central office, toward the destination address*. Ex. A, the '377 patent at col. 3, ll. 18-22 (emphasis added).

These excerpts from the specification make clear that the patents provide for both intra-network and inter-network communications, and that the determining factor for these communications depends upon whether the "destination address" is identified as a remote station in the context of a "local call," or a "hub node" or "central office" for an inter-network

communication.  Thus, the intrinsic evidence supports Plaintiff's proposed revised definition of "destination address."[10]

### 3.   "traffic density"

For the purpose of clarification, Linex proposes the following revised construction for the term "traffic density," which is found only the '377 patent and is found in all of the asserted claims of the '377 patent.  For the purposes of clarification, Linex proposes the following revised construction for this term:

<u>**Linex's Proposed Construction:**</u>

**Traffic congestion.[11]**

<u>**Defendants' Proposed Construction:**</u>

**The number of packets presently traversing a node per unit of time.**

Linex respectfully withdraws the concession made in its Opposition Brief with respect to this term.  Opposition Brief, DE 76 at 19-20.  Linex offers this revised construction in an effort to greatly simplify the Court's claim construction analysis.  While Linex believes that "traffic congestion" is a sub-species or variable of "traffic information," as asserted in Linex's Opening Claim Construction Brief, it further submits that "traffic congestion" is, in essence, the same as "traffic density."  Indeed, these terms should be considered in the same context as automobile traffic density, *i.e.*, congestion, on a highway.

Linex's proposed construction of "traffic density" to mean "traffic congestion" is consistent with Linex's proposed definition set forth in its Opposition Brief, but dispenses with the necessity of having to measure the number of packets at a particular node, which is not called for in the asserted claims.

---

[10] The Court should note that law of claim construction does not limit Linex to only those embodiments described in the specifications with respect to the "destination address" being directed to hub nodes, the central office, remote users and/or remote stations.  On the contrary, Linex's proposed construction necessarily includes other variants of a "destination address," including, but not limited to, the destination addresses of those nodes that the packet travels to, one after the other, as it traverses the path through the mesh network, among others. *See* n. 2, *supra*.

[11] Linex originally proposed that this term be construed as: "The number of packets at a node at a given time."

Furthermore, the proposed construction set forth herein is, quite simply, more correct than that originally asserted by Linex and the intrinsic evidence squarely provides support for this proposed construction.

The term "traffic congestion" appears in several claims of the '377 patent – claims that are not being asserted against the Defendants in this lawsuit – and is used in conjunction with the phrase "traffic density".[12]  *See* Ex. A, the '377 patent at claims 1, 2 and 3.  Linex contends that the language appearing in these claims provides insight into what is meant by the term "traffic density."  In particular, the term "traffic density" serves as the antecedent basis for the term "traffic congestion," which serves to define "traffic density."

The relevant language of claim 1 of the '377 patent reads as follows:

*             *             *

a flow-control subsystem, coupled to the store-and-forward subsystem, for controlling the store-and-forward subsystem, to store each packet arriving at the spread-spectrum transceiver,

> said flow-control subsystem communicating traffic information between each of the nodes in the plurality of nodes, ***with the traffic information including traffic density at each of the nodes,***

> said flow-control subsystem, responsive to the traffic information and to a packet having the destination address to the hub node, for routing the packet through appropriate nodes to the hub node,

> said flow-control subsystem, responsive to the traffic at each node . . . for transmitting the packet from the hub node to an appropriate node, routing the packet to the first recipient node,

> ***said flow-control subsystem, responsive to the traffic congestion*** and to a plurality of packets having voice data, for routing . . .

*See* Ex. A, the '377 patent at claim 1 (excerpt of segregated limitation); *see also* claim 2.

Additionally, claim 3 of the '377 patent reads as follows:

3.  A distributed network, spread-spectrum method, for a plurality of remote stations and a plurality of nodes for covering a geographic area, the plurality of nodes including a hub node, each node covering a micro-cell having a radius less than one mile, comprising the steps of:

---

[12] Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-15 (Fed. Cir. 2005) (internal citation omitted).

