IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-80300-CIV-MARRA/JOHNSON

| | |
|---|---|
| LINEX TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> MOTOROLA, INC.; NORTEL NETWORKS, INC.; TROPOS NETWORKS, INC.; and STRIX SYSTEMS, INC., <br><br> Defendants. | JURY TRIAL DEMANDED |

**PLAINTIFF LINEX TECHNOLOGIES, INC.'S OPPOSITION
TO DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF
ADDITIONAL CLAIM CONSTRUCTION TERMS**

Plaintiff Linex Technologies, Inc. ("Linex") respectfully submits this brief in opposition to the Defendants' Joint Memorandum of Law In Support of Additional Claim Construction Terms, and requests that the Court reject each construction proposed by Defendants and adopt each of the constructions proposed by Linex.

**I.    SUMMARY OF ARGUMENT**

As part of their efforts to avoid an ultimate finding of infringement of United States Patent Nos. 6,493,377 ("the '377 patent") 7,167,503 ("the '503 patent," and collectively with the '377 patent, the "patents-in-suit"), the Defendants proposed constructions for the additional terms at issue run contrary to both the intrinsic evidence and long-settled claim construction principles. As a general matter, each of the Defendants' proposed constructions for the additional terms ignore the plain language of the claims and the specifications of the patents-in-suit, and, contrary to settled law, attempt to limit the meaning of these terms to particular embodiments referenced in the patents-in-suit, primarily focusing on two figures in particular rather than the claims or the teachings of the patents as a whole.

## II. ARGUMENTS AND AUTHORITIES

### A. The Law of Claim Construction.

While Linex will not endeavor to set forth a comprehensive recitation of legal authorities with respect to the central tenets of claim construction herein, as this has been extensively briefed previously, Linex does believe that it is necessary to once again point out (as it has in all of its claim construction briefing in this case to date) one particularly relevant point of law that the defendants have ignored and continue to ignore: *it is impermissible to read a particular embodiment into the claim being construed*. *Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1186 -87 (Fed. Cir. 1998); *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1433 (Fed. Cir. 2000), *cert. dismissed*, 530 U.S. 1299 (2000).

"References to a preferred embodiment, such as those often present in a specification, are not claim limitations." *Varco, L.P. v. Pason Sys. USA Corp*., 436 F.3d 1368, 1375 (Fed. Cir. 2006) quoting *Laitram Corp. v. Cambridge Wire Cloth Co*., 863 F.2d 855, 865 (Fed. Cir. 1988). The Federal Circuit has repeatedly and continuously cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification. *Id*. citing *Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 805 F.2d 1558, 1563 (Fed. Cir. 1986). However, as the following paragraphs point out, despite this long settled principle of claim construction, the Defendants' arguments make clear that they are attempting to impermissibly limit the claim terms found in the asserted claims to several particular embodiments recited in the patents-in-suit.

## III. DEFENDANTS' PROPOSED CONSTRUCTION OF THE DISPUTED TERMS FOUND WITHIN THE NEWLY ASSERTED CLAIMS OF THE '377 AND '503 PATENTS ARE IMPROPERLY LIMITING.

### A. "first multiplicity of neighboring nodes"[1]

The Defendants propose that the phrase "first multiplicity of neighboring nodes" be construed as "[a] group of nodes, each of which is adjacent to the first node." Linex's opening brief correctly anticipated Defendants' arguments. *See* Linex's Memorandum of Law (DE 125) at 3-6. As Linex pointed out in its opening brief, the Defendants propose to limit this phrase to only those nodes in closest physical proximity to the "first node." Further, and by incorporation of their arguments relative to the phrase "capable of communicating," Defendants contend that

---

[1] This term is unique to the '377 patent and is found in claims 16 and 22.