CASE NO. 05-80300-CIV-MARRA/JOHNSON

\*          \*          \*

communicating traffic information between each of the nodes in the plurality of nodes, *with the traffic information including traffic density at each of the nodes*;

\*          \*          \*

*routing, in response to the traffic congestion and to a plurality of packets having voice . . .*

*Id.*, at claim 3 (excerpt).

These portions of claims 1-3 of the '377 patent draw their support from that portion of the specification that provides that the flow-control subsystem routes packets "*in response to the traffic congestion*," which, as described in the preceding paragraph of the specification, clearly refers to the density of the traffic at each of the nodes. Ex. A, the '377 patent at col. 10-18, 24-26.

Based upon the foregoing, Linex respectfully withdraws the concession made in its Opposition Brief with respect to the construction of the term "traffic density." Based upon the analysis above, Linex offers the alternative construction of the term "traffic density" to mean "traffic congestion." Further, because "traffic congestion" is an easily understood term, no additional construction is required.

## III.    CONCLUSION

Linex requests that the Court enter a claim construction order consistent with the definitions provided by Linex and/or the ordinary meaning of the terms found in the '377 and '503 patents.

Respectfully submitted,

Dated:   March 28, 2008

/s/ Julie Braman Kane
Julie Braman Kane
Florida Bar No. 980277
**COLSON HICKS EIDSON**
255 Aragon Avenue, 2nd Floor
Coral Gables, FL  33134-5008
Tel:  (305) 476-7400
Fax:  (305) 476-7444
Email: Julie@colson.com

*CASE NO. 05-80300-CIV-MARRA/JOHNSON*

Edward W. Goldstein
Corby R. Vowell
**GOLDSTEIN, FAUCETT & PREBEG, LLP**
1177 West Loop South, Suite 400
Houston, TX 77027
Tel: (713) 877-1515
Fax: (713) 877-1737
Email: egoldstein@gfiplaw.com
Email: cvowell@gfiplaw.com

**ATTORNEYS FOR
LINEX TECHNOLOGIES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on this the 28th day of March 2008, the foregoing document was electronically filed with the Clerk of the Court via CM/ECF. I also certify that the foregoing document is being served on this day on all counsel of record via transmission of automatic Notices of Electronic Filing generated by CM/ECF, or some other authorized for those counsel or parties who are not authorized to receive automatic Notices of Electronic Filing generated by CM/ECF.

/s/ Julie Braman Kane
Julie Braman Kane

*CASE NO. 05-80300-CIV-MARRA/JOHNSON*

## SERVICE LIST

COUNSEL FOR:
NORTEL NETWORKS, INC.

Marissa D. Kelley, Esq.
mkelley@swmwas.com
Fla. Bar No. 379300
**Stearns, Weaver, Miller, Weissler,
Alhadeff & Sitterson, L.L.P.**
200 E. Broward Boulevard, Suite 1900
Fort Lauderdale, Florida 33301-1949
Tel: (954) 462-9500
Fax: (954) 462-9567

Mark M. Supko, Esq.
msupko@crowell.com
Michael H. Jacobs, Esq.
mjacobs@crowell.com
**Crowell & Moring, L.L.P.**
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
Tel: (202) 624-2500
Fax (202) 628-5116

COUNSEL FOR:
TROPOS NETWORKS, INC.

James A. Gale, Esq.
jgale@feldmangale.com
Fla. Bar No. 371726
Gregory L. Hillyer, Esq.
ghillyer@feldmangale.com
Fla. Bar No. 682489
**Feldman Gale, P.A.**
Miami Center, Suite 1920
201 South Biscayne Blvd.
Miami, FL 33131-4332
Tel: (305) 358-5001
Fax: (305) 358-3309

COUNSEL FOR:
STRIX SYSTEMS, INC.

Ramsey M. Al-Salem, Esq.
ralsalam@perkinscoie.com
Jessica L. Rossman, Esq.
jrossman@perkinscoie.com
**Perkins Coie, L.L.P.**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Tel. (206) 359-8000
Fax (206) 359-9000

Charles H. Lichtman, Esq.
clichtman@bergersingerman.com
Fla. Bar No. 501050
**Berger Singerman**
Las Olas Centre II
350 E. Las Olas Boulevard, Suite 1000
Fort Lauderdale, Florida 33301
Tel: (954) 627-9913
Fax: (954) 523-2872