"adjacent nodes" are only those nodes in closest physical proximity which have a "direct link" between them. *See* Defendants' Memorandum of Law (DE 124) at 3, 9-10. It is readily apparent that the Defendants, in an attempt to avoid infringement, are attempting to limit the claims utilizing this term to only *wired* mesh network configurations (*i.e.*, the nodes comprising the mesh are connected via wire). There is absolutely no such limitation in the asserted claims, and the patents-in-suit make clear that the mesh network configurations may be wired or wireless. *See, e.g.*, Ex. A, the '377 patent, Col. 2, ll. 39-45; *Id.* at Col. 4, ll. 17-25 (Figures 4 and 5 provide an example of what might be at each node, including a "node transceiver," which can be at "microwave frequencies or connect to a fiber optic link or any other channel *capable of handling the traffic between the nodes.*") (emphasis added); *Id.* at Col. 5, ll. 1-5 ("Each node may include a plurality of spread-spectrum transceivers . . ."); *see also Id.* at Col. 4, ll. 38-40 ("The [node] antennas could be omnidirectional, sectored, or steerable (smart) antennas").

In an attempt to support their arguments, Defendants point to two particular embodiments found within the patents-in-suit – Figures 2 and 3. As Linex pointed out in its opening brief, Figure 2 (and likewise, Figure 3) is only one representative example of a simplified mesh network used for illustrative purposes, and there is absolutely no support in the specification (or claims) for the proposition that a mesh network must be configured in a linear or grid-like fashion – such that uniform "direct links" to "adjacent nodes" are created. As Linex has previously pointed out, the patents-in-suit actually teach away from the concept of nodes communicating only with those "adjacent" nodes, in that the specification discusses a preferred embodiment in which the "plurality of nodes . . . covers a geographic area," and where "[e]ach node covers a micro-cell having a radius, which, typically, is less than one mile." Ex. A, the '377 patent at Col. 2, ll. 26-29; Col. 4, ll. 12-16; claims 1-3; *see also id.* at Col. 4, ll. 40-46 (". . . a node communicates *with a different node* having a node transmitter and node receiver [].") (emphasis added). Moreover, as the inventors recognized, and one of ordinary skill in the art would recognize, nodes can be placed on fixed objects that are not necessarily uniform in nature. *Id.* at Col. 7, ll. 27-29 ("Each node is small and can be mounted on telephone poles, building [sic], etc."). Moreover, the very nature of this type of environment for node placement in a mesh network architecture necessarily includes a variety of manmade or naturally occurring obstructions, such as buildings, trees, etc., all of which could preclude the transmission or receipt of signals broadcast to or from "adjacent" or physically closest nodes.

The patents-in-suit further teach away from the adjacent node/direct link theory proffered by Defendants in that the patents' specifications make clear that a variety of antennas can be used for transmitting and receiving packets via radio waves, and such antennas "could be *omnidirectional*, sectored, or steerable (smart) antennas." Ex. A, the '377 patent at Col. 4, ll. 38-40. This is important because in December of 2000, one of ordinary skill in the art would understand that an omnidirectional antenna would transmit packets via radio waves in a near uniform manner in *all* directions on a single plane that would be received by any other receiver antenna within its broadcast range – regardless of whether the receiver antenna was physically adjacent to the omnidirectional transmitter antenna. *See, e.g.*, Ex. B, U.S. Patent No. 5,914,695, entitled "Omnidirectional Dipole Antenna".

The concept of a node in a mesh network utilizing an omnidirectional antenna is shown in the following figure (Figure 2 from the patents-in-suit), which demonstrates that the nodes are designed to communicate with other nodes within a particular range and are not limited to communications with only "adjacent" nodes, as proposed by Defendants:



In this example, assume the node in the upper left hand corner (node 110) was broadcasting packets via radio waves with an omnidirectional transmitter antenna. If node 110's power source for broadcasting said packets is sufficient, the radio waves being transmitted are received by those nodes that are in communication range of node 110, which, for purposes of

4

discussion, could include all of the nodes in the mesh network (including those that could be characterized as the second "layer" of nodes from node 110 – *i.e.*, nodes 130, 160, 170, 180 and 190), including those nodes in the first "layer" (*i.e.*, nodes 120, 140 and 150). Thus, each of the nodes within node 110's broadcast or communication range – could receive the packets being transmitted via radio waves from node 110, regardless of whether they are physically adjacent and/or the closest to node 110.[2] To limit packet communications in the claimed mesh networks to only those nodes physically adjacent to one another as Defendants suggest would defy the teachings of the patents-in-suit, as well as common sense.

The Court should keep in mind that the asserted claims of the patents-in-suit are set in the context of radio communications. When the claimed mesh networks are viewed in this light, it is readily apparent that "adjacent" in the radio communications context can be vastly different than in a physical context. For example, consider a transmitted radio signal that is obstructed by a wall, building or other structure. The attenuation of the obstructed signal can be far greater than that of an unobstructed radio signal. Take the following rudimentary diagram for example:



As this diagram depicts, node 1 is 200' away from node 2, but because these nodes are separated by an obstruction, they are – in the radio communications context – electronically further away from one another than node 1 is from nodes 3, 4 and 5 that are 300', 400' and 500' away, respectively. Thus, the obstruction precluding the transmission or receipt of radio signals directly between nodes 1 and 2, renders nodes 3, 4 and 5 closer to node 1 in the radio communications context, even though nodes 1 and 2 are physically adjacent and in closest proximity to one another.

---

[2] If the figure were to be taken literally for purposes of claim construction, which it is not, node 150 would depict a node transmitting packets with an omnidirectional antenna; whereas, node 110 would depict a node transmitting packets with a sectored or steerable (smart) antenna.

5

Based on the foregoing, the asserted claims and the specification make clear that Defendants' proposed construction for the phrase "first multiplicity of neighboring nodes" is improperly limiting and that Linex's proposed construction for this phrase – "nodes within the distributed network that are in communication range with the first node" – should be adopted.

### B. "first traffic information"[3]

Linex's proposed construction for the term "first traffic information" is "[t]raffic information related to the first multiplicity of neighboring nodes." This definition is consistent with the plain language of the claims and the specification of the '377 patent. In addition to the reasons set forth in Linex's Opposition to Defendants' Joint Memorandum of Law In Support of Their Proposed Claim Construction (DE 76) with respect to Defendants' proposed construction of the term "traffic information" (*See* DE 76 at 19), Defendants' proposed construction for the term "first traffic information" adds unnecessary and improper limitations not supported by the claims or the specification, adding confusing complexity to a rather simple term. For example, Defendants wish to unnecessarily interject terms relative to adjacent nodes, packet routing, node capacity and traffic density in this one disputed term.[4]

Quite simply, it is clear from the context of claim 22 that the referenced "traffic information" relates to that traffic information exchanged between the first multiplicity of neighboring nodes and the first node – nothing more and nothing less. This proposed construction is entirely consistent with not only claim 22 of the '377 patent, but those claims depending on claim 22, claims 23-27.

### C. Flow Control Subsystems

Linex's opening brief, unlike the Defendants', went to great length in describing the relevant portions of the specification relative to the flow-control subsystems described in the

---

[3] This term is unique to the '377 patent and is found in asserted claim 22.

[4] Linex would note that Defendants' proposed inclusion of "traffic density" in this term, as well as the term "traffic information," is inappropriate considering that unlike the asserted claims of the '377 patent, the asserted claims of the '503 patent do not include the limitation of "traffic density" relative to "traffic information." Linex would further point out that for the reasons stated in its opening brief and in the preceding paragraphs, Defendants' attempt to limit the construction of this term to "adjacent nodes" (by virtue of its proposed definition of "first multiplicity of neighboring nodes") is also improper.

6

patents-in-suit.[5]  Linex does not wish to rehash those arguments in the instant brief, and respectfully submits that the Court has ample intrinsic evidence to rely upon in support of Linex's proposed construction for the term "flow control system," as well as the term "central flow-control management system."  However, Linex would once again point out that the specifications of the patents-in-suit describe in great detail the flow-control subsystems subject of the asserted claims, and both patents discuss and make absolutely clear that there are two fundamental types of flow-control subsystems subject to the teachings of the patent – distributed systems (in which each node gathers data from other nodes) and centralized systems (in which a central controller gathers data from all nodes).  With respect to the disputed terms of "flow control system" and "central flow-control management system" found in claims 15 and 30 of the '503 patent, respectively, the Defendants attempt to lump these terms together in an effort to characterize each as a centralized system.  As pointed out in Linex's opening brief and in the following paragraphs, the Defendants' characterization is incorrect.

        1.      **"flow control system"**[6]

Linex's proposed construction for the term "flow control system," "[a] system that routes packets through a part of, or the entire, distributed network," is clear, concise and supported by the intrinsic evidence.  Defendants' unwieldy and overly complicated proposed construction for this term is clearly an attempt to limit this type of flow control subsystem to a "centralized" system without regard for plain language of asserted claims or the specifications of the patents-in-suit.  For example, Defendants argue that the "flow-control system is not – and cannot be – a part of either the remote stations or the nodes."  *See* Defendants' Memorandum of Law (DE 124) at 7.  Such is not the case.  First and foremost, the specification makes clear that in a preferred embodiment "[e]ach node also includes a store-and-forward system, and a flow–control subsystem. . ." Ex. C, the '503 patent at Col. 2, ll. 41-42; *see also id*. at Col. 6, ll. 11-14.

The Court should note that the claims provide that an appropriate address (*i.e.*, the "destination address") is included in the packets being transmitted by the nodes, which also includes information about other nodes in the mesh network.  *See, e.g.,* Ex. C at Claim 15 (". . .

---

[5] Linex incorporates by reference those descriptions and arguments set forth in its opening brief. *See* Linex's Memorandum of Law (DE 125) at 7-10.

[6] This term appears in claim 15 of the '503 patent.

the particular packet having a particular destination address . . ."). Thus, as the specification makes clear, some device or software, or firmware must be resident at the node to receive the information regarding the appropriate node to which to forward the packet (*i.e.*, the second node) and to assign the appropriate address to the packet. These functions – all of which occur at the node – must be performed by a flow-control subsystem:

> Each node may include . . . a flow-control subsystem. The flow-control subsystem typically would include a processor or computer. The store-and-forward subsystem typically would include memory and the memory may be part of the computer embodying the processor for the flow-control subsystem. The memory may be random access memory (RAM) or hard drive, or other volatile or non-volatile memory and memory storage device. Other devices are well-known in the art, and include hard drives, magnetic tapes, compact disk (CD), and other laser/optical memories and bubble memory devices. The particular flow-control subsystem 340 and the store-and-forward subsystem 341 would be specified by a particular system requirements and design criteria.

Ex. C, the '503 patent at Col. 5, ll. 7-24.

Defendants' proposed construction, which is improperly limited to a "central computer or processor" and reads in limitations not supported by the claims or the specification, should be rejected. Linex's proposed construction for this term (unlike the term central flow-control management system) is not limited to any particular type of flow control subsystem and could include either a distributed system (*i.e.*, one where the flow control subsystem is located at each of the nodes) or a centralized system.

### 2. "central flow-control management system"[7]

Defendants have misread Linex's proposed construction for the term "central flow-control management system." Linex proposes that this term be construed as "[a] system that routes packets through the distributed network," not "[a] system that routes packets through **[a part of, or]** the entire distributed network. Defendants (without the benefit of Linex's opening brief) wrongly assumed that Linex contends that this term was not limited to a centralized system. *See* Linex's Memorandum of Law (DE 125) at 10 ("Linex's proposed construction for this term is limited to a centralized system").

---

[7] This term appears in claim 30 of the '503 patent.

For the reasons described in Linex's Memorandum of Law and in the preceding paragraphs, the Court should reject Defendants' proposed construction and adopt Linex's proposed construction.

### D.     "second node"[8]

As pointed out in its opening brief, Linex does not believe that this term needs to be construed by the Court, because "second node" is a term that is easily understood in the context of the claims and should be afforded its plain meaning. *See* Linex Memorandum of Law (DE 125) at 10-11.  Defendants, on the other hand, wish to further complicate and confuse matters by proposing a definition that incorporates three other disputed claim terms – but not the one that is most relevant to the construction of this term – "first node." Further, and as pointed out above, Defendants' attempt to limit the construction of this term to "adjacent nodes" (by virtue of its proposed definition of "first multiplicity of neighboring nodes") is improper.

Again, while Linex does not believe that this term needs to be construed, to the extent the Court determines that a construction is required, Linex contends that its definition should retain its ordinary meaning and be construed as follows: "[a] node within the distributed network that receives a packet [directly transmitted] from a first node."[9]

### E.     "capable of communicating"[10]

As pointed out in its opening brief, Linex does not believe that this term needs to be construed by the Court because "capable of communicating" is a term that is easily understood and should be afforded it plain meaning. *See* Linex Memorandum of Law (DE 125) at 11-12. However, the Defendants maintain that this term should be construed and offer a hyper technical construction that ignores the plain meaning of the words "capable of communicating."

As pointed out in their brief, the Defendants go to great length to try to establish that "communicating," in the context of the claims, must mean a "direct link between nodes." In their attempts to support this argument, Defendants once again point to the two embodiments depicted

---

[8] This term is found in both the '377 patent and the '503 patent – specifically, claims 16 and 22 of the '377 patent and claims 1, 2, 15, 18 and 30 of the '503 patent.

[9] Linex has added the bracketed language in an effort to clarify this term in response to Defendants' position that Linex's construction would include "any node in the network that eventually receives a packet on its path to the destination node. . ."

[10] This term is found in both the '377 patent and the '503 patent – specifically, claims 16 and 22 of the '377 patent and claims 1, 2, 15, 18 and 30 of the '503 patent.

in Figures 2 and 3, in an attempt to improperly limit this term to an embodiment which would further their non-infringement arguments. As pointed out above, the Defendants are attempting to limit the claims utilizing this term to only *wired* mesh network configurations. There is absolutely no such limitation in the asserted claims and the patents-in-suit make clear that the mesh network configurations may be wired or wireless. *See, e.g.*, Ex. A, Col. 2, ll. 39-45.

As the arguments set forth in Section III.A point out, Figures 2 and 3 are merely representative examples of mesh network configurations, and there is no language in the claims or the specifications to suggest that the claimed distributed (i.*e.*, mesh) networks be configured in a linear or grid-like fashion such that nodes are capable of communicating with only "adjacent nodes" or those in closest physical proximity. As Linex points out above, and as the teachings of the patents indicate, the network configurations are not so limited and do not specify how the precise mesh networks are configured. On the other hand, the claims specifications do suggest that nodes comprising the mesh network can be wired or wireless, that node spacing over a geographic area is typically less than one mile, that the nodes communicate with other nodes by utilizing transmitters and receivers (which can utilize omnidirectional, sectored or steerable antennas), that the nodes are small and can be mounted on telephone poles and buildings. Ex. A, the '377 patent at Col. 2, ll. 39-45, Col. 4, ll. 17-25, 38-46, Col. 5, ll. 1-5, Col. 7, ll. 27-29.

Similarly, it defies common sense to think that omnidirectional node antennas (which are part of the suggested teachings of the patents-in-suit) would be so limited when broadcasting a radio signal containing either packetized data or traffic information throughout a wireless mesh network. Once a signal is communicated from a node with an omnidirectional antenna, that signal is communicated in all directions and received by all nodes within communication range of the node that are capable of receiving the signal. *See, e.g.*, Ex. B. Contrary to Defendants' suggestion, this does not necessarily include those nodes "adjacent to" the node sending the data.

For example, consider a mesh network in a municipal environment with nodes mounted on buildings and telephone poles randomly spaced over a radius of three city blocks. Certain nodes within this random configuration may be "adjacent" and in closest in proximity to one another, yet for any number of reasons they are not "capable of communicating" with one another. These reasons could include, for example, an obstruction, such as a wall, building or other structure (whether manmade or naturally occurring), poor link quality between the nodes, or traffic congestion, among other things, all of which could precluding the transmission or

receipt of signals broadcast from the node – *regardless of whether the nodes are "adjacent" or in closest proximity to one another*. *See, e.g.,* Diagram at 5, *supra*.

In other words, regardless of the configuration of the mesh network, physically adjacent nodes may not be capable of communicating with one another. Accordingly, should the Court require a construction of the term "capable of communicating," Linex asserts that its proposed construction "[h]aving the ability to transmit and/or receive," depending upon the context of the term, is consistent with the patents' claims and specifications and is the more appropriate construction.

### III.     CONCLUSION

Linex requests that the Court enter a claim construction order consistent with the definitions provided by Linex and the ordinary meaning of the terms found in the '377 and '503 patents.

Respectfully submitted,

Dated:   May 13, 2008                     /s/ Julie Braman Kane
                                          Julie Braman Kane
                                          Florida Bar No. 980277
                                          **COLSON HICKS EIDSON**
                                          255 Aragon Avenue, 2nd Floor
                                          Coral Gables, FL  33134-5008
                                          Tel:  (305) 476-7400
                                          Fax:  (305) 476-7444
                                          Email: Julie@colson.com


                                          Edward W. Goldstein
                                          Corby R. Vowell
                                          **GOLDSTEIN, FAUCETT & PREBEG, LLP**
                                          1177 West Loop South, Suite 400
                                          Houston, TX  77027
                                          Tel:  (713) 877-1515
                                          Fax:  (713) 877-1737
                                          Email: egoldstein@gfiplaw.com
                                          Email: cvowell@gfiplaw.com

                                          **ATTORNEYS FOR
                                          LINEX TECHNOLOGIES, INC.**

*CASE NO. 05-80300-CIV-MARRA/JOHNSON*

## CERTIFICATE OF SERVICE

I hereby certify that on this 13TH day of May 2008, the foregoing document was electronically filed with the Clerk of the Court via CM/ECF. I also certify that the foregoing document is being served on this day on all counsel of record via transmission of automatic Notices of Electronic Filing generated by CM/ECF, or some other authorized for those counsel or parties who are not authorized to receive automatic Notices of Electronic Filing generated by CM/ECF.

s/ Julie Braman Kane<br>
Julie Braman Kane

*CASE NO. 05-80300-CIV-MARRA/JOHNSON*

## SERVICE LIST

| | |
|---|---|
| COUNSEL FOR:<br>NORTEL NETWORKS, INC.<br><br>Marissa D. Kelley, Esq.<br>mkelley@swmwas.com<br>Fla. Bar No. 379300<br>**Stearns, Weaver, Miller, Weissler,**<br>**Alhadeff & Sitterson, L.L.P.**<br>200 E. Broward Boulevard, Suite 1900<br>Fort Lauderdale, Florida 33301-1949<br>Tel: (954) 462-9500<br>Fax: (954) 462-9567<br><br>Mark M. Supko, Esq.<br>msupko@crowell.com<br>Michael H. Jacobs, Esq.<br>mjacobs@crowell.com<br>**Crowell & Moring, L.L.P.**<br>1001 Pennsylvania Avenue, N.W.<br>Washington, DC 20004-2595<br>Tel. (202) 624-2500<br>Fax (202) 628-5116<br><br>COUNSEL FOR:<br>TROPOS NETWORKS, INC.<br><br>James A. Gale, Esq.<br>jgale@feldmangale.com<br>Fla. Bar No. 371726<br>Gregory L. Hillyer, Esq.<br>ghillyer@feldmangale.com<br>Fla. Bar No. 682489<br>**Feldman Gale, P.A.**<br>Miami Center, Suite 1920<br>201 South Biscayne Blvd.<br>Miami, FL 33131-4332<br>Tel: (305) 358-5001<br>Fax: (305) 358-3309 | COUNSEL FOR:<br>STRIX SYSTEMS, INC.<br><br>Ramsey M. Al-Salem, Esq.<br>ralsalam@perkinscoie.com<br>Jessica L. Rossman, Esq.<br>jrossman@perkinscoie.com<br>**Perkins Coie, L.L.P.**<br>1201 Third Avenue, Suite 4800<br>Seattle, WA 98101-3099<br>Tel. (206) 359-8000<br>Fax (206) 359-9000<br><br>Charles H. Lichtman, Esq.<br>clichtman@bergersingerman.com<br>Fla. Bar No. 501050<br>**Berger Singerman**<br>Las Olas Centre II<br>350 E. Las Olas Boulevard, Suite 1000<br>Fort Lauderdale, Florida 33301<br>Tel: (954) 627-9913<br>Fax: (954) 523-2872 |